**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| RONALD E. COGGINS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br>CAMBER ENERGY, INC., JAMES A. DORIS, and FRANK W. BARKER, JR.,<br><br>Defendants. | Case No. 4:21-cv-03574<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED CLASS ACTION COMPLAINT** |

Lead Plaintiffs George C. Smith, Jr., Robert Laurent, and Ajmal Hussain (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Complaint (the "Complaint") against Defendants Camber Energy, Inc., James Doris, Discover Growth Fund, LLC, Discover Fund Management LLLP, and John C. Kirkland (collectively, "Defendants"), alleges the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, the investigation conducted by and through his attorneys, including, among other things, a review of Defendants' public statements and filings made with the U.S. Securities and Exchange Commission (the "SEC"), wire and press releases either issued by or regarding Camber Energy ("Camber" or the "Company"), analysts' reports, and information obtained from interviews with knowledgeable former employees of the Company. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities class action brought on behalf of all persons who purchased the securities of Camber Energy, Inc., between July 13, 2021, and October 4, 2021, both dates inclusive ("Class Period"), and who held such shares through close of trading on October 4, 2021. Excluded from the Class are (i) Defendants, (ii) officers, directors, and employees of Camber, Viking Energy, Inc., Discover, or Discover Fund Management, LLLP; (iii) the family members, heirs, assigns, and legal representatives of

all persons set out in (i) and (ii); and (iv) all entities controlled by the persons set out in (i)-(ii).

2. Without knowing how many of a company's shares are outstanding, investors literally do not know what they own. For this reason, the SEC mandates that issuers disclose the number of their shares that are outstanding and inform investors whenever that number materially changes. During the Class Period, Defendants conspired to conceal from investors that because Discover's stock sales increased the number of Camber shares outstanding from 100 million to 250 million, investors' ownership in Camber had secretly been diluted. Defendants made high eight-figure or nine-figure profits from these sales. But when an analyst reported that Camber had understated the number of its shares that were outstanding, its stock price fell from $3.09/share to $0.90/share, damaging investors.

3. A share is a fractional interest in a company. An investor's ownership in a company is a function of the number of shares owned divided by the number of shares outstanding. For that reason, the value of an investment cannot be ascertained unless the investor is informed of how many shares are outstanding.

4. The SEC mandates disclosure of the number of shares outstanding in all quarterly and annual financial statements. In addition, if the number of issuer shares outstanding increases by more than 5% during any period between the issuer's filing of its financial statements, including through the conversion of securities into common stock, the issuer must file a Form 8-K announcing the dilution.

5. In February 2020, Camber announced it was pursuing a reverse merger with Viking Energy, Inc. ("Viking"). While Camber was the surviving entity, the reverse merger would leave Viking shareholders with a substantial majority of its shares.

6. From the time of the announcement, Camber's executives *de facto* relinquished control to Viking's CEO, Defendant Doris.

7. Doris's interests were not aligned with Camber investors. Doris did not hold any Camber shares, but he held Viking securities that could be converted into more than a billion Viking shares. That was more than enough to hold the majority of Camber shares after the reverse merger. Thus, dilution had far less impact on Doris than it had on Camber shareholders themselves.

8. Like Doris, Discover was shielded by the structure of its investments from feeling the brunt of the dilution that gutted Camber shareholders. Discover held convertible preferred shares that converted into a fixed dollar value of shares. Thus, Discover was partially hedged against any decrease in Camber's stock price – if Camber shares went lower, it would receive more shares upon conversion.

9. Taking advantage of these structural protections, Defendants hatched a profitable scheme. Discover bought dilutive shares from Camber. Camber transferred the money to Viking by purchasing Viking stock. These transfers did not bring meaningful value to Camber itself, because Doris's billion-share stake in Viking ensured that he would continue to own a substantial majority of Viking's shares, and upon the reverse merger, of Camber itself. Discover sold the common shares and recycled some of the proceeds into buying more Camber convertible securities.

10. In total, Camber took on $29 million in funding from Discover in 2020, almost all of which it immediately transferred to Viking in economically meaningless purchases of Viking shares or through loans to Viking that were soon forgiven.

11. By September 2020, Camber had literally run out of authorized shares to issue Discover. It needed its shareholders to vote to authorize an increase in its maximum issuable shares from 25 million to 250 million. The shareholders approved the authorization in February 2021.

12. By February 2021, Discover held thousands of dilutive convertible Camber securities, each of which could be converted into tens of thousands of Camber common shares. Discover had planned to convert its convertible securities into hundreds of millions of common shares and then sell them for nine-figure profits.

13. Discover was able to effect some conversions and sales before June 2021. But on May 21, 2021, Camber became delinquent on its SEC filings, a delinquency it has not remedied to the date of this filing.

14. The common shares Discover obtained upon conversion were not registered. They could only be sold lawfully under an exemption from the registration requirements. While Discover purported to rely on a provision set out in SEC Rule 144, that provision is not available if the issuer is delinquent in its SEC filings. Thus, Discover could not legally sell any Camber common stock it obtained upon conversion after May 21, 2021, when Camber became delinquent.

15. Defendants thereafter conspired to allow Discover to continue to convert and sell Camber securities, while at the same time hiding information about those sales and the resulting dilution from the investing public.

16. Before the Class Period, Defendants had kept investors regularly apprised of increases in the number of Camber's shares outstanding, as they were required to do. On July 12, 2021, Camber disclosed that about 104 million of its shares were issued and outstanding.

17. During the Class Period, Discover's continued conversions and sales caused the number of shares outstanding to increase to 250 million, which Camber was required to, but did not, disclose. Thus, although the published information indicated that a purchase of 1,000 shares of Camber represented approximately 1/100,000th of the Company, it really only represented 1/250,000th of the Company. Investors' fractional interest in Camber was only 40% of what Defendants' omissions misleadingly suggested. ***140.1 million*** of these shares were issued to Discover.

18. Defendants knew what they were doing. Until July 2021, Camber disclosed when its share count increased. And Camber only stopped revealing increases in the number of its shares outstanding shortly after it became illegal for Discover to sell its converted shares. Defendants' misconduct thus was designed to, and did, conceal Discover's illegal sales.

19. Doris and Discover reaped massive profits. Discover made nine-figure profits from illegally selling converted Camber shares. In 2021, Discover and an affiliated

fund provided or contracted to provide Camber with $143.5 million in new funding despite Camber having no significant operations.

20. But unsuspecting investors paid the price. On October 5, 2021, an analyst released a report revealing that Camber's fully-diluted capital stock likely exceeded 250 million shares. On October 6, 2021, Camber revealed that it had 249.6 million shares issued and outstanding.

21. Camber's stock price fell 70.6% between its closing on October 4, 2021, and its closing on October 6, 2021, a plain result of the disclosure of the previously-concealed fraud.

## II. JURISDICTION

22. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district. Further, Camber's primary place of business is in this District.

25. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES

26. Plaintiffs George C. Smith, Jr., Robert Laurent, and Ajmal Hussain purchased Camber common stock at artificially inflated prices during the Class Period, as set forth in their previously-filed certifications, and were damaged thereby.

27. Defendant Camber Energy, Inc. is a small oil and gas company based in Houston, Texas. Camber is a public company whose stock is publicly traded on the NYSE American Stock Exchange under the ticker symbol CEI. By 2020, it had substantially halted its activities except that it continued to pay exorbitant amounts to the independent contractors who conducted its managerial and administrative activities. In February 2020, it entered into an agreement to consummate a reverse merger with Viking, in which Camber would acquire Viking in exchange for a substantial majority of Camber's shares. The reverse merger has not closed as of the date this Complaint is filed. During the Class Period, Camber's value was driven by its potential reverse merger with and purported investment in Viking.

28. Defendant James Doris ("Doris") has served as Viking's CEO since 2014 and also Camber's CEO since December 2020, thus simultaneously controlling both companies from before the Class Period through the present. Doris has over 25 years of experience negotiating national and international business transactions. Doris has a Canadian law degree and worked as a lawyer for over 16 years, including in Mergers and Acquisitions, Corporate Finance, and Corporate Governance. Doris has never owned any

Camber shares but through convertible securities owned more than 95% of Viking's shares during the Class Period. Doris signed a February 2021 reverse merger agreement between Viking and Camber, as well as multiple eight-figure transactions between the two, on behalf of ***both*** Viking ***and*** Camber.

29. Camber and Doris are the "Camber Defendants."

30. Based in St. Thomas, V.I., Defendant Discover Growth Fund, LLC ("Discover") is a fund managed and wholly owned by Defendant Discover Fund Management LLLP ("DFM LLLP"). Discover provides financing to microcap and nanocap public companies, usually in exchange for securities that can be converted into a fixed dollar amount of common shares.

31. Defendant DFM LLLP is Discover's fund manager.

32. Defendant John C. Kirkland ("Kirkland") is the sole member of Discover and the general partner of DFM LLLP. Kirkland described himself in a declaration under penalty of perjury thus:

> I received a B.A. from Columbia University in 1986, and a J.D. from UCLA School of Law in 1990. I was duly admitted to practice before all courts of the state of California from 1990 until becoming voluntarily inactive in 2016. I began my legal career as an associate at Cadwalader, Wickersham & Taft, and was a full equity partner at Greenberg Traurig, and later at Luce Forward Hamilton & Scripps, which subsequently merged into Dentons. I am the author of "Practical Approaches to Securities Compliance Issues," SEC Compliance Best Practices (Thomson Reuters 2010 ed.), and various articles on legal and business topics. I have represented leading investment banks, private equity firms, and public companies as a practicing securities attorney for more than 20 years. I have handled billions of dollars in public offerings and private placements of debt and equity securities. I was also a corporate litigator, trying multiple cases to verdict in state and federal courts. I was frequently listed as a Southern California Super Lawyer in both business and

litigation, and have been quoted in publications such as The New York Times, The Washington Post, and The Wall Street Journal.

33. In 2012, Kirkland was sued for engaging in the following misconduct while holding himself out as a company's General Outside Counsel: falsely telling *The New York Times*, *The Washington Post*, and *The Wall Street Journal* that the company had reached an agreement with a large defense contractor to bid on a $35 billion defense contract, which news he fabricated, the apparent reference of his boast that he was quoted in these publications; obtaining majority control of the company's board by falsely claiming that he was a majority shareholder; issuing himself and his co-conspirators 88% of the issuer's shares by purchasing a company bearing the same name as a foreign defense contractor but which was actually held by Kirkland and the co-conspirators; issuing himself 15 million of the company's shares through a fraudulent undisclosed related-party transaction; and purporting to cause the company to issue a blanket release for his misconduct – a release a U.S. District Court found was not authorized and was a breach of fiduciary duty. During that litigation, Kirkland: filed an anti-SLAPP motion that both the District Court and Ninth Circuit Court of Appeals deemed frivolous, ordering him to pay more than $200,000; engaged in discovery misconduct so serious that the District Court entered default against him; and filed a fraudulent bankruptcy petition in which he suborned perjury and submitted fraudulent documents. During the pendency of that lawsuit, Kirkland abandoned his law license and left California for the Virgin Islands.

34. Discover, DFM LLLP, and Kirkland are the "Discover Defendants".

35. At all relevant times, Kirkland also controlled an entity named Antilles Family Office, LLC. Discover and nonparty Antilles share a Treasurer (nonparty Sheniqua Rouse-Pierre), and Kirkland holds voting control over both Discover's and Antilles' shares. John Kirkland verified a complaint that Antilles filed. *Antilles Family Office, LLC, v. Inception Mining, Inc.*, 21-cv-1822-CFC, Dkt. #1, at 16 (D. Del. Dec. 27, 2021). Antilles paid the attorneys' fees in the bankruptcy referenced in ¶33. Since July 2018, nonparty John Burke has conducted both Discover and Antilles's securities trading. *Discover Growth Fund v. Camber Energy, Inc.*, 22-cv-755, dkt. # 17-3, ¶4 (S.D. Tex. 2022).

## IV. BACKGROUND

### A. Issuers Must Disclose When the Number of Shares Outstanding Increases

36. There is no issue more fundamental to an investor interested in buying shares in a company than the number of shares there are outstanding.

37. The total number of shares an investor owns in the abstract means nothing unless the investor knows how many shares are outstanding. That is because investors cannot determine the value of their shares unless they know the issuer's total number of shares. Earnings of $10 million look completely different if an issuer has 1 million shares outstanding than if the issuer has 100 million shares outstanding.

38. Thus, the SEC requires that issuers disclose the number of shares outstanding on the cover pages of all registration statements, annual reports, and quarterly reports.

39. Form 8-K mandates prompt disclosure of sales of unregistered securities. The instructions to Form 8-K provide

> ***(a) If the registrant sells equity securities in a transaction that is not registered under the Securities Act, furnish the information set forth in paragraphs (a) and (c) through (e) of Item 701 of Regulation S-K (17 CFR 229.701(a) and (c) through (e).*** For purposes of determining the required filing date for the Form 8-K under this Item 3.02(a), the registrant has no obligation to disclose information under this Item 3.02 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the equity securities are to be sold. If there is no such agreement, the registrant must provide the disclosure ***within four business days*** after the occurrence of the closing or settlement of the transaction or arrangement under which the equity securities are to be sold.

40. The purpose of disclosure is to ensure investors understand exactly what securities they are holding, as "unregistered sales of equity securities can have a significant effect on the capital structure of the company and the security holdings of existing investors." *Additional Form 8-K Disclosure Requirements & Acceleration of Filing Date*, Release No. 8400 (Mar. 16, 2004), 2004 WL 536851, at *19.

41. The SEC has ordered after notice-and-comment rulemaking that the conversion of convertible securities into common stock is a sale of unregistered securities that must be disclosed using Form 8-K:

> Commenters suggested that issuances of unreported equity securities through conversion and similar transactions should not require an Item 8-K filing. ***We believe that, given the 1% and 5% thresholds[1] we have adopted and the importance of equity security issuances, these types of transactions should be covered***.

*Id.* at *20.

[1] Both figures are percentages of outstanding shares. 1% applies to standard issuers; 5% applies to what was then called small business issuers and are now called smaller reporting companies.

42. Thus, Camber was required to disclose on Forms 8-K Discover's conversion of its convertible securities into common shares whenever the conversions caused Camber's outstanding stock to increase by 5% or more.

**B. Camber First Takes on Convertible Financing**

43. Camber is a tiny operator in the oil and gas business. Camber's future briefly looked hopeful in the early 2010's. As oil prices soared, so did Camber's revenues – from less than $2 million in the year ended March 31, 2010, to $8.2 million in the year ended March 31, 2013.

44. But, as the price of oil collapsed in 2014-2015, so did Camber's fortunes. In the year ended March 31, 2016, Camber lost $25.5 million on revenues of $1.0 million.

45. Its fortunes dwindling, and needing financing, Camber turned to Discover. Discover offers financing to companies in exchange for fixed price convertible securities.

46. Convertible securities are bonds or preferred stock that can be converted into common stock.

47. Typically, convertible securities convert into a fixed number of common shares. Investors who purchase fixed number convertible securities can benefit from an appreciation in the company's stock price.

48. But some convertible securities – the kind that Discover purchases – can be converted into a fixed dollar value of common shares.

49. At scale, fixed price convertible securities are dangerous. Holders of such securities generally monetize them by converting into common shares and selling the common shares. But the large-scale increases the number of common shares outstanding

which, when disclosed, causes the company's stock price to fall. Because the conversion remains for a fixed dollar-value worth of shares, a lower share price necessarily results in the issuance of a greater quantity of shares and an even greater downward pressure upon disclosure of sales by the converting party.

50. In April 2016, Discover bought 527 shares of Camber's Series C Preferred Convertible Shares ("Camber Convertible Securities") for $5.26 million. Discover's purchase marked the first time Camber sold its Camber Convertible Securities.

51. Several of the Camber Convertible Securities' terms created the potential for dilution:

a. Discover was entitled to 6.0% annual dividends based on the face value of the preferred share, a rate that was reasonable on its face. Certificate of Designation of Camber Convertible Security, I. C.1.[2] However, the dividend rate increased if Camber's stock price fell below a certain level. *Id.* at I.F.3.b. Specifically, the rate increased by 1% for every $0.10 below $2.75. *Id.* at I. G.7.a., l., n., o. The maximum rate was 24.95%, which would be reached if Camber's stock traded for less than $0.85.

b. The Series C preferred stock had a 7-year term. Once Discover exercised its conversion rights, regardless of when, all dividends that would have accrued over the entire 7-year period became immediately due and owed. Thus, if Discover converted a Series C share with a face value of $10,000 the day it was acquired, Discover would immediately be entitled to $17,465 in share dividends in addition to its $10,000 principal.

c. The dollar value of the dividend was converted into common shares, but not at the actual price. The price of the common share used for conversion began with the average for the 5 days with the lowest trading value in the period between the 30 trading days before the exercise and 30 days after the exercise ("Measurement Period"). *Id.* at I.G.7.i. Thus, if Camber's stock traded at abnormally low prices at any point during the Measurement Period, Discover would receive proportionately more shares.

[2] Available at https://www.sec.gov/Archives/edgar/data/1309082/000158069516000313/ex3-1.htm.

d. Trading days on which Camber's stock price traded below $1.5 did not count towards the Measurement Period. *Id.* at I.G.7.h. Thus, if Camber's stock price continued to trade below $1.5, the Measurement Period would extend indefinitely, allowing Discover to benefit from subsequent decreases in Camber's stock price.

e. To reach the actual exercise price, Discover received a flat $0.05 discount from the average of the five lowest trading days during the Measurement Period. Id. at I.C.2. As Camber's stock price fell lower and lower, the value of Discover's discount increased. At $0.45, the flat $0.05 discount was a 10% discount.

### C. Camber's Then-Executives Exhaust Its Ability to Serve as Their Personal Piggybank

52. With the overhang from Discover's Camber Convertible Securities, Camber could not secure any other funding. Thus, Camber kept itself afloat by periodically selling more Camber Convertible Securities to Discover.

53. In October 2017, Camber entered into an agreement to sell Discover up to 1,684 Camber Convertible Securities for $16 million. Then, in November 2018, Camber entered into an agreement to sell Discover up to 2,941 Camber Convertible Securities for up to $28 million.

54. Pursuant to these agreements, from March 31, 2017 through February 2, 2020 Camber sold Discover a total of 2,315 Camber Convertible Securities for $22 million.

55. Discover then converted the additional Camber Convertible Securities and resold the resulting shares for substantial profits.

56. But Camber's business never took off even with the proceeds from selling Camber Convertible Securities. From the years ended March 31, 2017 through 2020, Camber's revenues and even its operating costs dwindle to almost nothing, but its expenses

for managerial and administrative functions did not. By 2020, Camber's sole important expenditure was paying fees to the independent contractors who administered Camber and served as its executives:

*Year ended March 31*

| | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Revenues | $5.3 million | $6.9 million | $2.7 million | $0.4 million |
| Cash operating expenses other than general and administrative | $3.5 million | $5.2 million | $3.0 million | $0.5 million |
| General and administrative expenses | $5.0 million | $7.2 million | $5.2 million | $4.9 million |
| Compensation to executives, directors, and their related parties | $1,029,334 | $565,038 | $1,518,452 | $979,452 |

**D. Viking Digs Itself into a Hole**

57. Viking took its current form in December 2014. Defendant Doris was looking for a public company to use to launch a business. Viking was a shell company with no assets, no revenues, and no prospects – nothing, in fact, except a public listing on the OTC bulletin board.

58. Beginning in 2016, Doris pivoted Viking to exploring, acquiring, and developing oil and natural gas properties.

59. Doris was an unlikely oil and gas company founder. He had no experience in oil and gas. He decided to enter the field because, as the price of oil had fallen, he thought he might be able to buy some wells on the cheap.

60. Enthusiasm proved no substitute for experience. By December 31, 2019, as set out in its 2019 10-K, Viking had annual revenues of $34.6 million, a net loss of $19.4 million, and owed more than $104 million in debt.

61. And Viking seemed to be on death's door. Viking's 2019 10-K admitted that there was substantial doubt about its ability to continue as a going concern, mainly because it had $22 million in debt maturing in 2020 and no cash to pay it off. Viking's obligations included a $13 million note due in August 2020, as well as other obligations requiring principal payments of approximately $8.5 million in 2020.

62. Viking was taking Doris down with it. To fund its operations, Viking relied in part on funds advanced from and loans made by Doris. By December 31, 2018, Viking owed Doris $395,555. Were Viking to file for bankruptcy, Doris might never recover the funds he had lent.

## E. Viking and Camber Attempt to Consummate a Reverse Merger

### 1. Viking and Camber Announce a Proposed Reverse Merger

63. On February 3, 2020, Camber announced that it had entered into an agreement for a reverse share-for-share merger with Viking.

64. The surviving entity would be Camber. Camber would acquire substantially all of Viking's assets in exchange for Camber shares. Thus, Camber shareholders would keep their shares, while Viking shareholders were issued new Camber shares in proportion to their holdings of Viking shares. But the reverse merger provided that no matter how many Camber shares were outstanding before the merger, Viking's shareholders would hold 80% of the post-merger entity's shares, and Camber 20%.

65. As part of the reverse merger, Viking's management would replace Camber's. Thus, Doris would control the merged company.

66. Despite being fiduciaries, Camber's executives had little financial interest in the Company. According to Camber's 10-K for the year ended March 31, 2020, Camber's executives collectively held 7 Camber shares. They negotiated cash-only compensation agreements, so they were not personally exposed to declines in Camber's stock price. In August 2020, Camber's Board of Directors voted to provide each director and executive $150,000 which would be paid upon the completion of a reverse merger with Viking. Thus, Camber executives and directors were financially aligned with Viking's interests, and not the fiduciary obligations they owed to Camber's shareholders.

**2. Doris Awards Himself a Billion Viking Shares for No Consideration**

67. Doris and Discover's incentives were also aligned with each other, but not with the incentives of Camber shareholders. Doris holds three types of securities in Viking Energy. First, Doris holds 222,223 common shares outright. Second, Doris owns 1,666,667 warrants, each to purchase one share.[3] The exercise price was $0.30/share until December 21, 2020, when Viking reduced it to the nominal sum of $0.001 for no consideration. Because Doris thereafter could exercise all 1,666,667 warrants for virtually nothing, he effectively owned 1,888,890 shares. Thus, on the surface, Doris only held 2.8% of Viking's approximately 66.5 million shares.

[3] Unless otherwise noted, references to Viking shares are to as-converted shares after a December 31, 2020 1:9 reverse stock split.

68. The substantial majority of Doris's voting interest in Viking consists of 28,096 Viking Series C preferred shares ("Viking Convertible Shares"). While the precise number of votes Doris controlled fluctuated, it was always enough to give him majority voting control over Viking at all times relevant hereto.

69. Until August 2020, Doris's voting control was not coupled with a significant economic interest. According to Viking's 2019 10-K, at the time, each Viking Convertible Shares was convertible into just one common share. Thus, Doris's Viking Convertible Shares offered him little economic interest in Viking.

70. That all changed in September 2020. Buried at the bottom of a Form 8-K filed September 3, 2020, Viking announced that the Viking Convertible Shares had been amended such that each share would not only entitle the holder to votes equivalent to 4,900 common shares but could also be converted into 4,900 common shares, giving Doris a majority economic as well as voting interest in Viking.

71. After a December 2020 amendment, Viking Convertible Shares each held the votes of and were convertible into ***37,500*** common shares. In total, Doris's Viking Convertible Shares were convertible into approximately 1.05 billion Viking common shares.

72. Doris paid no consideration for this amendment, the purpose of which was to serve Doris's personal financial interests. The amendment was disclosed in Viking's filings five days after Camber announced the merger. The amendment was never disclosed by Camber.

73. A December 31, 2020, 1:9 reverse stock split then reduced the total number of Viking shares outstanding to 51.6 million.

74. The reverse stock split was disclosed in Viking's SEC filings, but not in Camber's. It applied to shares outstanding, but not shares issuable upon Doris's conversion of Viking Convertible Shares into Viking common shares.

75. Doris's billion shares would account for more than 95% of Viking's equity.

76. Because Doris did not own any Camber shares but effectively owned the overwhelming majority of Viking shares, Doris suffered a limited financial penalty from dilution of Camber's shareholders. Likewise, Discover received more shares if Camber's stock price fell so it was partially hedged against dilution.

### 3. Defendants Enter an Arrangement That Serves Their Interests at the Expense of Camber Shareholders

77. The planned reverse merger kicked the relationship between Camber and Viking into overdrive.

78. The Camber Defendants and the Discover Defendants arrived at a solution that served both their interests. First, Doris would cause Camber to take on dilutive funding from Discover in which Discover provided Camber cash in exchange for Camber Convertible Securities. Second, Camber would transfer the money to Viking. Third, Discover would convert its Camber Convertible Securities into common stock and sell those securities. Fourth, Discover would recycle some of its sales proceeds into further funding Camber, thereby restarting the cycle:




Legend

| | |
|---|---|
| **1.a** | Sale of Camber Convertible Securities to Discover |
| **1.b** | Transfer of sales proceeds to Viking |
| **2.a** | Conversion of Camber Convertible Securities and sale of common stock on open market causing significant dilution |
| **2.b** | Proceeds of stock sales to Discover |
| **3.a** | Discover retained profits |
| **3.b** | Profits recycled back into purchases of more Camber Convertible Securities |
| **4** | Disclosure of dilution causes Camber's stock price to fall |

79. On February 3, 2020, Camber sold Discover 525 shares of Camber Convertible Securities for $5 million. Camber lent Viking the $5 million that same day. The loan left Camber with less than $1 million in cash.

80. On June 22, 2020, Camber sold 630 shares of Camber Convertible Securities to Discover for $6 million. On June 25, Camber lent Viking $4.2 million. On June 26, Viking used $4 million to pay off a loan maturing on June 30.

### 4. Doris Pours Camber's Money into Viking

81. The reverse merger planned between Viking and Camber involved the issuance of a controlling stake in Camber shares to Viking. Thus, to complete the reverse merger, Viking and Camber were required to complete a Registration Statement on Form S-4. A draft of the Registration Statement was filed on September 4, 2020, for the SEC's review.

82. In reviewing the Registration Statement, the SEC determined that Camber's accounting for Camber Convertible Securities had been false and in violation of Generally Accepted Accounting Practices.

83. The SEC's determination required Camber to restate its financial statements. Unless and until Camber restated the financial statements, the SEC would not approve the S-4, and the reverse merger would not be completed. Camber never produced these financial statements, so the merger never closed.

84. On December 11, 2020, Discover exchanged 600 shares of Camber Convertible Securities with a $6 million face value for a $6 million promissory note with an interest rate of 10%. The note's terms required Camber to complete its reverse merger with Viking by March 11, 2022.

85. On December 23, 2020, Camber borrowed $12 million more from Discover to facilitate a transaction between itself and the Doris-controlled Viking.

86. On December 24, 2020, Camber and Viking disclosed that the day before, they had entered into an initial transaction that would secure Doris control of both companies, without the restatement required to complete the reverse merger. In this

transaction, Camber acquired 26.3 million Viking shares, giving it what the parties described as a 51% interest. Camber paid $20.1 million, consisting of $10.9 million in cash (from Discover's loan) and cancellation of $9.2 million in debt that Viking owed to Camber.

87. Defendants always referred to Camber's investment into Viking without adjusting for the overwhelming dilution from Doris's Viking Convertible Securities.

88. In truth, when Doris converted his Viking Convertible Shares, Camber would only own 18.4% of Viking's shares, not 51%, while Doris would own more than two thirds.

89. After the reverse stock split, Doris effectively owned and controlled more than 95% of Viking's stock through his Viking Convertible Shares.

90. The Camber purchase of a majority stake in Viking likewise served Doris's financial interests. Camber's money rescued Viking from an impending default. As described in Viking's Q3 2020 10-Q, as of September 30, 2020, Viking owed: (a) notes with a $6.4 million face value due in December 2020; (b) a revolving credit facility with a $6.8 million balance due May 2021; (c) a $15.6 million note payable due June 2021; and (d) a term loan with a face value of approximately $34.3 million.

91. Amidst the flurry of filings, Camber also announced that Viking senior management had already replaced Camber senior management. As a result, Doris became Camber's CEO and also continued to serve as Viking's CEO, and Viking's CFO, Frank Barker ("Barker"), took over as CFO of Camber.

92. The premature takeover of Camber's C-suite created an inextricable conflict of interest. Although the two companies were supposed to be independent, and were

continuing to negotiate a reverse merger agreement, the same senior executives controlled both. The conflict was all the more important because though Doris effectively owned and controlled approximately 95% of Viking's shares by the end of 2020, he did not own any Camber shares. The dual roles gave Doris an incentive to benefit Viking at Camber's expense.

93. Camber's Board had five directors. Doris and Barker each held a seat. Two others had a financial interest because they had awarded themselves a $150,000 payment contingent on closing the reverse merger. Thus, four directors had an incentive to rubberstamp Doris's actions.

94. On January 8, 2021, Doris again caused Camber to place Viking's interests above its own. That day, Camber entered into a Securities Purchase Agreement with Viking ("January 2021 SPA"). Pursuant to the January 2021 SPA, Camber offered its own securities to a Viking creditor in exchange for forgiving Viking's debt:

a. The creditor, EMC Capital Partners, LLC, forgave a promissory note issued by Viking to EMC with a face value of $20.9 million face value, along with all accrued interest and any other rights thereon.

b. Camber issued EMC 1,890 of its Camber Convertible Securities;

c. Viking paid EMC $325,000; and

d. Viking issued 16.2 million of its shares to Camber.

95. On February 15, 2021, Camber and Viking entered into a restructured reverse merger agreement ("2021 Reverse Merger Agreement").

96. The 2021 Reverse Merger Agreement no longer limited Viking to 80% of post-merger Camber's stock. Instead, it provided that each Viking share would be converted into one Camber share. This provision ensured that Doris's ownership of Camber after the reverse merger would not be limited to 80%.

97. On April 23, 2021, Camber borrowed another $2.5 million from Discover.

98. On July 9, 2021, Camber sold Discover-affiliate Antilles 1,575 Camber Convertible Securities for $15 million. Then, on July 29, 2021, Camber Energy bought 27.5 million Viking common shares directly from Viking for $11 million.

### F. Camber's Failure to Timely File Quarterly and Annual Reports Threatens the Scheme

#### 1. Camber Frees Up Shares for Discover to Sell Only to Quickly Become Delinquent in Its SEC Filings

99. By September 30, 2020, Discover had accumulated 2,693 Camber Convertible Securities.

100. But by September 2020, Camber already had 25 million common shares issued and outstanding, the maximum then authorized.

101. Accordingly, to convert more of Discover's Camber Convertible Securities and sell the resulting common shares, the Discover Defendants needed Camber to increase its maximum authorized shares. Camber shareholders had to authorize the increase at a meeting after notice.

102. On February 23, 2021, Camber's shareholders accepted its recommendation to increase the number of authorized shares from 25 million to 250 million.

103. As part of the reverse merger, Camber changed its fiscal year to a calendar year. Camber's 10-KT for the nine-month transition period ending December 31, 2020 ("2020 10-K"), was due on May 20, 2021.[4]

104. Camber has yet to file its 2020 10-KT or indeed financial statements for any period after the quarter ended September 30, 2020.

### 2. Camber's Delinquency Halts Discover's Plan

105. Investors like Discover who fund convertible securities transactions always face one problem: how to sell the common shares obtained through conversion without running afoul of SEC regulations.

106. The Securities Act of 1933 ("Securities Act") generally prohibits the sale of unregistered securities. 15 U.S.C. § 77e. The Securities Act exempts third parties that are neither a broker nor an underwriter, 15 U.S.C. §77(d)(a)(1), but also broadly defines an underwriter to include "any person who has purchased from an issuer with a view to [] the distribution of any security." 15 U.S.C. § 77b.

107. Distribution of the underlying securities, however, is Discover's business model. As Discover principal Kirkland explained in a declaration under penalty of perjury in an adversary proceeding styled *Immune Pharmaceuticals, Inc. v. Discover Growth Fund, LLC*, A.P. 19-02033 (VFP), dkt. # 22-2 (Bankr. D.N.J. 2020):

[4] 17 C.F.R. 240.15d-10(b) and (j), read together, provide that a transition report is due on the later of 90 days after the close of the end of the transition period or the determination to change the fiscal year. Camber Energy changed its fiscal year on February 4, 2021, 90 days from which is May 5, 2021. On May 6, 2021, Camber sought an automatic 15-day extension of its time to file, extending the due date to May 20, 2021. Thus, Camber's filings were delinquent beginning May 21, 2021.

> Discover was a lender, and not a long term investor having upside potential. The 2015 Transaction with Discover Cayman involved convertible preferred stock, which we had immediately converted up to the maximum 4.99% common stock ownership, sold those shares as quickly as reasonably possible without causing undue harm to the stock price, then immediately converted again back up to the 4.99% limit. We methodically continued these prompt seriatim conversions until all of the preferred stock was converted, and thereby eliminated, leaving Discover with no upside potential. Even that transaction, which was a straight equity purchase, was not a long term investment with significant upside potential.

*Id.* ¶10.

108. Accordingly, it was critical that Discover either ensure that the underlying Camber common shares to be issued upon conversion were registered or qualified under an exemption from registration.

109. Discover's business exists because of an exemption in Rule 144 allowing the resale of converted common shares if the seller has held the convertible shares for at least six months. 17 C.F.R. §230.144. To take advantage of the exemption, shareholders who are not affiliated with the issuer need only meet one additional condition: the issuer must have filed all required reports under Section 13 of the Exchange Act. 17 C.F.R. §230.144(c)(1)(i).

110. Section 13 of the Exchange Act mandates (among other things) that companies file periodic reports including financial statements and that the SEC establish the form of such reports. 15 U.S.C. §78m(a)-(b).

111. The SEC has exercised this authority to require domestic issuers like Camber to file quarterly and annual financial statements on Forms 10-Q and 10-K, respectively. 17 C.F.R. §210-3-01(a); 17 C.F.R. §210-3-02(b).

112. The SEC recognizes that "quarterly reporting is an integral part of the resale safe harbors provided for in Rule 144 and Rule 144A that contemplate the provision of ongoing and continuous information." *Amends. for Small & Additional Issues Exemptions Under the Sec. Act (Regul. a)*, Release No. 2501 at *80 (Mar. 25, 2015) available at 2015 WL 1788375.

113. Accordingly, the Discover Defendants could not legally sell the unregistered Camber shares Discover received upon converting Camber Convertible Securities unless Camber had filed all required annual and quarterly financial statements.

114. Discover has admitted these obligations applied to it. All of the securities purchase agreements through which Discover purchased Camber Convertible Securities provided:

> **Furnishing of Information.** For as long as Investor owns any Shares, ***Company will timely file all reports required to be filed by Company pursuant to the Exchange Act. As long as Investor owns any Shares, Company will prepare and make publicly available such information as is required for Investor to sell its Conversion Shares under Rule 144.*** Company further covenants that, as long as Investor owns any Shares, Company will take such further action as Investor may reasonably request, all to the extent required from time to time to enable Investor to sell its Conversion Shares without registration under the Act within the limitation of the exemptions provided by Rule 144.

115. Discover and Kirkland acknowledged understanding that if an issuer was not current on its periodic filings, Discover could not sell the common shares received upon conversion. On April 6, 2020, Discover sued a different issuer who had not timely filed its periodic reports. In its complaint, which Kirkland verified, Discover alleged:

> ***[Issuer's] failure to file its Annual Report and its filing of a Form 15 prevent Discover from converting its preferred stock into free trading***

> ***shares of common stock***, will cause [issuer's] stock to be delisted from the Principal Market, and are in direct violation of [issuer's] obligations under the SPA and RRA. ***As a result of [issuer's] filing the Form 15 and failure to keep its SEC filings current, the transfer agent will no longer issue common stock to Discover***. Once de-listed from the OTCQB market, the [issuer] stock could trade on the Pink Sheet market, but only if [issuer] filed current information for purposes of Rule 144, which it also failed to do. ***Because [issuer] has not filed the necessary reports with the SEC, or even the necessary Rule 144 current information with the Pink Sheet markets, Discover is unable to obtain free trading shares for resale on either OTCQB or Pink Sheets.*** The transfer agent designated under the SPA will not issue Discover common stock to be traded on the Pink Sheets.

*Discover Growth Fund, LLC v. OWC Pharmaceutical Research Corp.*, 20-cv-2857-AKH, Dkt. # 1 ¶10 (S.D.N.Y. 2020).

116. Discover and Antilles would later sue Camber for failing to timely file financial statements. *Discover Growth Fund, LLC v. Camber Energy, Inc.*, No. 22-cv-755 (S. D. Tex.). In their complaint, which Kirkland verified, Discover and Antilles alleged:

> Rule 144 under the Securities Act of 1933 provides a safe harbor that would allow plaintiffs to convert their preferred shares into common stock, and sell the common stock in the public market—provided that Camber has complied with its periodic reporting requirements under the Exchange Act. 17 CFR § 144(c). If Camber is not current in its filings, Plaintiffs are not able to rely on Rule 144 to sell their shares

*Id.* dkt. # 1 ¶18.

117. Both because it knew the historical financial statements were false and because beginning May 21, 2021, Camber's filings were not timely, the Discover Defendants knew that Discover could not legally sell any converted common shares. Nevertheless, they did.

## V. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT BY ENGAGING IN A SCHEME TO DEFRAUD INVESTORS

118. In order to get around the prohibition on trading unregistered shares under Rule 144 in the absence of current financial statements from Camber, Defendants conspired to permit the Discover Defendants to continue converting and selling Discover's Camber securities – but to conceal the transactions from investors:




Legend

| | |
|---|---|
| 1.a | Sale of Camber Convertible Securities to Discover |
| 1.b | Transfer of sales proceeds to Viking |
| 2.a | Conversion of Camber Convertible Securities and sale of common stock on open market causing significant dilution |
| 2.b | Proceeds of stock sales to Discover |
| 3.a | Discover retained profits |
| 3.b | Profits recycled back into purchases of more Camber Convertible Securities |
| 4 | No disclosure of dilution, preventing Camber's stock price from falling |

### A. Defendants Stop Disclosing Increases in the Number of Camber Shares Outstanding

119. The Camber Defendants recognized that Camber was obligated to file Forms 8-K to advise the market that the number of Camber shares outstanding had increased. Defendant Doris signed all of the 8-Ks:

a. On March 18, 2021, Camber filed a Form 8-K reporting that as of that day, approximately 35,395,139 shares were outstanding. Of the increase from 25,000,000 since the twenty-third of February, 9,705,045 (93.4%) resulted from one institutional investor converting its Camber Convertible Shares into common shares. Discover, though unnamed in the Form 8-K, was the investor.

b. On April 27, 2021, Camber filed a Form 8-K reporting that as of that day, there were approximately 42,050,780 shares outstanding. Camber acknowledged that the entire increase since March 18, 2021 resulted from institutional investor, again Discover, converting its Camber Convertible Shares into common shares.

c. On June 8, 2021, Camber filed a Form 8-K disclosing that as of that day, there were 58,455,304 million shares outstanding. Camber acknowledged that the entire increase since April 27, 2021 resulted from institutional investor, again Discover, converting its Camber Convertible Shares into common shares.

d. On July 12, 2021, Camber filed a Form 8-K acknowledging, among other things, that there were 104,195,295 shares issued and outstanding. Camber disclosed that the majority of new shares issued since February 2021, arose from conversions of Camber Convertible Securities, but unlike in previous notices, did not state that only one investor was converting shares:

> As of July 9, 2021, the Company had 104,195,295 shares of common stock issued and outstanding. The increase in our outstanding shares of common stock from the date of the Company's February 23, 2021 increase in authorized shares of common stock (from 25 million shares to 250 million shares), is primarily due to conversions of shares of Series C Preferred Stock of the Company into common stock, and conversion premiums due thereon, which are payable in shares of common stock.

120. These disclosures caused Camber's stock price to fall from $1.14 on March 18, 2021, to $0.59 on July 12, 2021.

121. Between February 23 and June 17, 2021, Camber issued 44.0 million shares to Discover.

**B. Under Cover of Camber's Silence, the Discover Defendants Continue to Sell Camber Securities in Violation of the SEC's Prohibition on the Sale of Unregistered Securities**

122. Despite the SEC's prohibition on the sale of unregistered securities, and Discover's failure to meet the Rule 144 exemption due the absence of updated financials, the Discover Defendants continued to cause Discover to convert and sell Camber securities throughout the Class Period.

123. During the Class Period, Bloomberg, Yahoo! Finance, and Google Finance all reported that there were 104.2 million Camber shares outstanding.

124. Yet as Camber acknowledged in an October 6, 2021 8-K, by that date, there were actually 249.6 million Camber shares issued and outstanding.

125. As set out below, approximately 140.1 million of these shares were issued to Discover after July 11, 2021.

### C. Defendants Schemed to Support Camber's Stock Price while Discover Unloaded its Camber Securities

126. To support Camber's stock price while the Discover Defendants unlawfully sold common shares, Defendants engaged in a stock promotion campaign. Camber acquired small assets unrelated to Camber's core oil and gas development business. Defendants then used buzzwords to make these acquisitions seem significant.

127. On August 8, 2021, the Camber Defendants published a press release announcing that Viking had acquired a 60.5% interest in Simson-Maxwell Ltd for approximately $8 million.

128. The Camber Defendants did not disclose any financial information about Simson-Maxwell at that time. However, in an August 9, 2021 8-K, Defendants promised Camber would file any Simson-Maxwell financial statements that were required to be filed. Filing these financial statements is require for which is required for any "significant acquisition," generally defined as one accounting for more than 10% of the purchaser' assets or that has a similar importance for qualitative reasons.

129. On October 19, 2021, after the close of the Class Period, the Camber Defendants filed an amendment to the August 9, 2021 8-K to acknowledge that the

acquisition of Simson-Maxwell was not significant and that Camber would thus not file its financial statements:

> ***In the Initial Report, the Company indicated that it would file any financial statements required by Item 9.01 no later than 71 calendar days after the date on which the Initial Report was required to be filed. The Company has now determined that the Simson-Maxwell acquisition was not deemed to involve a significant amount of assets (and the acquisition was not a "significant" transaction as defined in Regulation S-X)***, given, among other things, the value of the Company's other assets at the time of the transaction. Accordingly, the Company hereby amends the Initial Report to eliminate references in Item 9.01(a) and (b) to the subsequent filing of historical financial statements and pro forma financial information relating to the partial acquisition of Simson-Maxwell.

130. Thus, Defendants overstated the scope of the Simson-Maxwell acquisition.

131. Defendants also littered their description of Simson-Maxwell with irrelevant buzzwords.

132. According to Simson-Maxwell's Chairman's LinkedIn account, it is:

> [A] power systems specialist. The company assembles and sells generator sets, industrial engines, power control systems and switchgear. Simson Maxwell has service and parts facilities in Edmonton, Calgary, Prince George, Vancouver, Naniamo [sic] and Terrace. The company has provided its western Canadian customers with exceptional sevice [sic] for over 70 years.

133. In an August 17, 2021 video presentation, Doris touted the Simson-Maxwell acquisition by stringing together a series of buzzwords:

> Simson-Maxwell supplies primary and standby power solutions under its own brand, the SIMMAX brand. A variety of generator types along with selling and servicing other pieces of equipment manufactured by globally recognized players. And the company has a sophisticated and talented team that's on the leading edge of power solutions, including having ***an ability to provide power system solutions optimized for cryptocurrency mining projects.***

> So there are a number of reasons why we're excited about the opportunity, including, one, it's an important step in our organization's overall diversification strategy. It's an entity with existing revenues and an extensive customer base. As I mentioned, a great team of industry professionals. ***It puts us ahead of the curve as an organization with respect to clean energy ESG and cryptocurrency initiatives.*** And the company, given its platform, is well-positioned for expansion throughout North America. And also, the need for primary and secondary power is not going away; in particular, as relates to secondary power ***with the increase in tropical storms and hurricanes***, it puts us in a good position to expand in the US. ***And just with the inflation concerns*** dominating the headlines, precious metals and commodity prices may be poised to appreciate which benefits the company, not only with respect to our existing EMP division ***but also with our power solutions division [i.e., Simson-Maxwell].***

134. Then, on August 23, 2021, Defendants announced another acquisition: Viking had acquired from ESG Clean Energy, LLC (i) an exclusive license to a portion of ESG's carbon capture intellectual property in Canada, and (ii) a license to use a portion of ESG's carbon capture intellectual property in up to 25 Viking facilities.

135. ESG Clean Energy's technology is in development, and early development at that. ESG Clean Energy filed an Answer on March 25, 2022 in a lawsuit filed by a former executive that admitted it has yet to earn any revenues, despite having been in business for more than a decade. *See Saros v. ESG Clean Energy LLC*, 21-cv-6105-DRH-AYS, dkt. # 19, ¶236 (E.D.N.Y. March 25, 2022).

136. ESG is a successor to Scuderi Group, named for the Scuderi family. Scuderi Group had been founded in 2002 to develop a new internal combustion engine. It raised $80 million in unregistered unexempted offerings between 2004 and 2011. The private placement memoranda represented that the funds would be used for "general corporate purposes, including working capital."

137. According to the SEC Cease-and-Desist Order charging the Scuderi Group with making materially misleading disclosures:

> [T]he company, at Mr. Scuderi's direction, had been, and was planning to continue, using a significant portion of the proceeds from securities offerings to make large, ad hoc bonus payments to Scuderi family employees to cover personal expenses; payments to family members who provided no services to the company; loans to Scuderi family members, without documented interest or repayment terms; large loans to fund $20 million personal "split-dollar" insurance policies for six of the Scuderi siblings for which the company has not been, and will not be, repaid; and personal estate planning services for the Scuderi family. Scuderi Group did not have a Board of Directors; all payments were made at Mr. Scuderi's sole direction. In total, from 2008 to 2011, Scuderi Group, at Mr. Scuderi's direction, used $3.2 million, or 4.3% percent, of the offering proceeds to personally benefit the Scuderi family over and above the usual compensation that the Scuderi family employees received.

138. Between February 2021 and October 4, 2021, Discover sold 223.1 million shares. 140.1 million of these shares were issued and sold after July 11, 2021. . During this time, Camber's shares never traded below $0.34, and that only for a short period. In September, Camber's stock price took off. It reached a closing price of $1.30 on September 9, 2021. Between September 10, 2021 and October 4, 2021, Camber's stock price did not fall below $1.22. It reached $4.85 on September 29, 2021. During this time, volume in Camber shares increased tenfold:




139. Thus, the Discover Defendants' sale of 145 million Camber shares during the Class Period earned Discover at least high eight-figure profits, likely more than $100 million, and potentially as much as a few hundred million dollars. Camber is the most lucrative investment in Discover's corporate history.

140. After the Class Period, the Discover Defendants rewarded the Camber Defendants for their role in the scheme. Camber continued to rely solely on Discover and its affiliates for financing, and Discover kicked back a portion of the proceeds to Camber:

a. On December 9, 2021, Discover lent Camber $1 million in exchange for a promissory note in the amount of $1.05 million, at 10% interest rate, secured by substantially all of Camber's assets;

b. On December 24, 2021, Discover lent Camber $25 million. The loan's terms provided that Camber would use the proceeds to buy out EMC's Camber Convertible Securities as well as any secured loans due and payable within

90 days of closing. Thus, the loan ensured that only Discover and its affiliate would own Camber Convertible Securities shares; and

c. On December 30, 2021, Antilles agreed to purchase up to 10,544 newly designated Series G Preferred Shares from Camber for $100 million. Series G Preferred Shares' terms were similar to Camber Convertible Securities except that there were limits on the conversion price, including that it could not go to less than $0.05. Antilles paid Camber $6 million immediately. The remainder would be paid in equal quarterly installments during 2022. Camber was free to cancel any or all quarterly purchases.

**D. Camber and Discover Necessarily Conspired to Issue Discover Shares**

141. To convert Camber Convertible Securities into common shares, Discover must first deliver notice to Camber or its transfer agent. The delivery notice must set forth, among other things, the number of shares to be issued to Discover.

142. Upon receipt of the conversion notice, Camber must, among either things, either affirmatively agree with or dispute Discover's assertions that it is entitled to the number of shares set out in its conversion notice:

> As soon as practicable, and in any event within 1 Trading Day of the Notice Time, time being of the essence, the Corporation will do all of the following: (i) transmit the Delivery Notice by facsimile or electronic mail to the Holder, and to the Corporation's transfer agent (the "Transfer Agent") with instructions to comply with the Delivery Notice; [] and (iii) if it contends that the Delivery Notice is in any way incorrect, a through explanation of why and its own calculation, or the Delivery Notice will conclusively be deemed correct for all purposes.[5]

[5] Form of Certificate of Designation, I. G.1.c.

143. Accordingly, both Camber and Discover had to authorize the issuance of shares. Thus, the Camber Defendants and the Discover Defendants necessarily conspired to issue the shares to Discover.

## VI. DEFENDANTS ALSO VIOLATED SECTION 10(b) BY FAILING TO DISCLOSE THE INCREASE IN OUTSTANDING CAMBER COMMON SHARES

144. As a part of Defendants' scheme to conceal the dilution of Camber common stock through the conversion and sale of Camber securities by Discover, Defendants omitted material information they had an obligation to disclose.

145. As more fully alleged above: (a) the SEC mandates prompt disclosure of any increases of more than 5% of an issuer's securities; (b) including if the new shares are issued as part of the conversion of convertible securities. Camber would have to disclose any conversions that increased the number of its shares issued and outstanding by 5.2 million shares.

146. Discover is contractually prohibited from owning more than 9.9% of Camber's shares.

147. Further, Discover must disclose its ownership if it holds more than 4.99% of Camber's shares. For passive investors like Discover, disclosure is due within 10 days after the acquisition. SEC Rule 13d-1(c).[6]

148. The Discover Defendants did not disclose any ownership during or after the Class Period.

---

[6] Discover acknowledged that it was a passive investor in a Schedule 13G filed on December 10, 2018.

149. During the Class Period, Discover gradually converted its Camber Convertible Securities into common stock, and then sold the stock.

150. Discover's Senior Trader John Burke explained his trading strategy in a declaration filed under penalty of perjury in *Discover Growth Fund, LLC v. OWC Pharmaceutical Research Corp.*, 20-cv-2857-AKH (S.D.N.Y. 2020), referenced above:

> As a professional trader, my job is to sell stock in a manner designated to maximize the total economic return on investment. This typically means selling as many shares as possible, at the highest price possible, in the manner that least impacts the price. Consistent with this overriding objective, I have personally sold shares of [issuer] in a manner designed to maximize returns, and to have the least negative impact reasonably possible. Consistent with my general practice, I often directed my [issuer] trades to [alternate trading systems] which do not make their order book available to subscribers, and therefore my trading strategies were not apparent to other traders and could not unduly influence the market. In placing [issuer] orders, I used discretion in showing size in my markets in order to avoid putting undue pressure on the stock. And, the way I traded [issuer] often provided liquidity for investors looking to buy [issuer] stock when the price was rallying. ***When there was volume, I was active.*** When there was little or no volume, I did not exert undue pressure.

*Id.* Dkt. # 30, ¶29.

151. The average daily trading volume in Camber common stock increased gradually beginning with Discover's first March 2021 sales:

| | |
|---|---|
| March 19 (first Discover sales)-March 31 | 3.4 million |
| April | 2.7 million |
| May | 3.9 million |
| June 1-July 12 (last disclosed Discover sales) | 14.9 million |
| July 13-July 30 | 18.6 million |
| August | 22.1 million |
| September | 302.0 million |

152. Because it is Burke's practice to sell shares "[w]hen there was volume," Discover made substantial sales beginning July 12, 2021. Further, the increase in trading volume is evidence that the Discover Defendants has placed more Camber shares on the market. As the Discover sold more shares into the market, there were more Camber shares to sell, and thus more volume.

153. Accordingly, the Discover converted enough securities to mandate disclosure within at most two weeks of July 12, 2021.

154. Thus, Camber was required to file a Form 8-K disclosing the Discover's conversion of its convertible securities into common shares within at most two weeks and four days of the start of the Class Period.

155. Moreover, based on Camber's disclosures in its Q2 2021 10-Q, Q3 2021 10-Q, and 2021 10-K, all filed May 20, 2022, Discover must have followed its usual practice of selling when there was volume.

156. On September 1, 2021, Camber issued Discover 10.4 million shares. Unless Camber had at least 200.8 million shares outstanding at the time, Discover would have had to disclose that it owned more than 5% of Camber's shares under SEC Rule SEC Rule 13d-1(c)

157. Further, read together, Camber's Q2 2021 and Q3 2021 10-Qs provide:

a. There were 85.0 million Camber shares outstanding as of June 30, 2021;

b. There were 104.2 million Camber shares outstanding as of July 11, 2021;

c. There were 249.6 million Camber shares outstanding as of September 30, 2021;

d. The weighted average number of Camber shares outstanding from July 1, 2021 through September 30, 2021, was 161.9 million; and

e. No shares were issued in connection with Camber Convertible Securities between September 30, 2021, and the close of the Class Period.

158. The vast majority of the shares were issued to Discover. 223.1 million Camber shares were issued in connection with Camber Convertible Securities between January 1, 2021, and September 30, 2021. The only two recipients were Discover and EMC. By the close of the Class Period, EMC had only received 4.9 million shares. EMC received these shares on September 14, 2021. Thus, Discover received 218.2 million shares. Of these, 159.3 million were issued between July 1, 2021 and September 30, 2021. Of those, at least 140.1 million were issued after July 11, 2021, the last time Camber disclosed the number of its shares that were outstanding.

159. Throughout the Class Period, Defendants failed to disclose the Discover's conversion of its Camber Convertible Securities in violation of SEC requirements.

160. All of the Stock Purchase Agreements between Camber and Discover included a provision requiring Discover's approval of all public filings relating to or referencing Discover:

> **Disclosure and Publicity.** Company will provide to Investor for review and approval prior to filing or issuing any current, periodic or public report, proxy or registration statement, press release, public statement or communication relating to or referencing Investor, any Transaction Documents or the transactions contemplated thereby.

161. Thus, Discover had control over Camber's omissions.

## VII. LOSS CAUSATION

162. On October 5, 2021, during trading hours, research firm Kerrisdale Capital published a report claiming that there were more than 250 million fully diluted Camber shares issued and outstanding.

163. On October 6, 2021, Camber filed an 8-K acknowledging that there were 249.6 million of its shares issued and outstanding.

164. On October 5, 2021, Camber's stock price fell to $1.53/share from its previous close of $3.09/share, down $1.56/share (50.5%), damaging investors.

165. Camber's stock price continued to fall on October 6, 2021, closing at $0.91/share, down $0.62/share (40.5%).

166. In total, Camber's stock price fell $2.11, or 70.6%.

## VIII. ADDITIONAL FACTS FURTHER SUPPORTING SCIENTER

### A. Kirkland's History of Similar Securities Laws Violations Bolsters the Scienter Allegations

167. As alleged above, shares sold or issued by an issuer outside of a registered offering are restricted shares.

168. As is customary, unless Discover can establish an exemption under Rule 144, the shares it receives will bear a prominent legend providing:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE ACT.

> IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT.[7]

169. Brokers will not buy or sell shares bearing a restrictive legend in public transactions. Thus, in order to sell shares, Discover must cause Camber's transfer agent to remove the restrictive legend.

170. Camber's transfer agent will only remove the restrictive legend if Discover provides evidence that it complies with Rule 144.

171. Camber's transfer agent ClearTrust LLC requires that shareholders like Discover seeking to remove restrictive legends submit, among other things, (a) a letter from counsel, and (b) a representation letter.[8] In the representation letter,[9] Discover must state:

> ***I have carefully reviewed a copy of Rule 144.*** I do not have any reason to believe that the proposed sale of the Shares would not comply with Rule 144. I understand that ClearTrust, my broker, and the attorney providing the legal opinion regarding my eligibility to sell shares will rely upon my statements herein. If any such statements become inaccurate or incomplete, I will immediately notify ClearTrust, my broker, and the attorney providing the opinion.
>
> * * * * *
>
> ***Based on information published or made available to me by the Issuer and relied upon by me, I have reason to believe there is adequate current public information, set forth in Rule 144(c), available with respect to the issuer.***

---

[7] Form of Stock Purchase Agreement, IV. O., available at https://www.sec.gov/Archives/edgar/data/1309082/000158069516000313/ex10-2.htm
[8] https://www.cleartrustonline.com/rule-144
[9] https://irp.cdn-website.com/2762efa5/files/uploaded/Rule%2B144%2BSeller%27s%2BRepresentation%2BLetter.pdf

172. Rule 144 plainly requires that the issuer have filed all quarterly and annual reports:

> **(c)** ***Current public information.*** Adequate current public information with respect to the issuer of the securities must be available. Such information will be deemed to be available only if the applicable condition set forth in this paragraph is met:
>
> > **(1)** ***Reporting issuers.*** The issuer is, and has been for a period of at least 90 days immediately before the sale, subject to the reporting requirements of section 13 or 15(d) of the Exchange Act and has:
> >
> > > **(i)** Filed all required reports under section 13 or 15(d) of the Exchange Act, as applicable, during the 12 months preceding such sale (or for such shorter period that the issuer was required to file such reports), other than Form 8-K reports (§ 249.308 of this chapter); []

173. Thus, to obtain sellable Camber shares, Discover must represent that Camber has timely filed quarterly and annual reports and acknowledge that counsel and the transfer agent will rely on that representation.

174. Because Camber had not timely filed periodic reports, any such representations were false.

175. Kirkland has a history of securities violations similar to those at issue in this case.

176. The following allegations are based on: (a) an internal investigation by the law firm Akin Gump Strauss Hauer & Feld LLP; (b) a Complaint as to which Kirkland was declared in default for discovery misconduct; and (c) orders entered into, and evidence submitted in, the case.

177. Kirkland served as outside counsel to New Century Companies, Inc. In 2009, New Century was insolvent and had less than $5 million in annual revenues. To save its fortunes, New Century acquired the assets of an aerospace company, Precision Aerostructures, Inc. ("Precision"). New Century was later renamed U.S. Aerospace, Inc. ("USAI").

178. Kirkland and a co-conspirator represented to outside investors that the acquisition of Precision was part of a new strategy: partnering with large foreign defense companies to bid on multibillion-dollar U.S. defense contracts.

179. Kirkland solicited investments based on the new strategy. To give the strategy a patina of plausibility, in March 2010, Kirkland told major U.S. newspapers, including *The Washington Post*[10] and *The Wall Street Journal*,[11] that USAI and a large Russian defense company he identified by name were planning to bid on a $35 billion U.S. Air Force contract. These newspapers published articles announcing the relationship as fact, citing only Kirkland as a source. Kirkland's boast that he has been quoted in *The Wall Street Journal*, *The Washington Post*, and others, all appear to relate to this incident.

180. The story was a complete fabrication. Days after these articles, the Russian defense company reported that it was not planning on bidding on the contract and had never heard of Kirkland.

---

[10] Dana Hedgpeth, *Russian firm, EADS may give Boeing competition for Air Force tanker*, WASHINGTON POST, Mar. 20, 2010, https://www.washingtonpost.com/wp-dyn/content/article/2010/03/19/AR2010031904582.html.

[11] Peter Sanders, *Russian Firm to Bid on Air Force Tanker Program*, WASHINGTON POST, Mar. 20, 2010, https://www.washingtonpost.com/wp-dyn/content/article/2010/03/19/AR2010031904582.html.

181. Kirkland then produced documents he claimed showed a putative joint venture. The defense company reported that "the serial numbers refer to completely different documents that were sent to other firms, and not to Mr. Kirkland's office."

182. Kirkland then entered into an agreement to potentially buy out USAI's largest investor. The agreement required Kirkland to make an initial $100,000 good faith deposit. With that payment made, Kirkland had the option to acquire the investor's interest for $11.0 million. Until he paid that $11.0 million, Kirkland had not acquired any of the investor's shares.

183. After making the deposit, Kirkland told USAI's board members that he had actually purchased the shares, though he had not made any further payments.

184. Relying on his claims that he had actually purchased the investor's interest, Kirkland demanded that the Board grant him a controlling number of seats, which it did.

185. Kirkland then took advantage of his controlling board seats to commit yet more fraud. First, Kirkland announced that USAI had purchased the U.S. subsidiary of a large Ukrainian aircraft manufacturer, Antonov Company. USAI had in fact purchased a company called Antonov USA. But Antonov USA had no connection with the actual Antonov Company. Instead, Antonov USA was a shell incorporated by Kirkland and his co-conspirator and controlled by them and the co-conspirator's wife. The preferred convertible shares USAI issued Kirkland and his co-conspirators in consideration for the acquisition, if converted, would constitute 88% of USAI's total shares.

186. Kirkland disclosed to the board that he represented both USAI and Antonov USA in the transaction and that he had a financial interest in Antonov USA. An

unconflicted board would reject the transaction and perhaps consider other actions like firing Kirkland or reporting him to his bar association and the SEC. But because they were Kirkland's co-conspirators, on July 1, 2010, the Board waived any conflict and ratified the transaction.

187. Neither of the entities that received the preferred shares made required SEC filings.

188. A company secretly controlled by Kirkland then filed a sham lawsuit against USAI. The company, Omnicom Holdings, Inc., had entered into a one-paragraph unsigned contract to travel to Ukraine to facilitate an introduction between USAI and Antonov Ukraine in exchange for $3 million, or almost as much as USAI's 2009 operating revenue. That introduction completed in early July 2010, on July 14, Omnicom immediately sued for breach of contract. Two days later, Kirkland entered into a settlement whereby USAI would issue Omnicom 15 million immediately tradeable shares, circumventing Rule 144's requirements. Kirkland disseminated the shares to third parties who promptly sold the shares. A portion of the shares were disseminated to a stock promotion company run by an individual who had served a year in prison for securities fraud.

189. An independent board member retained Akin Gump to conduct an internal investigation, which concluded that Kirkland had likely breached his fiduciary duties and his professional responsibilities as an attorney. Akin Gump recommended that Kirkland be fired and his employer, the law firm Luce Forward Scripps & Hamilton LLP be notified of his misconduct.

190. In response, Kirkland fired USAI's independent directors, instructed its lessor to repossess its assets, and told some customers to stop payment and others to make payments to one of Kirkland's co-conspirators rather than to USAI. Kirkland then had USAI's captive board release all of USAI's claims against him for no consideration.

191. During the course of litigation, Kirkland so thoroughly violated court orders that the court ultimately entered default against him for the violations. *CAMOFI Master LDC v. Pressman*, 11-cv-4574-JLS-SP, dkt. # 388 (C.D. Cal. January 26, 2016).

192. Kirkland also filed a SLAPP motion the Ninth Circuit deemed "frivolous and intended solely to cause unnecessary delay." *Defrees v. Kirkland*, 579 F. App'x 538, 541 (9th Cir. 2014).

193. During the course of the litigation, Kirkland caused USAI to file for bankruptcy, which would have prevented a settlement from being consummated. *See In re USAE, LLC*, 17-11778-KJC (Bankr. D. Del.) ("Bankruptcy Action"). USAE was purportedly USAI's successor after the latter redomiciled as a Delaware LLC. By operation of law, the filing of a bankruptcy action stays any derivative action. Further, the derivative action becomes a part of the debtor's estate, such that the derivative plaintiff no longer has standing.

194. According to a bankruptcy opponent represented by Hogan Lovells LLP, Kirkland suborned perjury and forged documents. The bankruptcy petition was signed by a Kirkland associate, Robert Craig. Bankruptcy Action, dkt. # 3. Craig declared under penalty of perjury that he had been sole manager of USAE since and pursuant to an

operating agreement dated July 17, 2015. *Id.* ¶¶ 2, 15. Craig also declared that he had reviewed USAE's books and records. *Id.* ¶4.

195. But Craig later testified that Kirkland, not he, had adopted the resolution authorizing the bankruptcy and that all bankruptcy documents including Craig's declaration were prepared by Kirkland. Craig also admitted that he had not reviewed USAI's records in preparation for the bankruptcy – or ever – because they were in Kirkland's possession. Bankruptcy Action Dkt. # 49-1, at 9:24-10:4; 12:9-22; 13:6-10; 68:18-69:8; 74:4-10; 90:10-92:19. Craig testified that neither he nor anyone else had ever seen the 2015 Operating Agreement. *Id*. at 101:19-102:5; 125:15-16. Thus, Kirkland knew that representations he drafted in documents prepared for Craig's signature were perjurious.

196. After Craig's deposition, a purported operating agreement was emailed to creditors by that would have granted Craig authority to file for bankruptcy. Forensic evidence indicated that the document had actually been created during the pendency of the bankruptcy and Craig's signature was forged. Bankruptcy Action Dkt. # 49, ¶¶12-16.

197. The resolution authorizing Craig to file for bankruptcy was also forged and backdated. *Id*. at 15-16.

198. In sum, Kirkland drafted papers for Craig to sign that fraudulently declared that Craig had been appointed manager in 2015, that Craig made the decision to file for bankruptcy, and that Craig was familiar with and had reviewed USAE's books and records. When caught, Kirkland forged a document for Craig to disseminate to creditors.

199. Craig resigned the day these facts were publicly disclosed. Craig now resides in Costa Rica.

200. The Bankruptcy Court ruled that the bankruptcy was unauthorized and dismissed it with prejudice. Bankruptcy Action, Dkt. # 62.

201. The retainer to pay the debtor's attorney was paid by Antilles. Bankruptcy Action Dkt. # 28.

202. Thus, Kirkland's illustrious history of securities law violations bolsters his scienter here.

### B. Doris's Prior Violations of the Securities Laws Bolster the Allegations that He Acted with Scienter

#### 1. That Doris Acted *Ultra Vires* to Obtain Control Over Viking Bolsters the Scienter Allegations

203. As of September 30, 2017, there were 66 million shares of Viking common stock outstanding. Doris held 2 million, while his Viking Convertible Shares entitled him to about 56 million. Thus, Doris held 58 million of Viking Energy's 122 million votes, or slightly less than a majority.

204. On October 23, 2017, Doris amended the terms of his Viking Convertible Shares such that each entitled him to 10,000 votes per Viking Convertible Share. Because Doris did not have voting control, a shareholder vote was necessary. But no stockholder vote had been held. Instead, Doris secured the amendment by falsely asserting that Camber had obtained stockholder approval. After the amendment, Doris's 28,096 shares entitled him to 280,960,000 votes, or enough to secure control.

205. Doris's amendment of his Viking Convertible Shares' terms to grant him 10,000 votes was *ultra vires* and legally defective.

206. This *ultra vires* actions bolster the scienter allegations against Doris.

**2. Doris' Financial Interest Bolsters the Scienter Allegations**

207. Doris could not monetize his interest in Viking shares until the reverse merger. Viking traded on the OTC bulletin board. Trading in its shares was desultory; on average, approximately 135,000 of its shares traded per trading day in 2020 usually for $0.10 to $0.20 per share. As a result, Doris could not liquidate his massive holdings.

208. With its NYSE American listing, Camber offered a more lucrative path to monetization. In 2020, approximately 3.9 million Camber shares traded hands per trading day on average usually from $0.50 to $1.50 per share. Thus, by dollar, the volume of trading in Camber shares was about 100 times that of Viking.

209. Were the reverse merger to close, Doris would obtain more than a billion Camber shares. He could easily sell tens – or even hundreds – of millions of Camber shares into a liquid market, earning tens or hundreds of millions of dollars.

210. This was life-changing wealth for a businessman whose full-time job was running a company on the brink of bankruptcy that was so cash-poor it owed him hundreds of thousands of dollars for loans he had advanced to pay its expenses.

211. The 2021 Reverse Merger provided for a closing of up to three days after all required approvals. Section 1.2.[12] In contrast, the conversion of Doris's Viking Convertible

[12] https://www.sec.gov/Archives/edgar/data/1309082/000147793221000935/cei_ex21.htm

Securities is effective the day before their surrender.[13] Thus, Doris can obtain all required approvals for the merger, convert his Viking Convertible Securities, consummate the merger, and then sell his new Camber stock.

212. This financial incentive to participate in Defendants' scheme bolsters Doris' scienter.

### 3. That Doris Failed to Disclose that Viking's CFO Was Not a Real Person Until After Viking Finished Raising Investments Bolsters the Scienter Allegations

213. In 2013, Viking's then-CEO Tom Simeo purportedly hired a person named Guangfang Yang to be Viking's CFO. Yang purportedly continued to serve as Viking's CFO until July 2016, when she purportedly resigned. Yang purportedly signed certifications under the Sarbanes-Oxley Act of 2002.

214. Viking's head offices were located in New York. But Yang was purportedly based in Shanghai, China.

215. Doris's term as Viking's CEO began in December 2014.

216. During his tenure, Doris also served as Chairman of Viking's Board. Yang also purportedly served on Viking's Board of Directors.

217. Viking's Board of Directors was responsible for, among other things: (a) selecting and firing auditors and overseeing their work; (b) selecting the company's executives and setting executive compensation; (c) overseeing annual meetings.

---

[13] https://www.sec.gov/Archives/edgar/data/1102432/000147793220007483/vkin_ex31.htm 6.c.

218. During Yang's purported tenure, Viking raised approximately $2 million from investors. Viking sold promissory notes that included common stock as part of the transaction. It also sold convertible redeemable promissory notes that could be converted to Viking common stock at the election of the note holder or redeemed by the Company. These offerings and sales were made using stock purchase agreements, some of which were signed by Simeo on Viking's behalf. These stock purchase agreements included the representation that Viking's periodic reports filed with the Commission were materially accurate.

219. The SEC later charged Simeo with making false statements by inventing Yang and signing her name on documents. *SEC v. Simeo*, 19-cv-8621-JPC-RWL (S.D.N.Y. 2019) ("*Simeo*")

220. According to a declaration he signed under penalty of perjury, Doris "never met Ms. Yang or spoken directly to her, either in person, by telephone, or by any other means." *Simeo* Dkt. # 56-6, ¶11. He "never communicated directly with Ms. Yang in writing, whether by email or by any other means." *Id.* ¶12. Doris "never discussed Viking's internal control over financial reporting [] with Ms. Yang, and [is] unaware of any discussions between Ms. Yang and anyone else at the company regarding [such controls]." *Id.* ¶14. Doris had "no interactions of any kind with Ms. Yang[.]" *Id.* ¶16. Yang "was not involved in the financial and strategic decisions that I was working on and I had no direct interactions with Ms. Yang" from the fall of 2014 through July 2016. *Id.* ¶6. Doris was not aware of any interaction between Yang and any employee or contractor of Viking, its auditor, or its counsel, other than through Simeo. *Id.* ¶10.

221. Camber publicly disclosed that Yang received a salary of $3,914 for 2014 and that she was not compensated in either 2015 or 2016.

222. In June 2016, Simeo sought to be appointed Viking's CFO, telling Doris that "I have previously been handling the [SEC] filing's [sic] for years." At the time, Viking was trying to raise money from investors.

223. Doris objected to Simeo's "replacing" while Yang because the resignation of the CFO could create a "perception that there is a problem with the company if [she] just resigned." *Simeo* Dkt. # 32 ¶37.

224. Viking continued to claim that Yang was its CFO until after securing the aforementioned investments.

225. Thus, Doris knowingly or recklessly concealed from investors that Viking's CFO was fake.

#### 4. That Viking's Auditor Accused Viking of an Illegal Act Supports Doris' Scienter

226. In September 2016, Viking's auditor resigned because, among other things, Viking had forged a document to avoid restating financial statements.

227. While reviewing Viking's Q2 2016 financial statements, the auditor discovered an agreement with a consultant, Jeffrey Morfit, that called for Viking to issue him 800,000 shares in 2015. Viking also provided the auditor with a second agreement, dated October 24, 2015. This second agreement provided that Morfit ***had already been*** issued 563,636 shares and was to receive 309,092 more upon execution of that agreement.

228. These agreements conclusively established that Morfit received Viking shares in 2015. Yet these shares had not been accounted for in Viking's 2015 annual financial statements. Thus, after receiving these agreements, the auditor asked that Viking restate its 2015 financial statements to account for the share issuances.

229. In response, Doris appears to have made false statements to the auditors. He first provided the auditor a letter purportedly from Morfit claiming that the agreement had been verbally rescinded at some point in 2015.

230. The agreements provided that they could not be amended except by a writing. The letter was a Microsoft Word document and was not signed by either Morfit or Viking.

231. When the auditor questioned the letter's accuracy and legal effectiveness, Viking produced an executed rescission letter dated June 3, 2016.

232. Thus, Doris entered into an agreement that misrepresented Viking's contractual history with a counterparty in order to avoid auditor scrutiny.

233. This was not the only dubious issue.

234. Though auditors review quarterly reports before their filing, Viking filed its Q1 2016 10-Q before even giving the auditor the materials necessary for a review. That 10-Q had to be restated.

235. On August 18, 2016, Doris promised the auditor it would give it materials and time to review the Q2 2016 10-Q. Viking filed its Q2 2016 10-Q on August 22, 2016, without providing the materials to the auditor, and without informing the auditor that the 10-Q had been filed.

236. On August 26, the auditor learned that Viking had defaulted on substantially all of the loans on August 16 and 17, shortly before Viking filed the 10-Q.

237. The auditor resigned and accused Viking of committing illegal acts. The auditor's resignation and the reasons therefor bolster the scienter allegations.

#### 5. That Doris and Camber Publicly Discussed Camber's Business Without Disclosing the Share Sales Supports the Scienter Allegations

238. During the Class Period, the Camber Defendants regularly publicly discussed Camber's business.

239. Camber maintains a website which hosts a series of presentations by Doris in a section titled CEO Vlog. During the Class Period, Doris posted presentations on July 15, August 17, September 7, September 16 (two presentations), September 22, and September 30.

240. Camber issued press releases on July 14, July 30, August 9, August 17, and August 24.

241. Camber filed 8-Ks on July 30, August 9, August 23, September 16, and September 22.

242. In this torrent of information, the Camber Defendants never mentioned that the number of Camber shares outstanding had increased by 150%.

243. Defendants' frequent communications to investors bolster scienter.

### 6. That Camber Has No Employees and Viking Only Has Nine Bolsters the Scienter Allegations

244. According to its 10-K for the year ended March 31, 2020, Camber had no employees.

245. Since then, Camber has merged its operations with Viking. Camber is administered by Viking employees from its head office.

246. Viking had nine employees in its head office as of each of March 25, 2021, and April 20, 2022, suggesting that it had only nine employees during the Class Period.[14]

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Camber securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of any Defendant at any time during the Class Period, members of the immediate families and their legal representatives, heirs, successors or assigns of any Defendant, and any entity in which any Defendant or combination of Defendants have or had a controlling interest.

248. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Camber securities were actively traded on the NYSE American Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery,

[14] As of April 20, 2022, Simson-Maxwell had 118 employees. These employees all work in Western Canada.

Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Camber or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

249. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

250. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

251. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether Defendants conspired to conceal from investors that the number of Camber common shares outstanding had risen from 100 million to 250 million, primarily due to sales by Discover at a time when Discover was legally prohibited from selling shares;
- whether omissions by Defendants to the investing public during the Class Period caused the investing public to have an inaccurate view of the business, operations, and management of Camber;
- whether Defendants caused Camber to fail to issue truthful financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly omitted material information from the investing public;

- whether Discover conducted illegal insider trading at the expense of the investing public;

- whether the prices of Camber securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

252. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

253. Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Camber and Doris)**

254. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

255. This Count is asserted against Defendants Camber and Doris for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

256. During the Class Period, Defendants Camber and Doris ("Defendants" for purposes of this Count) had an affirmative duty to disclose the unregistered sales of securities and the dilution of Camber common stock as a result of Discover's conversion and sale of its Camber Convertible Securities. Defendants' failure to do, as outlined in Paragraphs 145 to 158, so were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Camber common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Camber common stock at artificially inflated prices.

257. Defendants either had actual knowledge of the material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts, although such facts were readily available to Defendants. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the

truth is peculiarly within these Defendants' knowledge and control. As the CEO of Camber, Doris had knowledge of the details of Camber's duty to disclose Discover's unregistered sales of securities, and the subsequent dilution of Camber common stock as a result.

258. As an officer and director of a publicly-held company, Doris had a duty to disseminate timely, accurate, and truthful information regarding Camber's business, operations, and total amount of outstanding securities. As a result of Doris and Camber's omission of this information, the market price of Camber common stock was artificially inflated throughout the Class Period.

259. In ignorance of the adverse facts concerning Camber's business, operations, and total amount of outstanding securities, which were concealed by the omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Camber common stock at artificially inflated prices and relied upon the price of the common stock and were damaged thereby.

260. During the Class Period, Plaintiffs and the other members of the Class purchased or otherwise acquired shares of Camber at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid. At the time of the purchases or acquisitions by Plaintiffs and the Class, the true value of Camber's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Camber's common stock declined sharply

upon the public disclosure of the facts or materialization of the risks concealed from and to the injury of Plaintiffs and other Class members.

261. By reason of the conduct alleged herein, Camber and Doris knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

262. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price Camber common stock to decline. Defendants are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

**COUNT II**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendants Camber, Doris, Discover, DFM LLLP, and Kirkland)**

263. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

264. This Count is asserted against Defendants Camber, Doris, Discover, and Kirkland ("Defendants" for purposes of this Count) and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(c) makes it unlawful for any person, directly or

indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

265. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Camber securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Camber securities and options at artificially inflated prices, all while Discover were selling their shares of Camber securities at a profit. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

266. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business and operations of Camber as specified herein, including Discover's conversion of Camber convertible securities into Camber common shares.

267. During the Class Period, Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct, as alleged herein, to permit Discover to convert and sell Camber shares in violation of the prohibition on the sale of unregistered securities, even in the absence of updated financials that would allow Discover to meet the Rule 144 exemption, while at the same time, concealing those actions from the investing

public. As alleged more particularly herein, these acts included in concealing and omitting from disclosure to investors Discover's conversion and sale of Camber shares to the investing public, concealing and omitting from disclosure to investors the massive increase in Camber common shares from 104,195,295 to 249,563,409 diluting the stake of existing shareholders, and engaging in a stock promotion campaign by acquiring small companies unrelated to Camber's business in order to keep the Camber stock price high while Discover sold millions of shares. These specific acts and omissions, and the underlying violations of federal law, operated as a fraud and deceit upon the purchasers of Camber common stock during the Class Period.

268. As a result of the fraudulent scheme and failure to disclose material facts of Defendants named in this count, as set forth above, the market price for Camber's securities was artificially inflated during the Class Period.

269. In ignorance of the fact that market prices of Camber's publicly traded securities were artificially inflated, and relying directly or indirectly on the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants named in this count, but not disclosed by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Camber's common stock during the Class Period at artificially high prices and were damaged thereby.

270. During the Class Period, Plaintiffs and other members of the Class were ignorant of the scheme of Defendants, or its impact on Camber securities. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Camber,

Plaintiffs and other members of the Class would not have purchased or otherwise acquired Camber common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

271. As a direct and proximate result of the wrongful conduct of Defendants named in this count, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

272. By reason of the conduct alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Camber securities during the Class Period.

**COUNT III**
**(Violations of Section 20(a) of the Exchange Act Against Defendant Doris)**

273. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

274. During the Class Period, Doris participated in the operation and management of Camber, and conducted and participated, directly and indirectly, in the conduct of Camber's business affairs. Because of Doris' senior position, he knew the adverse non-public information about Camber's failure to disclose Discover's conversion of Camber convertible securities into Camber common shares, as well as the dilution of Camber common stock due to Discover's conversion and sale of Camber securities.

275. As officer and/or director of a publicly owned company, Doris had a duty to disseminate accurate and truthful information with respect to Camber's financial condition and Discover's conversion of convertible securities into common shares.

276. Because of his positions of control and authority as a senior officer, Doris was able to, and did, control the contents of the various reports, press releases, and public filings which Camber disseminated in the marketplace during the Class Period, and what Camber omitted from the investing public. Throughout the Class Period, Doris exercised his power and authority to cause Camber to engage in the wrongful acts complained of herein. Doris, therefore, was a "controlling person" of Camber within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Camber securities.

277. Doris, therefore, acted as a controlling person of Camber. By reason of his senior management position of Camber, Doris had the power to direct the actions of, and exercised the same to cause, Camber to engage in the unlawful acts and conduct complained of herein. Doris exercised control over the general operations of Camber and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

278. By reason of the above conduct, Doris liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Camber.

**COUNT IV**
**(Violations of Section 20(a) of the Exchange Act Against Defendants Kirkland and DFM LLLP)**

279. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

280. During the Class Period, Defendants Kirkland and DFM LLLP ("Defendants" for purposes of this Count) participated in the operation and management of Discover, and conducted and participated, directly and indirectly, in the conduct of Discover's business affairs. Because of their positions and relationships with Discover, they knew the adverse non-public information about Discover's illegal actions, including Discover's unlawful trading of securities in violation of the prohibition on the sale of unregistered securities in the absence of updated financials that would allow Discover to meet the Rule 144 exemption.

281. Because of their positions of control and authority as with Discover, as well as the Stock Purchase Agreements Discover signed with Camber that included a provision requiring Discover's approval of all public filings by Camber relating to or referencing Discover, Defendants were able to, and did, control the actions of Discover and Camber, including Discover's conversion of Camber convertible securities into Camber common shares and subsequent sale of those shares in violation of the prohibition on the sale of unregistered securities, even in the absence of updated financials that would allow Discover to meet the Rule 144 exemption, as well as Camber's concealment of Discover's sales from investors. Throughout the Class Period, Defendants exercised their power and authority to cause Discover to engage in the wrongful acts complained of herein. Defendants, therefore,

were "controlling persons" of Discover within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Camber securities.

282. Defendants, therefore, each acted as a controlling person of Discover. By reason of their positions and relationships with Discover, both of these Defendants had the power to direct the actions of, and exercised the same to cause, Discover to engage in the unlawful acts and conduct complained of herein. Both of these Defendants exercised control over the general operations of Discover and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

283. By reason of the above conduct, Defendants Kirkland and DFM LLLP are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Discover.

**COUNT V**
**(Violations of Section 10(b) and 20A of the Exchange Act Against Defendant Discover)**

284. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

285. This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. §78t-1, by Discover, who sold shares of Camber common stock while in possession of material, non-public information, as alleged herein, including concerning Camber's true business and financial condition.

286. Section 20A(a) of the Exchange Act provides that:

> Any person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

287. As set forth herein, Discover violated §10(b) of the Exchange Act for the reasons stated in count II above. Additionally, Discover further violated §10(b) of the Exchange Act, Rule 10b-5, Rule 10b5-1 (17 C.F.R. §240.10b5-1) and Section 20A of the Exchange Act by selling shares of Camber common stock while in possession of material, non-public adverse information concerning the dilution of Camber securities.

288. Contemporaneously with Discover's insider sales of Camber common stock, Plaintiffs and the other Class members purchased shares of Camber common stock.

289. Plaintiffs and the other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

290. By reason of the violations of the Exchange Act alleged herein, Discover is liable to Plaintiffs and the other Class members who purchased shares of Camber common stock contemporaneously with Discover's sales of Camber common stock during the Class Period.

291. Plaintiffs and the other Class members, who purchased contemporaneously with Discover's insider sales of Camber securities, seek disgorgement by Discover of profits gained or losses avoided from Discover's transactions in Camber common stock contemporaneous with Plaintiffs and the other Class members.

292. This action was brought within five years after the date of the last transaction that is the subject of the Discover's violation of Section 20A, and with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Discover.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 28, 2022

Respectfully submitted,
**COCHRAN LAW**

By: */s/ Stuart L. Cochran*
Stuart L. Cochran

Attorney-in-charge
Texas Bar No. 24027936
S.D. Tex. Bar No. 24027936
8140 Walnut Hill Ln, Suite 250
Dallas, Texas 75231
Telephone: (469) 333-3405
Email: stuart@schochranlaw.com

*Liaison Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne
275 Madison Avenue, 40th Floor
New York, New York 10116
Phone: (212) 686-1060
Fax: (212) 202-3827
jhorne@rosenlegal.com

*Co-Lead Counsel for the Class*

**POMERANTZ LLP**
Joshua B. Silverman
(admitted *pro hac vice*)
Christopher P.T. Tourek
(admitted *pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com

*Co-Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
(*pro hac vice* application forthcoming)

2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiffs*