# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| RONALD E. COGGINS, Individually and On Behalf of All Others Similarly Situated,<br><br>                                            Plaintiff,<br><br>                    v.<br><br>CAMBER ENERGY, INC., JAMES A. DORIS, and FRANK W. BARKER, JR.,<br><br>                                            Defendants. | Case No. 4:21-cv-03574<br><br>CLASS ACTION<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS .............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

I.     INTRODUCTION ............................................................................................ 1

II.    NATURE AND STAGE OF PROCEEDING ................................................... 2

III.   STATEMENT OF THE ISSUES ..................................................................... 2

IV.    STATEMENT OF FACTS ............................................................................... 2

       A.     Background ........................................................................................... 2

       B.     Camber's Delinquency Prevents Discover From Selling Camber Shares
              Lawfully ............................................................................................... 5

       C.     Discover Sells Shares Unlawfully and Without Disclosure .................. 5

V.     LEGAL STANDARD ...................................................................................... 7

VI.    PLAINTIFFS PROPERLY PLEAD 10b–5(b) VIOLATIONS ......................... 8

       A.     Camber Defendants had a duty to disclose accurate number of outstanding
              shares to investors ............................................................................... 8

              1.   Item 3.02 of Form 8-K required disclosure ................................. 11

       B.     The facts Defendants omitted were material ...................................... 14

VII.   THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY ........... 14

       A.     The scheme involved conduct .............................................................. 15

       B.     Defendants' scheme was not fully disclosed ....................................... 22

     C.     Discover could not lawfully sell unregistered Camber stock under Rule 144 or Section 4(a)(1) ...................................................................................... 24

     D.     The Complaint does not rely on group pleading ......................................... 28

VIII.    THE COMPLAINT SUFFICIENTLY PLEADS SCIENTER .............................. 29

     A.     Defendants profited from the secret scheme ............................................... 29

     B.     "Special circumstances" support an inference of scienter ......................... 32

     C.     Camber's reversal of its share count disclosure practice during the Class Period supports scienter ............................................................................. 35

     D.     Individual Defendants' history of securities laws violations bolsters their scienter ........................................................................................................ 36

     E.     Viewed holistically, the Complaint's allegations support a strong inference of scienter .................................................................................................... 39

IX.     PLAINTIFFS SUFFICIENTLY PLEAD LOSS CAUSATION ............................ 42

X.      PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON LIABILITY ...... 44

XI.     PLAINTIFFS SUFFICIENTLY ALLEGE INSIDER TRADING BY DISCOVER .................................................................................................... 46

XII.    CONCLUSION ................................................................................................... 48

CERTIFICATE OF WORD COUNT ........................................................................... 50

CERTIFICATE OF SERVICE ...................................................................................... 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
 9 F. Supp. 3d 175 (D. Conn. 2014) ................................................................. 18

*Affiliated Ute Citizens of Utah v. United States*,
 406 U.S. 128 (1972) ......................................................................................... 43

*Bachow v. Swank Energy Income Advisers, LP*,
 2010 WL 70520 (N.D. Tex. Jan. 6, 2010) ........................................................ 7

*Brief for the United States as Amicus Curiae Supporting Respondents*, *Leidos, Inc. v. Indiana Public Retirement System*, 2017 WL 4004533 (U.S. Sept. 7, 2017) ........ 12, 14

*Brody v. Zix Corp.*,
 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ............................................... 45

*Campton v. Ignite Rest. Grp., Inc.*,
 2014 WL 61199 (S.D. Tex. Jan. 7, 2014) ........................................................ 48

*Carlton v. Cannon*,
 184 F. Supp. 3d 428 (S.D. Tex. 2016) ........................................................ 32, 33

*Carvelli v. Ocwen Fin. Corp.*,
 934 F.3d 1307 (11th Cir. 2019) ....................................................................... 13

*Catilina Nominees Proprietary Ltd. v. Stericycle, Inc.*,
 2021 WL 1165087 (N.D. Ill. Mar. 26, 2021) ............................................. 19, 20

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
 511 U.S. 164 (1994) ......................................................................................... 18

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
 497 F.3d 546 (5th Cir. 2007) ........................................................................... 30

*City of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc.*,
 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ........................................... 41, 42

*City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*,
 878 F.3d 36 (2d Cir. 2017) ............................................................................... 17

*Collmer v. U.S. Liquids, Inc.*,
 268 F. Supp. 2d 718 (S.D. Tex. 2001) ............................................................. 38

*Commodity Futures Trading Comm'n v. Gorman*,
 587 F. Supp. 3d 24 (S.D.N.Y. 2022).......................................................................20

*Defrees v. Kirkland*,
 2018 WL 11365544 (C.D. Cal. July 26, 2018)..........................................................37

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
 2022 WL 3227584 (S.D. Tex. Aug. 10, 2022) ..........................................................41

*Dirks v. S.E.C.*,
 463 U.S. 646 (1983)..............................................................................................21, 47

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005).....................................................................................................42

*Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*,
 905 F.3d 892 (5th Cir. 2018) ......................................................................................19

*Fidel v. Rampell*,
 2005 WL 5587454 (S.D. Fla. Mar. 29, 2005)............................................................38

*Fitzpatrick v. Uni-Pixel, Inc.*,
 35 F. Supp. 3d 813 (S.D. Tex. 2014) ..........................................................................32

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
 565 F.3d 200 (5th Cir. 2009) ......................................................................................29

*Garcia v. J2 Glob., Inc.*,
 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021)..............................................................31

*Gelfer v. Pegasystems, Inc.*,
 96 F. Supp. 2d 10 (D. Mass. 2000) .............................................................................36

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
 514 F. Supp. 3d 942 (S.D. Tex. 2021) ..................................................................15, 16

*Giancarlo v. UBS Fin. Servs., Inc.*,
 725 F. App'x 278 (5th Cir. 2018)................................................................................47

*Glover v. DeLuca*,
 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)............................................................38

*Greebel v. FTP Software, Inc.*,
 194 F.3d 185 (1st Cir. 1999)........................................................................................38

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................................................................................................. 44

*Hedden v. Marinelli,*
796 F.Supp. 432 (N.D.Cal.1992) ............................................................................. 27

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ................................................................................... 29

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...................................................................................... 15

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ............................................................................. 43, 44

*In re Cabletron Sys. Inc.,*
311 F.3d 11 (1st Cir.2002) ....................................................................................... 30

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 2599327 (S.D. Tex. June 15, 2017) .......................................................... 47

*In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*,
298 F. Supp. 2d 544 (E.D. Tex. 2004) ............................................................... 33, 34

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................... 13, 46

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................ 15, 21, 36

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
610 F. Supp. 2d 600 (S.D. Tex. 2009) ..................................................................... 22

*In re Enron Corp. Sec., Derivative "Erisa" Litig.*,
2003 WL 230688 (S.D. Tex. Jan. 28, 2003) ............................................................ 45

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
2016 WL 4095973 (S.D. Tex. Aug. 2, 2016) ........................................................... 47

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................. 11, 15, 18

*In re Immune Pharm. Inc.*,
635 B.R. 118 (Bankr. D.N.J. 2021) ......................................................................... 23

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ........................................................................ 13

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    2006 WL 6829623 (S.D. Cal. Aug. 1, 2006) ................................................... 47

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001).............................................................................. 35

*In re Scripsamerica, Inc.*,
    34 B.R. 863 (Bankr. D. Del. 2021) ................................................................. 23

*In re Segue Software, Inc. Sec. Litig.*,
    106 F. Supp. 2d 161 (D. Mass. 2000) .............................................................. 38

*In re TETRA Technologies, Inc., Sec. Litig.*,
    2009 WL 6325540 (S.D. Tex. July 9, 2009)..................................................... 45

*In re TETRA Technologies, Inc., Securities Litigation*,
    2009 WL 6326865 (S.D. Tex. Aug. 10, 2009) ................................................. 45

*In re Tyco Int'l, Ltd.*,
    2004 WL 2348315 (D.N.H. Oct. 14, 2004) ............................................... 12, 13

*In re UBS Auction Rate Sec. Litig.*,
    2010 WL 2541166 (S.D.N.Y. June 10, 2010) .......................................... 20, 21

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ........................... 14, 32, 44, 45, 46

*In re Xcelera.com, Sec.*,
    2002 WL 745835 (D. Mass. Mar. 8, 2002)...................................................... 14

*JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*,
    997 F. Supp. 2d 710 (E.D. Mich. 2014).......................................................... 16

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006)............................................................ 44

*Karpov v. Insight Enterprises, Inc.*,
    2010 WL 2105448 (D. Ariz. Apr. 30, 2010) ................................................... 39

*Klein v. Altria Grp., Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) .............................................................. 17

*Klein v. Altria Grp., Inc.*,
2021 WL 2349904 (E.D. Va. Apr. 13, 2021) ........................................................... 17

*Kraft v. Third Coast Mistream*,
2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ........................................................ 18, 19

*Lee v. Active Power, Inc.*,
29 F. Supp. 3d 876 (W.D. Tex. 2014) ................................................................ 30, 31

*Lorenzo v. Sec. & Exch. Comm'n*,
139 S. Ct. 1094 (2019) .................................................................... 2, 11, 15, 17

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................. 7, 42

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................................ 44

*Luczak v. Nat'l Beverage Corp.*,
812 F. App'x 915 (11th Cir. 2020) ..................................................................... 43, 44

*Markman v. Whole Foods Mkt., Inc.*,
2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) ........................................................ 13

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ............................................................................................. 7, 29

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .............................................................................. 43

*MicroCapital Fund LP v. Conn's Inc.*,
2019 WL 3451153 (S.D. Tex. July 24, 2019) ............................................. 28, 38, 47

*MicroCapital Fund LP v. Conn's Inc.*,
2019 WL 4673209 (S.D. Tex. Sept. 24, 2019) ........................................................ 28

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ............................................................................ 32, 34

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ................................................................................. 44

*Nykredit Portefolje Admin. A/S*,
2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) ........................................................ 14

*Parker v. Missouri City, Tex.*,
2015 WL 4431019 (S.D. Tex. July 17, 2015) ................................................................. 7

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ....................................................................................... 31

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) ................................................................................... 12, 13

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ................................................................................... 7, 33

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ........................................................................................... 18

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ......................................................................... 11, 42, 43

*Puddu v. 6D Glob. Techs., Inc.*,
2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ....................................................... 15, 37

*Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) ................................................................................. 18, 22

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*,
58 F. Supp. 3d 424 (S.D.N.Y. 2014) ..................................................................... 23, 24

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) ......................................................................... 36

*Schiller v. Physicians Res. Grp., Inc.*,
2002 WL 318441 (N.D. Tex. Feb. 26, 2002) .............................................................. 31

*Schiller v. Physicians Res. Grp., Inc.*,
342 F.3d 563 (5th Cir. 2003) ...................................................................................... 31

*S.E.C. v. Big Apple Consulting USA, Inc.*,
783 F.3d 786 (11th Cir. 2015) .................................................................................... 25

*S.E.C. v. Big Apple Consulting USA, Inc.*,
2011 WL 13143143 (M.D. Fla. Dec. 29, 2011) ..................................................... 26, 27

*S.E.C. v. Blackburn*,
431 F. Supp. 3d 774 (E.D. La. 2019) .......................................................................... 25

*S.E.C. v. Cavanagh,*
    155 F.3d 129 (2d Cir.1998)................................................................28

*S.E.C. v. GPL Ventures LLC,*
    2022 WL 158885 (S.D.N.Y. Jan. 18, 2022) ................................. 17, 18

*S.E.C. v. Ficeto,*
    2013 WL 1196356 (C.D. Cal. Feb. 7, 2013)....................................23

*S.E.C. v. Fiore,*
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)..............................................20

*S.E.C. v. Nat'l Bankers Life Ins. Co.,*
    324 F. Supp. 189 (N.D. Tex.) ...........................................................25

*S.E.C. v. Nat'l Bankers Life Ins. Co.,*
    448 F.2d 652 (5th Cir. 1971) ............................................................25

*S.E.C. v. Olins,*
    2010 WL 900518 (N.D. Cal. Mar. 12, 2010).............................. 27, 28

*S.E.C. v. Panuwat,*
    2022 WL 633306 (N.D. Cal. Jan. 14, 2022) ....................................19

*S.E.C. v. Platforms Wireless Int'l Corp.,*
    617 F.3d 1072 (9th Cir. 2010) .................................................... 24, 25

*S.E.C. v. Zandford,*
    535 U.S. 813 (2002)..........................................................................12

*Shapiro v. Drs. Hosp. Renaissance, Ltd.,*
    2014 WL 12618723 (S.D. Tex. Mar. 27, 2014)............................ 17, 20

*Simpson v. AOL Time Warner Inc.,*
    452 F.3d 1040 (9th Cir. 2006) .........................................................16

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
    365 F.3d 353 (5th Cir. 2004) .................................................. 28, 29, 30

*Stein v. Tangoe, Inc.,*
    2014 WL 12767210 (D. Conn. Sept. 30, 2014)................................38

*Stephens v. Uranium Energy Corp.,*
    2016 WL 3855860 (S.D. Tex. July 15, 2016)............................... 20, 34

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014)................................................................... 33, 45

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ............................................................................................. 15, 20

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)......................................................................................... 12

*Takata v. Riot Blockchain, Inc.*,
    2020 WL 2079375 (D.N.J. Apr. 30, 2020) ............................................................ 36, 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 7, 29, 39, 40

*Union Cent. Life Ins. Co. v. Ally Fin., Inc.*,
    2013 WL 2154220 (S.D.N.Y. Mar. 29, 2013) .............................................................. 38

*Vanderhoef v. China Auto Logistics Inc.*,
    2021 WL 3260849 (D.N.J. July 30, 2021).................................................................... 35

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)......................................................................................... 23

*Yang v. Nobilis Health Corp.*,
    2021 WL 3619863 (5th Cir. Aug. 13, 2021)................................................................. 34

*Young v. Nationwide Life Ins. Co.*,
    2 F. Supp. 2d 914 (S.D. Tex. 1998) ............................................................................. 17

*Zagami v. Nat. Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) .............................................................. 12, 35, 45

## Rules

15 U.S.C.A. § 78t-1 ........................................................................................................... 47

17 C.F.R. §229.701............................................................................................................... 8

17 C.F.R. § 240.10b–5.................................................................................................... 14, 15

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 7

Fed. R. Evid. 404(b) .......................................................................................................... 36

**Statutes**

15 U.S.C. § 77b(a)(11) ...................................................................................... 25

Securities and Exchange Act of 1934.................................................................*passim*

**Additional Resources**

*Additional Form 8-K Disclosure Requirements & Acceleration of Filing
    Date*, Release No. 8400, 2004 WL 536851 (Mar. 16, 2004)......................... 8, 9, 13, 14

*Business and Financial Disclosure Required by Regulation S-K*, 81 FR
    23916-01 (Apr. 22, 2016) ............................................................................. 9

*In the Matter of Galena Biopharma, Inc., et al.*, Release No. 3865, 2017
    WL 3215775 (April 10, 2017) ...................................................................... 20

Office of Investor Education and Advocacy. (2012, May). *Investor bulletin: How to read
    an 8-K- SEC*. sec.gov. https://www.sec.gov/investor/pubs/readan8k.pdf......... 8, 11, 12

United States Securities and Exchange Commission, *Form 8-K*. sec.gov.
    https://www.sec.gov/about/forms/form8-k.pdf............................................. 35

United States Securities and Exchange Commission, *Form 10-Q*. sec.gov.
    https://www.sec.gov/files/form10-q.pdf ...................................................... 9

Lead Plaintiffs George C. Smith, Jr., Robert Laurent, and Ajmal Hussain (collectively "Plaintiffs") oppose Defendants' motions to dismiss[1] as follows:

## I.    INTRODUCTION

Defendants Camber Energy, Inc. ("Camber") and James Doris ("Doris") (the "Camber Defendants") and Discover Growth Fund, LLC ("Discover"), Discover Fund Management LLLP ("DFM LLLP"), and John C. Kirkland ("Kirkland") (the "Discover Defendants") (collectively, "Defendants") schemed to allow Discover Defendants to unlawfully sell over 140 million converted Camber common shares for profits of tens or hundreds of millions of dollars while concealing the sales from the public, in violation of clear disclosure obligations. Because of Defendants' violations, investors could not know that the number of Camber shares outstanding rose by 150% during the Class Period, diluting each investor's holdings. When the dilution was revealed, Camber's stock price fell by 70.6%, leaving defrauded investors with significant losses.

Camber Defendants maintain that, though 150% dilution is material and the SEC's rules call for its disclosure, no disclosure was required because of a loophole for issuers who had disclosed the "***maximum amount*** of the underlying shares that may be issued." The SEC has never recognized such a loophole under these circumstances. What Defendants reference is not a statute, regulation, or even a statement of the Commission, but rather a staff interpretation limited to "particular situations" not present here. It has no

---

[1] All "¶__" references are to the Second Amended Consolidated Class Action Complaint (the "Complaint") (ECF No. 65). All "DM" references refer to the Discover Defendants' Motion to Dismiss (ECF No. 69), and all "CM" references refer to Camber Defendants' Motion to Dismiss (ECF No. 70).

bearing on delinquent issuers like Camber or floorless convertibles like it issued to Discover, which have no "maximum amount."

Camber's claim that defrauded investors are without private remedy is similarly baseless. As the SEC itself has ruled, a violation of SEC disclosure obligation can ground a private securities fraud action. The "basic purpose behind [the SEC's antifraud] laws [is] 'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1103 (2019). As the Complaint demonstrates, Defendants concealed a quintessential fact necessary to value their Camber shares: the number of total shares. Plaintiffs' claims are well-pled and should not be dismissed.

## II.     NATURE AND STAGE OF PROCEEDING

This is Plaintiffs' response in opposition to Defendants' motion to dismiss the claims Plaintiffs assert in their Second Amended Complaint. ECF Nos. 65, 69, 70.

## III.    STATEMENT OF THE ISSUES

1.      Whether Plaintiffs have sufficiently pled a *prima facie* case against Defendants for violations of (i) Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) thereunder, (ii) 20A of the Exchange Act, and (iii) Section 20(a) of the Exchange Act.

## IV.     STATEMENT OF FACTS

### A.     Background

Camber is a small oil and gas development company. ¶43. In 2014, oil prices crashed, and with them Camber's future. ¶44. With its fortunes fading, Camber turned to

2

Discover, a small company specializing in offering financing in exchange for floorless convertible securities.  ¶45.

Floorless convertibles are bonds or preferred stock that convert not into a fixed number of shares, but into however many shares are necessary to reach a fixed dollar value. ¶48.  For example, a $100,000 floorless convertible would convert into only 1,000 shares if the share price were $100 but 1,000,000 shares if it were $0.10.

Floorless convertible securities are dangerous at scale because they can trigger a vicious cycle.  When a holder exercises these securities, the number of shares outstanding increases, diluting all existing investors.  ¶49.  Learning of the dilution creates selling pressure, because investors' shares are worth less.  *Id.*  Then, the lower share makes the next conversion even more dilutive, potentially creating a downward spiral.  *Id.*

In April 2016, Camber sold 527 Series C preferred shares ("Convertible Securities") to Discover, each with a face value of $10,000.  ¶¶50-51.  They entitled Discover to dividends of up to 24.95% annually (and accruing in full upon exercise) over a 7-year term. ¶51.a.  They converted at a discount to the actual trading price on the five lowest-priced days during a period that extended indefinitely into the future where, as here, Camber's shares dipped below $1.50.  ¶51.d.  The agreements expressly contemplated that the converted shares would be sold pursuant to SEC Rule 144.  ¶¶114-116.

Camber kept itself afloat by periodically selling additional Convertible Securities to Discover.  ¶¶53-55.  Proceeds were used to pay high executive salaries and director fees, as well as related-party transactions.  ¶56.  But Discover's exercise of Convertible Securities ballooned Camber's share count.  By September 2020, following a series of

3

reverse stock splits, Camber had literally run out of treasury shares to issue to Discover. ¶100.  Though Discover was entitled to hundreds of millions of shares, Camber could not issue them.  ¶101.

In 2014, Doris took control of Viking, an existing publicly-traded company that had no assets or prospects, in an ill-fated attempt to profit from the 2014 collapse in oil prices by acquiring oil wells at what he believed were rock-bottom prices.  ¶¶58-59.  Enthusiasm proved no substitute for experience.  In 2019, Viking lost $19.4 million on revenues of $34.8 million.  ¶60.  Worse, Viking owed $104 million, with $22 million due in 2020, and no cash to pay either.  ¶¶60-61.  Viking was collapsing, and if it did, Doris could not recover the $395,000 he had lent it.  ¶62.

By the end of 2019, Camber, Discover, and Doris's company, Viking, were all in terrible shape.  Viking had debts it could not pay.  ¶¶60-62.  Camber kept itself afloat using proceeds from the Convertible Securities.  ¶56.  But Discover had bought more Convertible Securities than Camber's share authorization allowed it to convert.  So, Doris, Discover, and Camber planned to resolve their respective problems by merging Viking into Camber, which would result in Doris owning the majority of Camber shares.  ¶¶63-66, 96.  Camber's executives would get six-figure payoffs, ¶¶66, 93, and Camber would boost its authorized shares so Discover could not only convert its existing Convertible Securities, but could buy and convert even more.  ¶¶79-80.  Camber then transferred its existing cash and the cash it raised to Viking so it could pay its obligations as they came due.  ¶¶79-80, 86, 97.  Discover would benefit because Camber would increase the maximum shares it could issue from 25 million to 250 million while the buzz regarding a new acquisition sparked investor interest.

4

¶102. Doris would benefit because he quietly changed the terms of his Viking preferred shares to convert into common shares that would amount for 95% of Viking's capital stock. ¶¶67-76. Ultimately, the reverse merger deal never closed, but Camber made large equity investments in Viking and boosted its own authorized share count tenfold, to allow Discover to keep converting and selling shares. ¶¶77-98, 100-102.

### B.   Camber's Delinquency Prevents Discover From Selling Camber Shares Lawfully

Initially, the plan worked. In February 2021, Camber increased the number of its treasury shares from 25 to 250 million. ¶102. Discover converted existing Convertible Securities and sold tens of millions of resulting Camber shares at a profit. ¶¶101, 109.

But in May 2021, Camber had stopped filing annual and quarterly reports to the SEC. ¶104. Unless an exemption from registration applies, it is unlawful to publicly sell unregistered shares like those Camber issued to Discover upon conversion. ¶106. Discover had relied on the Rule 144 safe harbor. ¶¶114-116. But Rule 144 is not available if, like Camber, the issuer is delinquent in its SEC filings. ¶¶112-113. Thus, once Camber stopped being current, Discover could no longer sell its shares lawfully. ¶116. Because Discover's profits fueled the scheme, Discover's displeasure threatened Doris's and Camber's interests as well.

### C.   Discover Sells Shares Unlawfully and Without Disclosure

Even though it was categorically prohibited from Rule 144 sales, Discover secretly and unlawfully continued selling shares. To sell shares, Discover falsely represented to Camber's transfer agent, ClearTrust LLC, that Camber was current with its quarterly and

annual reports, so ClearTrust would remove the restrictive legend on the Convertible Securities. ¶¶167-174.

Primarily because of Discover's conversions before the Class Period, share count grew from 25 million on February 23, 2021 to 104 million by July 9, 2021. ¶119. Revelation of this dilution caused Camber's stock price to fall from $1.14 on March 18, 2021, to $0.59 on July 12, 2021. ¶120.

During the Class Period, Camber issued 140.1 million additional shares to Discover, which Discover sold. ¶¶158-159. But to conceal Discover's unlawful sales and prevent Camber's stock price from falling, Camber did not disclose the increase in shares outstanding. ¶159. Financial sources continued to falsely report that there were only 104 million Camber shares outstanding, though Defendants knew the actual count by the end of the Class Period was almost 250 million. ¶¶123-124. By this scheme, Defendants concealed that shares were diluted approximately 71% during the Class Period.

To increase Discover's profits, Doris also initiated a short-term stock promotion scheme. On July 9, 2021, Discover and its affiliate bought $15 million of Convertible Securities. ¶98. On July 29, Camber transferred $11 million to Viking in which then used the proceeds to acquire Simson-Maxwell, a small company Camber claimed would launch Camber into the then-hot fields of clean energy and cryptocurrency. ¶¶127-129. Two weeks later, Camber announced it had licensed rights to a carbon capture technology, concealing that neither the technology nor the company that developed it ever generated any revenues despite a decade's operations. ¶¶134-135. These machinations aimed to buoy Camber stock while Discover was secretly and illegally dumping converted shares.

6

## V.   LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 n.12 (2011).  A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 545 (2007).  In considering a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor.  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).   Rule 12(b)(6) motions "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citations omitted).  Even in a securities fraud case, "a dismissal pursuant to Rule 12(b)(6) is difficult to obtain since such a claim revolves around fact-specific inquiries." *Bachow v. Swank Energy Income Advisers, LP*, 2010 WL 70520, at *2 (N.D. Tex. Jan. 6, 2010) (citations omitted).  "The court's role on a motion to dismiss is not to weigh the evidence that might be presented at trial,       but merely to determine whether       the complaint itself is legally sufficient." *Parker v. Missouri City, Tex.*, 2015 WL 4431019, at *11 (S.D. Tex. July 17, 2015).

The elements of an Exchange Act claim under Section 10(b) are: (1) material misrepresentations or omissions; (2) scienter; (3) a connection between the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx*, 563 U.S. at 37-38.  Here, Defendants challenge falsity, scienter, and loss causation.

7

## VI.    PLAINTIFFS PROPERLY PLEAD 10b–5(b) VIOLATIONS

The Complaint adequately alleges that Camber Defendants violated Rule 10b-5(b) when they failed to disclose Discover's sale of Convertible Securities during the Class Period, why they had a duty to do so, and how their concealment harmed investors.  That is all the law requires.

### A.    Camber Defendants had a duty to disclose accurate number of outstanding shares to investors

Camber Defendants admit that they concealed throughout the Class Period both massive dilution through issuance of conversion shares to Discover, and the actual number of outstanding shares from which shareholders could determine dilution on their own. Instead, they assert an SEC staff interpretive memo permits their concealment, incorrectly claiming the staff interpretation allows prior disclosure of the Stock Purchase Agreements ("SPAs") with Discover to substitute for honest disclosure of converted shares (as they had done previously on Form 8-K), or of outstanding shares in quarterly and annual.  CM10-12.

Item 701, which predates Form 8-K, requires disclosure in every quarterly and annual report of "***securities issued in exchange for*** property, services, ***or other securities***." 17 C.F.R. §229.701 (introduction).  Form 8-K requires disclosure of certain events within four business days "rather than waiting until the[] next periodic report."  *See* https://www.sec.gov/investor/pubs/readan8k.pdf.  Item 3.02 of Form 8-K requires disclosure of material share issuances, including through conversion of other securities. *Additional Form 8-K Disclosure Requirements & Acceleration of Filing Date*, Release No.

8

8400, 2004 WL 536851, at *19 (Mar. 16, 2004).  In adopting Item 3.02, the SEC was not creating a new disclosure requirement: it was *accelerating* Item 701's existing disclosure requirement.  *Business and Financial Disclosure Required by Regulation S-K*, 81 FR 23916-01, at *23963 (Apr. 22, 2016).

When enacting Item 3.02, the SEC initially considered removing Item 701 disclosure requirements from quarterly and annual reports.  It ultimately rejected that approach, requiring Item 701 disclosures in periodic reports of any share issuances that had not been disclosed in Form 8-K.  *Id*. at *23964.  And issuers must disclose the current number of outstanding shares in every periodic report.  *See https://www.sec.gov/files/form10-q.pdf*.  By requiring this "belt and suspenders" approach, the SEC reaffirmed the importance of timely disclosing share issuances to investors.  Neither Form 8-K, the text of Item 3.02, nor any SEC regulation or commission statement recognize any exemption to this disclosure.

Camber Defendants turn the legal scheme on its head.  Although disclosure was required both on an interim and periodic basis, Camber did neither.  ¶¶114-161.  The SEC staff publication they cite to excuse their conduct, "Interpretive Responses Regarding *Particular Situations*," has no force of law or application to the "particular situation" here.  The "particular situation" considered by SEC staff was not a delinquent company, like Camber.  Moreover, the staff interpretation cited requires disclosure of the "maximum amount of the underlying securities that may be issued"—i.e., the total number of shares that can be issued—and the floorless convertibles like Camber issued had no "maximum

9

amount." They could be converted into an infinite number of shares. These hazardous features require greater disclosure, not less.

Further, even if there were a maximum number of shares, it would not be meaningful. Defendants asserted in Camber's 10-Q for the period ending December 30, 2020, that Discover could be issued 47 billion shares, based on the $0.001 par value. That figure is approximately 188,000% higher than the number of shares Camber asserted were outstanding at the time, ¶16, and is so high that disclosure of *potential* dilution is meaningless. For floorless convertibles like Camber provided to Discover and others, the only meaningful metric is the number of shares actually issued. Indeed, outside of this litigation, Camber's current management admitted that the "par value" assumption actually did not substitute for "appropriate disclosure." *See* Exhibit A, April 16, 2021 Letter to SEC. At any rate, even if the "par value" assumption were accurate, Camber could always hold yet another reverse split or amend the par value.

At best, the materials Camber references recited a complex formula whose output depended on, among other things, Camber's trading price on each conversion date, whether specific numerical thresholds were satisfied, and the number of Camber Convertible Securities that had previously been converted and the dates of each conversion. ¶51. Further, the output depended on whether one or more of fourteen trigger events had occurred and the number of such occurrences, because each occurrence entitled Discover to increase the applicable interest rate by 10.0% (payable in even more shares). Hefley Dec. Ex. 1 at 20 (I.F.3.b). And the formula cannot yield the actual issuable amount because: (a) Defendants did not disclose all needed inputs; (b) the agreement allowed

10

Discover to skip any conversion or forgive any triggering event; and (c) many of the trigger events involved private interactions between Discover and Camber which no public investor could observe.  *Id*. at 26-27 (I. H. 1. (a)-(e), (h), (n)).

Moreover, Courts have rejected attempts by defendants to shift the burden onto investors to piece together information from various sources.  *See Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (rejecting the argument that investors were aware of fraudulent conduct because "complex economic data" was released to the public in its "native state" that would have required investors to conduct their own calculations and analysis); *see also In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1189-91 (D. Or. 2015) (rejecting the argument that information was already disclosed to the market because investors could have pieced together information from "obscure" sources).

Nor can the materiality of dilution or the actual share count be disputed.  A share is a fractional interest in a company, meaningful only in relation to the total number of shares outstanding.  Camber's claim it could leave the public blind while inflating the number of its shares outstanding by 150% eviscerates the Exchange Act's "philosophy of full disclosure." *Lorenzo*, 139 S. Ct. at 1103.

### 1.    Item 3.02 of Form 8-K required disclosure

Item 3.02 requires issuers to disclose "[p]rivate sales of securities exceeding 1 percent of a company's outstanding shares of that class (or 5 percent for smaller reporting companies)."  *See https://www.sec.gov/investor/pubs/readan8k.pdf*.  According to the SEC, "[i]nvestors … use the information provided under this item to determine the amount

11

of capital raised by the company as well as the potential dilutive effect of reported private sales." *Id.* As the Complaint details, Defendants used private sales to massively dilute Camber's common shareholders, but concealed this dilution during the Class Period.

Fraudulent issuers are not shielded from private liability for violations of Item 3.02. It "is the SEC's longstanding and consistent position [] that a violation of [] SEC disclosure obligation[s] can be the predicate for a Rule 10b-5 claim," including in private actions. *Brief for the United States as Amicus Curiae Supporting Respondents*, *Leidos, Inc. v. Indiana Public Retirement System*, 2017 WL 4004533, at \*22, 27-28 (U.S. Sept. 7, 2017) ("*SEC Brief*"). Where, as here, the SEC's interpretation is reasonable, it "is entitled to deference." *S.E.C. v. Zandford*, 535 U.S. 813, 819–20 (2002).

Like the SEC, courts find that Section 10(b) claims can arise where SEC regulations demand disclosure. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) (duty to disclose when there is a "statute or regulation requiring disclosure"). Even *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000), cited by Defendants, held as much. *Id.* at 285-86 (duty to disclose arises where there is "a statute requiring disclosure"). As the Second Circuit explained, nondisclosure of required information is likely to mislead investors: "[d]ue to the obligatory nature of these regulations, a reasonable investor would interpret the absence of a[] disclosure [required by SEC regulation] to imply the nonexistence" of the facts requiring disclosure. *Stratte-McClure*, 776 F.3d at 102. Thus, courts uphold complaints that allege defendants misled investors by omitting disclosures mandated by SEC regulations. *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 709 (N.D. Tex. 2008) (Item 404, requiring disclosure of related-party transactions); *In re Tyco Int'l,*

12

*Ltd.*, 2004 WL 2348315, at \*7 (D.N.H. Oct. 14, 2004) (Item 402, requiring disclosure of executive compensation).

The only cases Defendants cite purportedly reaching a contrary conclusion involved the particularities of a unique provision, Item 303, because it mandates disclosure of information that may not be material under securities laws.  As *In re NVIDIA Corp. Sec. Litig.*, cited by Camber Defendants, explains "the materiality standards for Rule 10b-5 and [Item 303] differ significantly."   768 F.3d 1046, 1055 (9th Cir. 2014).   Thus, "'demonstration of a violation of the disclosure requirements of Item 303 ***does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5***. Such a duty to disclose must be separately shown.'"  *Id.* (quoting *Oran*, 226 F.3d at 288) (emphasis added).   Item 303 violations may not be ***materially*** misleading because the omitted information may not be ***material***.  *Id*.  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1331 (11th Cir. 2019) likewise based its ruling on its recognition "[t]he disclosure obligations imposed by Item 303 and Rule 10b-5 are materially [] different" and noted that this was also the basis of *NVIDIA* and *Oran*.  In *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 632 n.63 (S.D. Tex. 2003), Judge Harmon wrote in a footnote that Item 303 did not give rise to a private right of action and cited *Oran*, presumably agreeing with its reasoning.  *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at \*10 (W.D. Tex. Aug. 19, 2016) just stated that it was persuaded by *NVIDIA*.

SEC regulations confirm that a litigant may recover for losses caused by a violation of Item 3.02.  The SEC recognized a limited safe harbor for certain "***private*** claims under [] Section 10(b)" related to other Form 8-K items rules but expressly declined to include

13

Item 3.02. *Additional Form 8-K Disclosure Requirements & Acceleration of Filing Date*, Release No. 8400, 2004 WL 536851, at \*26 (Mar. 16, 2004). By specifically refusing to extend the private litigation safe harbor to Item 3.02, the SEC confirmed that a violation of Item 3.02 can give rise to private liability under Section 10(b). *SEC Brief*, 2017 WL 4004533, at \*24.

### B.      The facts Defendants omitted were material

Defendants raise no deficiency in any other element of the 10b–5(b) claim, and all are adequately pled. As this Court has previously recognized, materiality is "a mixed question of fact and law and generally a decision for the jury[.]" *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 655 (S.D. Tex. 2021). Significant dilution of Camber common stock, shrinking the value of each other share, would unquestionably "be viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Nykredit Portefolje Admin. A/S*, 2021 WL 9037758, at \*26 (W.D. Tex. Sept. 13, 2021) (information that benefits insiders at investors' or company's expense more likely to be material); *see also In re Xcelera.com, Sec.*, 2002 WL 745835, at \*4 (D. Mass. Mar. 8, 2002) (holding that the failure to inform "stockholders of the possible dilution effect" of an agreement the defendants entered into constituted a material omission).

### VII.   THE COMPLAINT ADEQUATELY ALLEGES SCHEME LIABILITY

The Complaint adequately alleges that Defendants used a "device, scheme, or artifice to defraud," and engaged in an "act, practice, or course of business which operates or would operate as a fraud or deceit," in violation of Section 10(b) and Rules 10b-5(a) and

(c). *See* 17 C.F.R. § 240.10b–5. Rule 10b-5's "provisions capture a wide range of conduct" and are not "mutually exclusive" with the prohibitions of Rule 10b-5(b). *Lorenzo*, 139 S. Ct. at 1101-02. The elements of scheme liability are: "(1) that each defendant made a material misstatement (or omission) or committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, (2) scienter, and (3) reliance." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1196–97; *see also Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 950-51, 953 (S.D. Tex. 2021). "Conduct itself can be deceptive." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008). "[A]llegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002).

### A.     The scheme involved conduct

Because of the "considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Lorenzo*, 139 S. Ct. at 1102, a scheme need not involve anything more than false statements or omissions. The "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*, which rejected the [Defendants'] argument that Rule 10b-5(a) and (c) concern scheme liability claims and are violated only when conduct other than misstatements is involved." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021); *accord Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *11 (S.D.N.Y. Mar. 30, 2021) (collecting cases applying *Lorenzo* finding same).

15

Though not required, the Complaint here alleges substantially "more than making misleading statements to the public." *Anadarko*, 514 F. Supp. 3d at 951. In *Anadarko*, the plaintiffs alleged a scheme primarily involving false statements and omissions. *Id.* at 953-54. The court nonetheless found scheme liability because of peripheral actions like using outdated maps to fool partners and threatening potential whistleblowers. *Id.* The scheme here included concealing sales and refusing to file mandatory Forms 8-Ks and 10-Qs to prop up Camber's stock price while Discover unloaded 140.1 million shares on unsuspecting investors. ¶¶139-41, 158-59. Defendants' deceptive acts were far more important to the scheme than Anadarko's. They include Discover's false representations to ClearTrust LLC that Camber was current with its filings and that Discover complied with Rule 144, so that the restrictive legend was removed from the Convertible Securities so as to sell them to the public (¶¶167-174), Discover's, with Camber Defendants' authorization, illegal sales of unregistered securities (¶¶141-143), and Camber Defendants' Discover-financed (¶98) stock pumping scheme (¶¶127-37). Camber Defendants' claim to have only participated in a "legitimate transaction," *see* CM20, is belied by this course of deceptive conduct. The Complaint thus alleges that each Defendant engaged in at least one manipulative act in furtherance of the scheme with scienter. *See JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735-37 (E.D. Mich. 2014) (finding scheme liability adequately pled for individual defendants who were each accused of committing at least one deceptive act in furtherance of the scheme). And this case is nothing like *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), where normal business transactions were later misreported by another company. In any case, that

16

both Camber Defendants and Discover Defendants were participants in the other's deceptive scheme suggests the allegations against each plausibly state a scheme.

Though Discover and Camber Defendants each maintain they were mere aiders and abettors of the other's scheme, CM18-20; DM19-20, scheme liability applies to masterminds and underlings alike. *Lorenzo*, 139 S. Ct. at 1101-02 (finding defendant liable for sending misleading e-mails under the direction of his boss); *see also Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021), *reconsideration denied,* 2021 WL 2349904 (E.D. Va. Apr. 13, 2021) (finding scheme liability adequately pled for defendants whose conduct furthered the defendants' scheme). As set out above, the Complaint alleges that each engaged in deceptive conduct and thus shows they were more than abettors. *See Shapiro v. Drs. Hosp. Renaissance, Ltd.*, 2014 WL 12618723, at *4 (S.D. Tex. Mar. 27, 2014) (holding that "a person who commits a deceptive act in the process of providing assistance to another primary actor may himself be liable as a primary actor"); *Young v. Nationwide Life Ins. Co.*, 2 F. Supp. 2d 914, 921 (S.D. Tex. 1998) (finding scheme liability pled for defendants who were alleged to have been "in cooperation" with other defendants in carrying out the scheme). Indeed, Defendants' arguments are not even a defense because "even an entity that plays a secondary role in a securities fraud case may be held liable as a primary violator." *City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, 878 F.3d 36, 51 (2d Cir. 2017). For example, in *Providence*, plaintiffs alleged that certain funds used manipulative trading tactics. *Id.* at 49. Even though the funds executed the scheme, the court held that the exchanges on which the tactics were used were liable because they authorized the tactics. *Id.*; *S.E.C. v. GPL Ventures LLC*, 2022 WL 158885, at *9 (S.D.N.Y.

17

Jan. 18, 2022) ("[E]ven a bit participant in the securities markets may be liable as a primary violator where a defendant is alleged not to have simply facilitated manipulative conduct, but rather to be a 'coparticipant in the manipulative scheme and profited by that scheme.'").

The scheme states a violation of the securities laws. In *Galena*, the defendants hired stock promoters to draft articles and approved their publication. 117 F. Supp. 3d at 1191-99. The articles were misleading because they omitted that they were paid promotions, paid for with undisclosed issuances of common stock, allowing certain defendants to sell shares at inflated prices. Similarly, Defendants concealed illegal stock sales, engaged in a misleading promotional campaign, and propped up Camber's stock price through massive stock sales.

The cases Defendants cite in which the defendants did not engage in manipulative conduct are inapposite. *Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 389–90 (5th Cir. 2007) (reversing a class certification ruling where the defendant was only alleged to have provided financing to the company without engaging in manipulative trading); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (similar). Here, the Complaint alleges that each Defendant committed a deceptive act. Further, Defendants' cited cases involving purely speculative schemes are inapposite. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (noting no factual allegations connecting money laundering at a single bank branch with defendants); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 210–11 (D. Conn. 2014) (dismissing scheme liability claim where the complaint alleged only that the defendant had hired many employees to sell its products); *Kraft v.*

18

*Third Coast Mistream*, No. 19-CV-9398 (LJL), 2021 WL 860987, at \*14-19 (S.D.N.Y. Mar. 8, 2021) (refusing to credit speculative allegations of scheme that ran counter to defendants' economic interest). The Complaint alleges specific facts with particularity that show Defendants violated the securities laws and the scheme it alleges is economically rational.

The Complaint's allegations of Defendants' insider trading also independently support scheme liability. *See S.E.C. v. Panuwat*, 2022 WL 633306, at \*8 (N.D. Cal. Jan. 14, 2022). In *Panuwat*, the court held that scheme liability based on insider trading "falls within …. the language of the applicable law" because "Rule 10b5-1(a) provides that 'manipulative and deceptive devices" include "'the purchase or sale' of securities based on material nonpublic information about that security or issuer." *Id*. The Complaint alleges the scheme enabled Discover to do exactly that. ¶¶284-292.

Camber Defendants mischaracterize Plaintiffs' allegations as "nothing more than Camber's own public statements and buzzwords," CM16-18, but the Complaint pleads that in its stock pumping scheme, Camber made materially misleading statements about Simson-Maxwell's size and the nature of its business, ¶¶128-133, while omitting to disclose that ESG had been operating for a decade without earning any revenues. ¶¶134-137. And the non-disclosure here was not puffery as in the cases Camber Defendants cite, but rather concrete financial information and a company's business plan and capabilities. *See Employees' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) (statements regarding commitments to "high quality" and "transparency" were puffery); *Catilina Nominees Proprietary Ltd. v. Stericycle, Inc.*, 2021 WL 1165087, at \*6 (N.D. Ill.

19

Mar. 26, 2021) (claim that containers were "ideal" was unprovable puffery). That the Defendants concealed stock sales further distinguishes this case from *Stephens v. Uranium Energy Corp.*, where all the plaintiffs alleged was that the defendants engaged in a fully-disclosed, non-misleading, promotional scheme. 2016 WL 3855860, at \*23-24 (S.D. Tex. July 15, 2016).

Finally, Camber Defendants argue that there can be no scheme to conceal Items 3.02 and 701 disclosures, CM10-16, but the SEC has brought Section 10(b) claims based on violations of Item 3.02 and 701. *In the Matter of Galena Biopharma, Inc., et al.*, Release No. 3865, 2017 WL 3215775.

Discover Defendants wrongly contend that Discover's participation in the scheme is excused because it had no independent disclosure obligations. DM18. But, as the Supreme Court explains, it is "erroneous" to require "a specific oral or written statement before there could be liability under §10(b)" because "conduct itself can be deceptive." *Stoneridge,* 552 U.S. at 158-59 (emphasis added). Reliance "is occasionally misconstrued, because its requirements differ depending on whether the first element, deceptive act, involves a misrepresentation, omission, or conduct." *Shapiro*, 2014 WL 12618723, at \*7. Thus, for example, an outside defendant's wash trades violate Rule 10b-5(a) and (c) even if the defendant has no fiduciary relationship with the public. *See*, *e.g.*, *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 327 (S.D.N.Y. 2019). That is because, "[w]here a defendant engages in market manipulation or a scheme to defraud in violation of Rule 10b–5(a) or (c), that misconduct creates a duty to disclose." *Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 46–47 (S.D.N.Y. 2022); *see also In re UBS Auction Rate Sec. Litig.*,

20

2010 WL 2541166, at *27 (S.D.N.Y. June 10, 2010) ("[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b–5(a) or (c), that misconduct creates an independent duty to disclose"). Participants in a market assume all other participants abide by their duty to forego illegal acts, and by breaching that duty, the defendant misleads other participants. *UBS*, 2010 WL 2541166, at *27. Discover Defendants owed a duty to persons who purchased Camber common stock not to engage in illegal and undisclosed sales in violation of Rule 144, or at least to disclose their misconduct, though Discover Defendants did neither. Because the Complaint alleges that Discover Defendants participated in a scheme to violate Section 10(b) (¶¶118-143; 263-272), they are liable under Rule 10b–5(a) and (c).

Moreover, Discover Defendants had a duty to disclose when they converted and sold their Convertible Securities. While "[c]orporate insiders do not have a duty to disclose all material information to the public … their duty is either to disclose the confidential information which is the basis for their wanting to sell their stock or to abstain from trading until such disclosure is made." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d at 575. Likewise, Discover was obligated to disclose or abstain from any sales. *Infra* at Section XI; ¶¶99, 284-292; *Dirks v. S.E.C.*, 463 U.S. 646, 655 (1983). Notably, Camber Defendants secretly provided Discover Defendants the precise information concealed from the public investors upon whom they dumped shares: the number of Camber shares issued to Discover and the number outstanding.

21

Thus, because Discover Defendants schemed to manipulate the market and profit off that manipulation through the sale of their Convertible Securities, they had – and violated – a duty to disclose their scheme.

Discover Defendants rely on a case that predates *Stoneridge*, DM18 (citing *Regents*, 482 F.3d at 389–90).  There, unlike Discover, the bank defendants did not act directly in the market, and thus could not be liable for manipulation under Rule 10b–5(a) and (c).  *Id*. at 392.  (*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 610 F. Supp. 2d 600, 609-10 (S.D. Tex. 2009) is *Regents* on remand.).

Finally, Discover Defendants assert the scheme is not plausible because an increased stock price means it will receive fewer shares from conversion.  DM29-30.  Not so.  If Camber's stock price is high, Discover will resell its converted shares at a large profit.  But because the measurement period extends indefinitely into the future, Discover will receive more shares after conversion when Camber's stock price declines.  Thus, the ideal scenario for Discover is exactly what happened here: it converts and sells Camber common shares when their price is artificially inflated by Defendants' fraud and receives more shares from the conversions when investors discover the fraud and Camber's stock price falls.

## B.     Defendants' scheme was not fully disclosed

As the Complaint details, neither the existence of the scheme nor the conduct of each Defendant in furtherance of the scheme, were disclosed during the Class Period. ¶¶118-161.  Defendants do not show otherwise.  Instead, they contend that such deception

22

was permissible because they published a copy of the SPAs between Camber and Discover. CM19-20; DM18-19.

Defendants' argument makes no sense, as the SPA does not disclose that any conversions or sales would be concealed from investors, that Discover would sell in violation of Rule 144, that the outstanding share count would not be updated in periodic reports, or that Camber would omit filing Forms 8-K.  Though Defendants cite *Wilson v. Merrill Lynch & Co.*, the brokers there disclosed that they would engage in the transactions at issue.  671 F.3d 120, 126 (2d Cir. 2011).  Here, nobody disclosed that Defendants were violating Rule 144 and their disclosure obligations. CM, Ex. 13.  Without these disclosures, *Wilson* is inapposite.  *Ficeto*, 2013 WL 1196356, at *8 (distinguishing *Wilson*); *S.E.C. v. Thompson*, 238 F. Supp. 3d 575, 598 (S.D.N.Y. 2017) (even stating promoters "may" sell shares was deceptive when intent was to sell all their shares).  Thus, disclosure of the initial contract between Discover and Camber does not excuse Defendants' deceptive conduct, or their scheme to defraud investors.  Moreover, if Defendants are arguing that these terms somehow became public knowledge, this is a "factual argument, which would require [the Court] to assess evidence outside the [Complaint, and] cannot be resolved on a motion to dismiss." *S.E.C. v. Ficeto*, 2013 WL 1196356, at *8 (C.D. Cal. Feb. 7, 2013).

Discover Defendants' citation of *In re Immune Pharm. Inc.*, 635 B.R. 118 (Bankr. D.N.J. 2021) and *In re Scripsamerica, Inc.*, 34 B.R. 863 (Bankr. D. Del. 2021) is misleading.  These "opinions" were actually unopposed bankruptcy orders that Discover had drafted and bankruptcy courts merely entered.  *Id*.  "Orders drafted by counsel, especially those making findings of fact and conclusions of law that award counsel their

23

own fees, should be given little precedential value." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014).  Thus, Defendants are citing "opinions" to the Court as though the "opinions" were authoritative without disclosure that Defendants themselves drafted the "opinions."  In any case, neither "opinion" dealt with a scheme similar to that alleged here, where the amounts of actual conversions, unregistered sales, and shares outstanding were concealed from investors, and the sales were made while the public was not provided current financial information in violation of Rule 144.

**C.  Discover could not lawfully sell unregistered Camber stock under Rule 144 or Section 4(a)(1)**

Discover Defendants do not argue that Discover was legally entitled to sell shares under Rule 144 during the Class Period.  DM13-16; ¶116.  Instead, they assert that their secret sales were permitted by Section 4(a)(1) of the Securities Act, which exempts transactions by persons other than issuers, underwriters, or dealers.  DM13-18.  Yet the SPAs themselves expressly contemplate that shares issued pursuant to conversion would be sold under Rule and requires that Camber remain current.  ¶114.  Discover even sued to enforce the provision.  ¶116.  Discover Defendants do not even attempt to explain their change of position.

In any case, Discover Defendants are wrong.  "Exemptions from registration provisions are construed narrowly in order to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010). Rule 144 (entitled "Persons Deemed Not to be Engaged in a Distribution and Therefore

24

Not Underwriters") interprets Section 4(a)(1) and is the primary means for avoiding underwriter liability.

In the Securities Act, an "underwriter" is defined expansively to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(a)(11). "[T]he term 'underwriter' is broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public," even without an underwriting agreement or compensation. *S.E.C. v. Nat'l Bankers Life Ins. Co.*, 324 F. Supp. 189, 194 (N.D. Tex.), *aff'd*, 448 F.2d 652 (5th Cir. 1971). "Any intermediary between the issuer and the investor that is an essential cog in the distribution process may be a statutory underwriter." *Platforms*, 617 F.3d at 1086-87 (internal citations omitted). Further, a party who buys stock directly from an issuer intending to sell the stock is considered an underwriter. *S.E.C. v. Blackburn*, 431 F. Supp. 3d 774, 803 (E.D. La. 2019). It "is difficult to fathom how [a party] could operate by receiving stock not with a 'view toward' distribution," *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 808–09 (11th Cir. 2015), and is unfathomable here.

The SPAs themselves contemplate resale to public investors where permitted by Rule 144, and Discover's lawsuit alleges it intended to do just that. ¶114. The terms of the transaction through which Discover acquired Convertible Securities also prove that Discover was an underwriter. The SPA specified that Discover must own less than 10% of Camber's shares. Yet the Convertible Securities could by their terms be converted into 99% or more of Camber shares. Thus, to profit from its Convertible Securities, Discover

25

***had to*** convert, sell, rinse and repeat.  Kirkland also admitted under penalty of perjury that distributing securities is Discover's entire business model.  ¶107.  Discover's course of conduct confirms this to be true.  Discover systematically sold converted shares at the earliest opportunity.  ¶¶12-13, 52-55, 84.  Thus, Discover was prohibited from selling both under Rule 144 and Section 4(a)(1).

The SEC itself has drawn a distinction between typical convertible securities and the floorless Convertible Securities that Discover purchases.  Rule 144 Holding Period and Form 144 Filings, 86 FR 5063, 5066 (proposed Jan. 19, 2021) (emphasis added).  A typical convertible security holder faces economic risks because the underlying security's price may not increase and may even fall.  This is not true of floorless convertible securities that Discover buys because Discover receives more shares as the stock price falls.  *Id*.  Rather, "initial purchasers or subsequent holders have an incentive to purchase the market-adjustable securities with a view to distribution of the underlying securities following conversion to capture the difference between the built-in discount and the market value of the underlying securities" in which case they are an "underwriter and [] unable to rely on the Section 4(a)(1) exemption from registration." *Id*.  Therefore, the SEC made clear even before the Class Period that parties like Discover who purchased floorless Convertible Securities and avoid economic risks are underwriters and must fit within a safe harbor.  *Id*. at 5066-5067.

That Discover held certain Convertible Securities from 2018 before selling converted common stock shares is irrelevant because it was not an investment decision. *S.E.C. v. Big Apple Consulting USA, Inc.*, 2011 WL 13143143, at *2 n.3 (M.D. Fla. Dec.

29, 2011) (holding stock because of an inability to sell due to market conditions irrelevant to whether holder is an "underwriter). Discover was converting its Convertible Securities and selling the resulting common stock from the moment of its purchase. As of March 31, 2018, Camber had 184 shares outstanding (adjusted for subsequent reverse stock splits). In successive quarters, the number of its shares outstanding rose to **532** to **2,371** to **5,418** to **39,053**, to **1,048,532** to finish at **4,709,167** on December 31, 2019. *See* Exhibit B, 2/14/2020 Camber Energy Form 10-Q. Further, Discover could not sell any shares between September 2020 and February 2021 because Camber literally ran out of shares. ¶¶99-100. It resumed selling shares as soon as Camber had more shares to issue. That Discover still had Convertible Securities left reflects that it takes time to sell 26,000% or more of an issuer's outstanding shares, not that it intended to invest in Camber.

Nor is Discover's admitted "aim to distribute those securities to the public" the only reason it was an underwriter. A party can still be "held liable under the Act as an underwriter where the sale is made for an issuer in connection with the distribution of such security." *S.E.C. v. Olins*, 2010 WL 900518, at *3 (N.D. Cal. Mar. 12, 2010) (collecting cases); *Hedden v. Marinelli,* 796 F.Supp. 432, 437 (N.D.Cal.1992) (holding where it did "not appear that [defendant] acquired the stock with a view to a distribution," such circumstance did "not ... defeat a finding that he [was] an underwriter"; noting "second prong of the analysis remains"). "[A] distribution is synonymous with 'public offering' as set forth under Section 4(2) … Whether a particular sale constitutes a 'public offering' turns on whether the particular class of persons affected need the protection of the Act." *Olins*, 2010 WL 900518, at *3–4. Where, as here, a party receives "a large

27

quantity of shares directly from the issuer and sold those shares without proper registration to the general public … the sale of the subject shares constituted a public offering." ¶¶43-56, 79, 84-85, 99; *Olins*, 2010 WL 900518, at *4. Camber financed its operations by selling Convertible Securities to Discover, which Discover then converted into common shares, diluting existing shareholders. Investors needed the Act's protection.

Further, because Discover is a controlling person of Camber by the SPA and its significant holding of Camber securities, *infra* at Section X, it is an "affiliate of an issuer and is treated as an issuer when there is a distribution of securities." *Olins*, 2010 WL 900518, at *4 (citing *S.E.C. v. Cavanagh*, 155 F.3d 129, 134 (2d Cir.1998) (holding "an affiliate ordinarily may not rely upon the [Section 4(a)(1)] exemption—he must either re-register his shares or qualify for a different exemption before undertaking to sell them")). For this additional reason, Discover cannot claim protection under Section 4(a)(1). *Id*.

**D.    The Complaint does not rely on group pleading**

That "some allegations pertain to more than one person ***does not make them group pleading***, particularly where, as here, it is sufficiently clear from the face of the complaint which [] allegations apply to each Individual Defendant." *MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *17 (S.D. Tex. July 24, 2019), *report and recommendation adopted*, 2019 WL 4673209 (S.D. Tex. Sept. 24, 2019) (emphasis added). In *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, which Defendants cite, the plaintiff alleged a scheme by seven separate defendants without differentiating their roles. 365 F.3d 353, 365 (5th Cir. 2004). Here, the Complaint specifies the roles of Kirkland and DFM LLLP: they controlled the actions of Discover, and helped Discover further its scheme with Camber.

28

¶¶30-34, 280-281. Moreover, the Complaint pleads additional particularized allegations concerning Kirkland. ¶¶35, 115, 167-202. Consequently, Discover Defendants' "group pleading" mantra, DM30, misstates the Complaint.

## VIII. THE COMPLAINT SUFFICIENTLY PLEADS SCIENTER

Scienter is "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (internal quotation marks and citation omitted). In assessing scienter, "the court must review all the allegations holistically." *Matrixx*, 563 U.S. at 48 (internal quotation marks omitted). The inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs, Inc.*, 551 U.S. at 324 (internal quotation marks omitted).

### A. Defendants profited from the secret scheme

Although insufficient on their own, motive allegations may "meaningfully enhance" the inference of scienter. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) (internal quotations omitted). Individual Defendants' opportunity is established by their corporate positions. *Id*.

29

As even the case Discover Defendants cite recognizes, profits from stock sales can support scienter. *Southland*, 365 F.3d at 368. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552–53 (5th Cir. 2007). Discover Defendants' stock sales in this case were enormous. Discover made at least high eight figure profits, and possibly more than $100 million, from selling converted Camber stock. As the Complaint details, Discover profited from inflated prices due to the concealment of the dilution it caused. ¶¶118-139. Discover Defendants' sole argument that it had a contractual right to sell, DM24-25, is irrelevant because this is not a breach of contract action and stock sales show that the seller had a motive to violate the securities laws. Executives, too, may sell their stock, but if they do so at suspiciously opportune times, it is evidence of scienter. *Southland*, 365 F.3d at 368.

Doris stood to gain a substantial concrete and personal benefit. Doris owned no Camber shares, owned nearly all of Viking's through Viking convertible securities, and transferred the money Discover paid for its Convertible Securities directly to Viking. ¶¶28, 75. In other words, Doris effectively misappropriated whatever Discover paid to buy Camber Convertible Securities for his personal company (which, incidentally, owed him $400,000). ¶62. That is a powerful incentive. Moreover, even ignoring the misappropriations, only well-timed infusions from Discover kept it afloat. ¶¶52-56, 140. This is "more than the general desire to improve financial results," and instead Doris' "career[] and the very survival of the company [was] on the line." *In re Cabletron Sys. Inc.,* 311 F.3d 11, 39 (1st Cir.2002); *see also Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876,

30

889 (W.D. Tex. 2014) (pressure to deliver immediate results was motive which supported scienter).

Doris's concrete and personal motive to prop up a failing business he secretly owned almost in its entirety contrasts with the generic motive for corporate success and to "maximize [the defendant's] stock price to complete a large number of acquisitions" that was rejected in Camber Defendants' cited case, *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *7 (N.D. Tex. Feb. 26, 2002), *aff'd,* 342 F.3d 563 (5th Cir. 2003). Moreover, Defendants' argument that Doris's lack of insider trading violations negates scienter ignores that Doris had no Camber shares to sell.  ¶76.

Camber Defendants assert that motive is negated because the underlying SPA was disclosed.  CM23-24.  But Defendants' misconduct consisted not in signing the SPA but in failing to disclose the mounting share count caused by Discover's illegal sales.  ¶¶52-98, 140, 207-212.  And their cases are inapposite.  In *Garcia v. J2 Glob., Inc.*, 2021 WL 1558331, at *2-3, 20 (C.D. Cal. Mar. 5, 2021), full disclosure of the self-dealing transaction was relevant because the plaintiffs alleged that the defendants had lied about it.  And in *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004), the ability to continue engaging in related-party transactions was not motive because false statements had no impact on company's ability to continue operating.  In any case, the analysis in *PR Diamonds*—half a sentence long—is incorrect.  It conflates motives with false statements. A statement is generally not misleading if the full true details are confirmed but a motive still gives a defendant an incentive to make the false statements even if the motive is

31

disclosed.    Indeed, insiders' stock sales are publicly disclosed yet they still serve as motives.

B.    "Special circumstances" support an inference of scienter

Courts in the Fifth Circuit find a strong inference of scienter when plaintiffs allege "special circumstances," including: "(1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions critical to the company's continued vitality, (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements by the officer." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 459-60 (S.D. Tex. 2016) (internal quotation marks and citations omitted); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).  As this Court recently held, a defendant's senior position combined with the importance of the issue to the company's business can establish scienter. *Venator,* 547 F. Supp. 3d at 664.  The Complaint alleges special circumstances for both the Camber Defendants and Discover Defendants.

Most securities class actions are brought against large companies with hundreds or thousands of employees.  The standard for scienter reflects that in such large organizations, senior executives cannot know everything.  But as the Fifth Circuit has recognized, in small organizations, executives know more.  Therefore, a company's small size supports scienter. *Nathenson*, 267 F.3d at 425 (32-35 full-time employees supported scienter); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 831 (S.D. Tex. 2014) (holding scienter sufficiently pled due to the small size of the company, 27 employees, and defendants' positions as senior managers).  Both Discover and Camber are ***much*** smaller even than the company in *Nathenson*.  Camber had no employees, Viking had seven, and Kirkland was Discover's

32

sole member.  ¶¶32-35, 244-246.  Kirkland would be intimately involved in receiving and delivering the conversion notices to request Camber shares, ¶¶32-35, 141-143, 279-283, while Doris would be involved in authorizing their issuances.

The omitted facts were critical.  The sale of Convertible Securities to Discover was crucial to Camber and Doris, as it was its predominant source of financing and the only reason it kept afloat.  ¶¶45, 52, 56.  Likewise, purchasing Camber Convertible Securities and selling the resulting shares was Discover's single most profitable transaction.  ¶¶107-108.  The information would have also been readily apparent to both Doris and Kirkland, as the undisclosed conversion and sale 140.1 million shares required both of their authorizations.  ¶¶141-143.  Finally, Doris's consistently positive statements about Camber's business—all while Discover Defendants were diluting Camber common stock by over 150%—were inconsistent with the reality facing Camber.

Thus, the special circumstances support a powerful inference of scienter here.  *See Plotkin*, 407 F.3d at 700 (holding scienter sufficiently pled due to the importance of the deal at issue to the continued viability of the defendant company and the magnitude of the deal); *Cannon*, 184 F. Supp. 3d at 483–84 (holding scienter sufficiently pled due to the centrality of a plant to the defendant's business and the defendant's position as CEO); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 601 (W.D. Tex. 2014) (holding scienter sufficiently pled where the information at issue was "extremely important to the success" of the company); *In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004) (holding scienter sufficiently pled where a contract's "sheer

33

magnitude and importance" to the continued survival of the company was such that the defendants, as CEO and CFO, would have known of its status).

The cases Camber Defendants cite are inapposite. CM24-25. In *Yang v. Nobilis Health Corp.*, the defendant "was a large company with hundreds of employees, in 30 locations, and the exception does not apply in such circumstances." 2021 WL 3619863, at *3 n.1 (5th Cir. Aug. 13, 2021). Similarly, in *Stephens*, 2016 WL 3855860, at *16, the company had 61 employees, the allegedly concealed fact was the effect a fully disclosed minor stock promotion scheme would have on the stock price, there were no allegations that the defendants "champion[ed]" the stock promotion scheme, and there was no "dump" following the "pump." Here, there were fewer employees, the facts were obvious and obviously material, there was indeed a "dump," and the facts suggest both Doris and Kirkland were intimately involved.

Discover Defendants fare no better. DM28. They rely on *Nathenson*, 267 F.3d at 419, which established the "special circumstances" rule, *found* special circumstances, and supports a strong inference of scienter here. Discover Defendants' mantra that Complaint's allegations are "conclusory" similarly fails. The Complaint details Defendants' positions and responsibilities, the size of Camber and Discover, the importance of the scheme to each Defendant, the actions that each took in furtherance of the scheme, Defendants' own admissions, and the nature of the scheme, all of which support a strong inference of scienter. ¶¶27-35, 63-161.

34

**C.     Camber's reversal of its share count disclosure practice during the Class Period supports scienter**

Pre-Class Period information can strongly support scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Here, before the Class Period, Camber regularly disclosed increases in the number of its outstanding shares on Forms 8-K.  ¶¶16, 18, 119. Thus, Camber knew that the total number of outstanding shares was "material information" requiring disclosure.  *See* https://www.sec.gov/about/forms/form8-k.pdf.  Camber also knew that the reaction to the earlier disclosures pressured its stock price.  ¶120.  That Camber stopped disclosing increases in shares outstanding around the time Discover ceased being able to lawfully sell shares pursuant to Rule 144 and around the time that Camber ceased disclosing total shares outstanding in periodic reports support an inference that the omission was deliberate.  *Zagami*, 540 F. Supp. 2d at 713 (disclosure of one related-party transaction suggests omission of another was knowing); *Vanderhoef v. China Auto Logistics Inc.*, 2021 WL 3260849, at *4 (D.N.J. July 30, 2021) (same).  None of Defendants' cited authorities hold otherwise.

Camber Defendants argue that their prior practice does not support scienter because they previously disclosed share count increases under Item 8.01 of Form 8-K, through which issuers disclose material news, rather than Item 3.02.  CM28.  In effect, Camber Defendants' argument is that they deliberately concealed material information but did not know they were required to disclose it.  Yet even Camber Defendants' strained argument is implausible.  Camber stopped disclosing Discover's sales soon after they became

35

unlawful and soon before it launched a stock promotion campaign with Discover's money. Camber's change in policy was too well timed to be innocent.

> **D.    Individual Defendants' history of securities laws violations bolsters their scienter**

The "[e]xistence of a prior action alleging the same fraudulent manipulations" can support scienter. *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d at 689 (fraud that plaintiffs could not pursue because of statute of repose contributed to scienter); *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *16 (D.N.J. Apr. 30, 2020) (prior concealed stock sales "support an inference that [defendant] knew that concealing his stock sales was deceptive."). Prior misconduct can also show that a defendant is familiar with specific rules and practices, supporting an inference that the defendant's subsequent violations of these rules and practices is at least reckless. *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (repetition of accounting violations "strongly probative of scienter"); *cf.* Fed. R. Evid. 404(b) (prior bad acts evidence admissible to show knowledge or absence of mistake).

Kirkland (like Doris) is a corporate lawyer familiar with the disclosure requirements of the federal securities laws. Before founding Discover, Kirkland was outside counsel to at least one public company, U.S. Aerostructures, Inc. ("USAI"). ¶177. Kirkland exploited this role to pump USAI shares by falsely reporting to the *Wall Street Journal* and the *Washington Post* that USAI had entered into huge contracts, and sold shares without making required disclosures. ¶¶179-181, 185-188. Feeling no remorse, he shamelessly

36

brags that he was quoted in these publications without disclosing that it was because he supplied false information. ¶32. Thus, his prior illegal conduct is quite like the conduct alleged here and supports an inference of scienter. *Takata*, 2020 WL 2079375, at *16.

Kirkland erroneously claims the Court cannot consider these allegations because they were unadjudicated. Yet the lawsuits *were* adjudicated: Kirkland lost. Kirkland regularly violated the district court's orders, so it entered a default against him, meaning he admitted all the allegations. ¶191. The bankruptcy court dismissed USAI's bankruptcy because it was not authorized, necessarily finding that Kirkland's associate's declaration purporting to authorize the bankruptcy was perjurious. ¶200. Regardless, "[i]t makes little sense to say that information [] is immaterial simply because it is conveyed in an unadjudicated complaint." *Puddu*, 2021 WL 1198566, at *13.

Kirkland's two other arguments also lack merit. First, he claims he was charged only with overzealous representation. Not so. The lawsuit charged that Kirkland had engaged in a fraudulent pump-and-dump scheme for his own benefit at the expense of his client, the corporation. ¶¶175-192. Second, he claims those plaintiffs' decision to release him without a payment from him suggests he did nothing wrong. But those plaintiffs released him only as part of a $12.2 million global settlement. *See Defrees v. Kirkland*, 2018 WL 11365544, at *1 (C.D. Cal. July 26, 2018). Without such payment, the lawsuit would have proceeded against Kirkland.

Doris's checkered history also supports an inference of scienter. For example, Doris twice forced alteration of the terms of his Viking convertible securities **to increase his personal stake upon conversion 37,500 fold**. ¶¶70-171. Doris now dubiously asserts that

37

the alteration was an error, but that is a fact question that must wait until summary judgment. CM23-24. Similarly, here, Doris did not promptly disclose that investors should no longer rely on Camber's financial statements and used that concealment to grant Discover the opportunity to dump Camber shares in the February-May 2021 period. ¶¶99-104, 144-161. That Doris previously deliberately disregarded and failed to disclose Viking's auditor's assertion that Viking's financial statements were misstated lend credence to allegations that the failure to restate was part of a deliberate scheme. ¶¶226-237.

Defendants also misstate the holding of *Collmer v. U.S. Liquids, Inc.* when arguing against scienter. DM24-26. That court stated that the "existence of an ancillary lawsuit charging fraud by a company and that company's quick settlement of the suit" does not alone compel, but ***does support***, a strong inference of scienter. 268 F. Supp. 2d at 751 (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). Thus, *Collmer* held the exact opposite of what Defendants claim. *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, 2013 WL 2154220, at *3 (S.D.N.Y. Mar. 29, 2013) provides no analysis but appears to suggest that another lawsuit charging mistake, not fraud, provided no evidence of scienter. The SEC investigations in *MicroCapital Fund LP*, 2019 WL 3451153, at *18 and *Glover v. DeLuca*, 2006 WL 2850448, at *23 (W.D. Pa. Sept. 29, 2006) similarly involved allegations of negligence, not recklessness, knowledge, or intent. In *Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *20 (D. Conn. Sept. 30, 2014), *Fidel v. Rampell*, 2005 WL 5587454, at *7 (S.D. Fla. Mar. 29, 2005) and *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000), the defendants' previous alleged fraud was

38

unconfirmed and completely different from the type of misconduct at issue in the case. Here, both cases allege that Kirkland engaged in deceptive stock sales. *Karpov v. Insight Enterprises, Inc.*, 2010 WL 2105448, at *7 (D. Ariz. Apr. 30, 2010) merely held that plaintiffs could not argue unpleaded facts.

**E.    Viewed holistically, the Complaint's allegations support a strong inference of scienter**

As described above, several alleged facts considered individually each suggest Defendants acted with scienter. When considered collectively—as the Court must under *Tellabs* (551 U.S. at 323)—the inference is as strong as any nonculpable inference. In late December 2020, Discover, Camber, and Viking were in a partnership that allowed each to make huge sums but was imperiled because Camber had no more shares to issue to Discover to fuel the partnership. Defendants attempted to restart the partnership in February 2021, but Camber quickly became delinquent, preventing Discover from selling shares. Over the summer of 2021, as Discover unlawfully sold Camber shares for high eight-figure profits, two things happened: (a) Camber stopped disclosing the sales, breaking with past practice; and (b) Camber began a stock promotional scheme using money provided by Discover and appropriated by Viking. These two steps propped up Camber's stock price while also rewarding Doris with nearly ten million dollars. Doris and Kirkland are no naïfs or overworked executives; they are both corporate lawyers who head tiny companies. Nor would it violating the securities laws be a first for either, and Kirkland's past misconduct reads like a dress rehearsal for what happened here. The inference that this was a deliberate scheme is at least as plausible as Defendants' competing

inference that Camber decided to begin concealing material increases in the share count for undisclosed well-timed but non-fraudulent reasons.

Defendants nevertheless ask this Court to believe that Camber Defendants independently reversed their reporting practices during the Class Period because they changed their minds about disclosure requirements did not believe that the reporting obligations Camber followed before the Class Period still applied during the Class Period. CM28. This implausible suggestion cannot be squared with well-pleaded Complaint allegations which must be accepted as true, even when weighing scienter. *Tellabs*, 551 U.S. at 322 (complaint allegations taken as true on a motion to dismiss). Specifically, Defendants' spontaneous reversal theory ignores: (1) that Camber is a small company and the continued sale of Convertible Securities to Discover had been the predominant source of financing that kept both Camber and Doris's career afloat, so they would have scrutinized Discover's continued conversions and resulting share issuances, while soliciting further purchases from Discover (¶¶45, 52-56); (2) that Camber Defendants had to personally themselves monitor and authorize the conversion authorize the sale of the Convertible Securities (¶¶141-143), so they knew that the number of outstanding shares were increasing, (3) that Camber defaulted on stopped its periodic known reporting obligations at the ***exact same time*** that continuing such reporting would disclose that the number of outstanding shares ***more than doubled*** (¶¶16, 18, 119), showing that they not only knew of its obligations but ignored them at the most opportune time for Defendants' scheme; (4) that both Doris and Camber had significant financial interests in allowing Discover to illegally sell the common shares resulting from conversion (¶¶52-56. 118-143);

40

and (5) Doris's own checkered history regarding a failure to disclose information to investors (¶¶203-237).

Camber Defendants also erroneously assert that they believed SPA disclosures permitted Class Period concealment. CM27-28. This assertion is implausible on its face: the SPA said nothing about the actual number of shares issued or outstanding during the Class Period. *See supra* at Section VII(B). Moreover, Camber had reported the increase in outstanding shares before the Class Period. ¶¶16, 18, 119. But even if true, Defendants' argument is not exculpatory. They are asserting that they deliberately failed to disclose a fact they admit they knew was material even as they concealed it: that the number of Camber's shares outstanding had increased by 150%. They argue that they thought the SEC's rules let them get away with it. But plaintiffs need not show that Defendants knew the precise provision of the securities laws they were violating. *United States v. Moldofsky*, 2002 WL 31385819, at *5 (S.D.N.Y. Oct. 21, 2002). If Defendants genuinely believed they could get away with not disclosing a near tripling of the number of Camber shares outstanding, that belief was reckless and their concealment was securities fraud.

Camber Defendants also argue that scienter cannot be pled without confidential witnesses or internal documents (CM24-25), but Fifth Circuit courts have found scienter without those factors. *See, e.g., Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2022 WL 3227584, at *19 (S.D. Tex. Aug. 10, 2022). Moreover, the case they cite, *Hartford Fin. Servs.*, concedes that internal information or confidential witnesses ***are not required*** for scienter, holding instead that plaintiffs there had proffered nothing more than

41

assumptions.  2011 WL 4357368, at *18 (S.D.N.Y. Sept. 19, 2011).  As Plaintiffs **have** proffered more than assumptions, *Hartford Fin Servs.*is inapplicable here.

Discover Defendants do not assert a nonculpable inference, but appear to argue that they acted in good faith.  DM24-30.  The inference of scienter is at least as strong.

## IX.    PLAINTIFFS SUFFICIENTLY PLEAD LOSS CAUSATION

Loss causation is the "causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  It is usually pled, as here, when a corrective disclosure reveals information relevant or related to the earlier omissions or misrepresentations, and the company's stock price falls.  *Lormand*, 565 F.3d at 258.  Pleading loss causation is not "burdensome" and requires only allegations that "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura*, 544 U.S. at 347.

Plaintiffs' Complaint provides that indication.  It alleges that the actual dilution and accurate number of outstanding shares was revealed for the first time on October 5-6, 2021 and the stock price immediately fell by more than 70%.  ¶¶162-166.  The law requires no more.  *Dura*, 547 U.S. at 347; *Lormand*, 565 F.3d at 258.

Defendants do not question the plausibility of Plaintiffs' account, but instead assert that the revelation on October 5 is *per se* not a corrective disclosure because it is based on information that had previously been disclosed in scattered public documents.  Yet Defendants' argument conceals a premise: that Camber shares traded on an efficient market.  Securities traded in an efficient market promptly incorporate new news into the stock price.  Thus, "it is generally true that *in an efficient market*, any information released

42

to the public is presumed to be immediately digested and incorporated into the price of a security[.]" *Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014). In an efficient market, a report that merely arranged information that was already public would not count as a corrective disclosure because that information was already incorporated into the stock price. But Defendant's main case acknowledges that this rule applies only to an efficient market. *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) ("***Having based their claim of reliance on the efficient market theory***, the Investors must now abide by its consequences.").

Not here. Plaintiffs allege that they are entitled to a presumption of reliance because Defendants omitted facts they had a legal duty to disclose. ¶253 (alleging presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972), which held that "[i]n cases involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."). With no efficient market, it is irrelevant that Kerrisdale may have been able to put together their report by scouring the Internet.

In any case, the Fifth Circuit rejected *Meyers'* purportedly absolute approach in *Amedysis*, where it found loss causation adequately alleged even though the corrective disclosure was a news article "based on publicly available Medicare records." 769 F.3d at 323. The Ninth Circuit, too, held that an analyst report based on public information suffices if "the shareholders [] allege particular facts plausibly suggesting that other market participants *had not* done the same analysis." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). Even the Eleventh Circuit later held that "[a] document is not *per se* barred from being a 'disclosure' simply because it discusses information that was

43

already available to the public." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 926 (11th Cir. 2020). Defendants cite a case from a district court within the Ninth Circuit, but there, too, already-public information can serve as a corrective disclosure unless the security trades on an efficient market. *BofI*, 977 F.3d at 794 (analyst reports incorporated "***[b]ecause this is a fraud-on-the-market case***."). Because "market efficiency is a matter of degree[,]" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014), it is plausible on the pleadings that the scattered information Kerrisdale unearthed had not previously been incorporated into Camber's stock price.

In any case, courts often determine whether information is corrective based on subsequent developments. For example, disclosure of an SEC investigation by itself is not a corrective disclosure, but it can count if there is "a subsequent revelation of the inaccuracy of [a] misrepresentation." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1203 (9th Cir. 2016); *accord Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 696 (6th Cir. 2017). Here, the day after the Kerrisdale report, Camber conceded that its allegations of the number of shares outstanding were accurate.

## X.   PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON LIABILITY

"Controlling person liability under Section 20(a) is not subject to the heightened pleading requirements of Rule 9(b), but is instead governed by Rule 8." *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 665 (W.D. Tex. 2006) (internal quotations and citations omitted). Plaintiffs need only allege "that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Venator*, 547 F. Supp. 3d at 666. Plaintiffs do so by alleging that the Individual Defendants wielded

44

actual power or influence over Camber and Discover, communicated with investors on behalf of Camber in the case of Doris, and were personally involved in the concealment of Discover's sale of Convertible Securities. *See* ¶¶273-283. Those allegations suffice. *See*, *e.g.*, *In re Enron Corp. Sec., Derivative "Erisa" Litig.*, 2003 WL 230688, at \*11 (S.D. Tex. Jan. 28, 2003) (holding that control-person liability requires only that each defendant "had the requisite power to directly or indirectly control or influence corporate policy."). Thus, because Plaintiffs have adequately pled the underlying Section 10(b) claims, *see* Sections VI-VII, *supra*, their Section 20(a) claims must also be sustained. *Stone*, 26 F. Supp. 3d at 612.

Discover Defendants' attempt to undermine well-pleaded control Complaint allegations ignores the law. DM35-39. Ability to control requires no formal relationship, but instead can be alleged through other means including an individual's position in a company, an individual's responsibilities, alleged participation in business operations, and stock ownership in a company. *Venator*, 547 F. Supp. 3d at 666; *In re TETRA Technologies, Inc., Securities Litigation*, 2009 WL 6325540 (S.D. Tex. July 9, 2009), *aff'd on reh'g*, 2009 WL 6326865 (S.D. Tex. Aug. 10, 2009); *Zagami*, 540 F. Supp. 2d at 716–17; *Brody v. Zix Corp.*, 2006 WL 2739352, at \*9 (N.D. Tex. Sept. 26, 2006). Here, Discover had the ability to control conversion and Camber's secret issuance of unregistered shares to Discover, and had contractual authority to review Camber's SEC reports before filing. ¶¶160-161, 279-283. Kirkland had the ability to control Discover as its sole member and exercised complete voting control over Discover. ¶¶32-35, 279-

45

283. No more is required. *Venator,* 547 F. Supp. 3d at 666. Whether he exercised such control is a fact question for trial. *Id.*

## XI.   PLAINTIFFS SUFFICIENTLY ALLEGE INSIDER TRADING BY DISCOVER

Plaintiffs have also adequately alleged that Discover is liable under Section 20A of the Exchange Act for selling shares of Camber common stock while in possession of material, non-public adverse information concerning the dilution of Camber common stock. ¶¶284-292. To plead a Section 20A claim, "the plaintiff must (1) allege a requisite independent, predicate violation of the Exchange Act (or its rules and regulations), e.g., § 10(b), and (2) show that he has standing to sue under § 20A because he contemporaneously with the purchase or sale of securities that is the subject of such violation has purchased ... or sold ... securities of the same class as the insider defendant." *Enron*, 258 F. Supp. 2d at 598–601.

As outlined above, the Complaint adequately alleges predicate Section 10(b) violations. It also sufficiently pleads that Plaintiffs purchased Camber common stock contemporaneously with Discover's sale of approximately 140.1 million shares of unregistered Camber stock between July 11, 2021 and September 30, 2021, all while possessing material non-public information about Camber's actual dilution and outstanding share count. ¶¶155-158. Discover's own Senior Trader, John Burke, declared under penalty of perjury that Discover's business model was to sell such shares "when there was volume." ¶150. In September 2021, the average daily trading volume for Camber securities was 302 million—the most at any point in the Class Period. ¶151. This

46

supports a plausible inference that Discover sold much of their 140.1 million shares throughout September 2021 and into the beginning of October 2021, at roughly the same time Plaintiffs purchased. *See* ¶291 and ECF No. 26-2. This satisfies contemporaneity. *See MicroCapital Fund LP*, 2019 WL 3451153, at *24 (four-day gap is contemporaneous); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *4–5 (S.D. Tex. June 15, 2017) (six-day gap to be "contemporaneous"); *In re Petco Animal Supplies Inc. Sec. Litig.,* 2006 WL 6829623, *37 (S.D. Cal. Aug. 1, 2006) (trades within seven days contemporaneous).

Discover erroneously claims that it cannot be liable because it was not a fiduciary to Camber, Plaintiffs, or the Putative Class. DM31-34. But that is not the test for liability under Sections 10(b) or 20A. *See* 15 U.S.C. § 78t-1. And, even if it were, underwriters can be temporary fiduciaries of a corporation when "they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes," as occurred here. *Dirks*, 463 U.S. at 655; *see also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2016 WL 4095973, at *10 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018). As Plaintiffs have already demonstrated, Discover was an underwriter for Camber, *supra* at Section VII(C), and knew through Camber that its share count had increased, and therefore was a fiduciary for purposes of Plaintiffs' Section 20A claim.

Finally, Discover erroneously argues that Plaintiffs cannot show that the information Discover traded on—the significant dilution of Camber stock—was

47

"material" non-public information.  DM34-35.  This argument makes no sense, and Discover does not explain why a reasonable investor would find 150% dilution to be immaterial.  *See supra* at Section VI(B), Section VII.  The precipitous drop upon disclosure proves the exact opposite.  ¶¶162-166; *Campton v. Ignite Rest. Grp., Inc.*, 2014 WL 61199, at *7 (S.D. Tex. Jan. 7, 2014) ("Evidence that stock price moved significantly is relevant to the issue of materiality[.]") (collecting cases).  Thus, Plaintiffs state a Section 20A claim.

## XII.   CONCLUSION

The Court should deny both motions to dismiss in full.  If the Court grants Defendants' motion to dismiss, it should grant leave to amend.

Dated: November 7, 2022

Respectfully submitted,
**COCHRAN LAW**

By:  */s/ Stuart L. Cochran*
        Stuart L. Cochran

Attorney-in-charge
Texas Bar No. 24027936
S.D. Tex. Bar No. 24027936
8140 Walnut Hill Ln, Suite 250
Dallas, Texas 75231
Telephone: (469) 333-3405
Email: stuart@schochranlaw.com

*Liaison Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne
275 Madison Avenue, 40th Floor
New York, New York 10116
Phone: (212) 686-1060
Fax: (212) 202-3827

jhorne@rosenlegal.com

*Co-Lead Counsel for the Class*

**POMERANTZ LLP**
Joshua B. Silverman
(admitted *pro hac vice*)
Christopher P.T. Tourek
(admitted *pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 229-8811
jbsilverman@pomlaw.com
ctourek@pomlaw.com

*Co-Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiffs*

49

## CERTIFICATE OF WORD COUNT

I hereby certify under Rule 18.c of the Court's Procedures, as modified by the Court's August 11, 2022 order extending word count (ECF No. 68), that the foregoing motion contains 12,987 words, excluding words in sections specified in Rule 18.c.

*/s/ Stuart L. Cochran*
Stuart L. Cochran


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 7th day of November, 2022.

*/s/ Stuart L. Cochran*
Stuart L. Cochran

50