# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RONALD E. COGGINS, Individually and §
on Behalf of All Others Similarly Situated, §
§
Plaintiff, §
§
v. §   Case No. 4:21-cv-03574
§
CAMBER ENERGY, INC., JAMES A. §
DORIS, and FRANK W. BARKER, JR., §
§
Defendants. §

### DECLARATION OF AMY PHARR HEFLEY

I, Amy Pharr Hefley, declare the following pursuant to 28 U.S.C. § 1746:

1.      I am an attorney with the law firm of Baker Botts L.L.P, which is counsel of record for Defendants Camber Energy, Inc. ("Camber") and James Doris in the above-styled case.

2.      I am legally competent to make this declaration. I have personal knowledge and am familiar with the matters stated in this declaration, and all of the facts and statements contained herein are true and correct.

3.      Attached as **Exhibit 19** is the Order Instituting Cease-and-Desist Proceedings, filed in *In re Galena Biopharma Inc.*, 2017 WL 3215775, dated April 10, 2017.

4.      Attached as **Exhibit 20** is the Complaint filed in *SEC v. Constantin, et al.*, 4:22-cv-04306 (S.D. Tex. Dec. 13, 2022), dated December 13, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6, 2023.

_____
Amy Pharr Hefley

2

# Exhibit 19

Case 4:21-cv-03574 Document 74-1 Filed 01/06/23 in TXSD Page 4 of 52

**Fed. Sec. L. Rep. P 81749 (C.C.H.), 2017 WL 3215775**

Federal Securities Law Reporter

Copyright (c) 2018 CCH INCORPORATED, A Wolters Kluwer business. All rights reserved. Securities and Exchange CommissionRuling: Release

April 10, 2017

# ¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA, INC. AND MARK J. AHN. SECURITIES ACT RELEASE NO. 10337. EXCHANGE ACT RELEASE NO. 80407. AAER RELEASE NO. 3865. APRIL 10, 2017.

**Exchange Act —— Antifraud —— Sanctions**

The SEC sanctioned a biopharmaceutical company and its CEO for engaging in a stock-touting scheme. The SEC alleged that the respondents commissioned over 100 publications promoting the company that purported to be independent and objective, when they were actually paid promotions paid for by the company. The SEC also alleged that the CEO engaged firms to pay writers to tout the company's stock without disclosing that the company had funded these communications. To settle the SEC's charges, the company and the CEO agreed to pay disgorgement, interest, and civil penalties totaling nearly $1.4 million. Both respondents agreed to cease and desist from future violations and the CEO agreed to a five-year officer-and-director bar.

See

In the Matter of Galena Biopharma, Inc. and Mark J. Ahn. Securities Act Release No. 10337. Exchange Act Release No. 80407. AAER Release No. 3865. April 10, 2017.

In the Matter of Galena Biopharma, Inc. and Mark J. Ahn.

Securities Act Release No. 10337. Exchange Act Release No. 80407. AAER Release No. 3865. April 10, 2017. Release in full text.

**ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER**

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities

Exchange Act of 1934 ("Exchange Act") against Galena Biopharma, Inc. ("Galena") and Mark J. Ahn ("Ahn") (together, "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, **and except as provided herein in Section V,** Respondents consent to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[1] :

**SUMMARY**

From January 2012 to February 2014, Galena and its then-CEO Mark Ahn engaged in a scheme to mislead investors by commissioning over 100 internet publications promoting Galena that purported to be independent and objective when, in fact, they were paid promotions funded by Galena. As CEO, Ahn, on behalf of Galena, engaged two firms, Lidingo Holdings and the DreamTeam Group, that paid writers to communicate about Galena on investment websites through articles and/or postings without disclosing that Galena had funded the communications. On over forty occasions, the writers affirmatively misrepresented that they were not receiving payment for their articles other than from the website on which their articles appeared. These omissions and misrepresentations about Galena's funding of the articles and postings created the misleading impression that the opinions they contained were objective and independently formed.[2] Some of the articles and postings that Galena funded constituted unlawful prospectuses transmitted while Galena was preparing to offer or offering securities. As a consequence of this conduct, Galena and Ahn violated the anti-fraud provisions of the federal securities laws, caused violations of the anti-touting provisions, and engaged in improper "gun-jumping."

Galena also violated the periodic reporting and books-and-records provisions of the federal securities laws in connection with stock options it granted to one of the firms, and, with Ahn, violated the securities registration provisions in connection with its issuance of shares to the firm after the firm exercised its options.[3] Galena sold securities to Lidingo in an unregistered transaction when it included stock options as part of Lidingo's compensation for its promotional activities in the third quarter of 2013. Thereafter, Galena sold shares to Lidingo in unregistered, non-exempt transactions upon Lidingo's exercise of those stock options without taking reasonable care to prevent further distribution of the shares. As a result of Ahn's involvement in the unregistered transactions with Lidingo, Ahn participated in the sale of securities to Lidingo. Galena and Ahn misstated in Galena's applicable periodic reports that the company had not issued unregistered securities. In the third quarter of 2013, Galena also did not record the expense of the stock options granted to Lidingo.

***RESPONDENTS***

1. **Galena Biopharma, Inc.**, is a biopharmaceutical company incorporated in Delaware. During the relevant time period, Galena was headquartered in Oregon; it is now headquartered in California. Galena's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and trades on the NASDAQ Capital Market.

2. **Mark J. Ahn**, 54, resides in Lake Oswego, Oregon. Ahn served as Chief Executive Officer and a director of Galena from 2007 to 2014.

***OTHER RELEVANT INDIVIDUALS AND ENTITIES***

3. **Lidingo Holdings, LLC,** a Nevada limited liability company formed in 2011 and dissolved in 2014, provided services to numerous issuers, including Galena, that included the generation of more than 400 articles on investment websites that described

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

Case 4:21-cv-03574    Document 74-1    Filed 01/06/23 in TXSD    Page 6 of 52

its clients' securities. Lidingo was owned and operated by Kamilla Bjorlin ("Bjorlin"). The Commission has charged Lidingo and Bjorlin for their roles in the misconduct described in this Order and for other misconduct unrelated to Galena.

4. **Michael A. McCarthy**, 47, resides in San Antonio, Texas. McCarthy founded The DreamTeam Group, LLC, a Florida limited liability company headquartered in Indianapolis, Indiana, in 2004. The DreamTeam Group, LLC and other entities owned and controlled by McCarthy, including Mission Investor Relations, LLC, a Delaware limited liability company headquartered in Atlanta, Georgia, provided services to numerous issuers, including Galena, that included the generation of more than 30 articles and 20 blog posts on investment websites that described their clients' securities. DreamTeam Group, LLC and Mission Investor Relations, LLC, which described themselves as being part of a "Family of Businesses," will be referred to together in this Order as "DreamTeam." The Commission has charged McCarthy and DreamTeam for their roles in the misconduct described in this Order and for other misconduct unrelated to Galena.

*FACTS*

**Galena Paid Firms to Generate Articles and other Communications Describing its Securities that Falsely Purported to be Independent from Galena**

5. In January 2012, Ahn signed a contract with Lidingo pursuant to which Lidingo would, among other things, "help generate independent research coverage for [Galena] through third parties." From January 2012 through April 2013, Galena paid Lidingo $20,000 per month for these services. Ahn signed a second contract with Lidingo, effective August 1, 2013, that provided that Galena would not only pay Lidingo $20,000 per month, which Galena did through February 2014, but would also grant Lidingo certain stock options. The second contract with Lidingo was signed around the time that Galena began preparing for an offering that Galena announced on September 12, 2013 (the "September 2013 Offering"). In total, in addition to the stock options, Galena paid Lidingo at least $460,000 in monthly fees and a $20,000 bonus.

6. On July 23, 2013, a week before signing the second contract with Lidingo, Ahn signed a contract with DreamTeam for 90 days of social media, marketing and branding services that stated, "[r]etail trading will be the target …." Ahn signed a second contract with DreamTeam on December 2, 2013 for an additional 150 days of coverage. In total, Galena paid DreamTeam $50,000 for its services.

7. Lidingo paid writers to publish, give publicity to, or circulate articles describing Galena securities via investment websites, and to ghostwrite such articles that Lidingo itself published, gave publicity to, or circulated via investment websites using pseudonyms. Overall, Lidingo and writers it paid generated more than 90 articles describing Galena securities. None of those articles disclosed the direct or indirect compensation from Galena, and more than 40 contained affirmative misrepresentations that such compensation was not received. For example, after Galena wired a $60,000 payment to Lidingo in November 2013 for three months of services, Lidingo paid a writer for an article describing Galena securities on Seeking Alpha's website.[4] The article failed to disclose the writer's indirect compensation from Galena and contained the following misrepresentation: "I am not receiving compensation for [this article] (other than from Seeking Alpha)."

8. Lidingo also generated messages describing Galena securities on stock message boards without disclosing that Galena had directly or indirectly funded the posts. For example, on September 12, 2013, the day Galena announced its September 2013 Offering, Ahn emailed Lidingo with "[k]ey messages re: today's financing," which included a comparison of Galena to Insys Therapeutics, Inc., and stated: "Please own the boards!" Lidingo forwarded the email to one of its paid writers with the message, "Pls post on boards …."

9. DreamTeam paid writers for four articles describing Galena securities that appeared on investment websites. None of those articles disclosed that the writers indirectly received compensation from Galena, and three contained affirmative misrepresentations that the writer did not receive such compensation. For example, after Galena made its first payment ($25,000) to DreamTeam in July 2013, DreamTeam paid a writer for an article describing Galena securities that appeared on Seeking Alpha's website.[5] The article did not disclose that the writer had been or would be indirectly compensated by Galena, and contained the following misrepresentation: "I am not receiving compensation for [this article] (other than from Seeking Alpha)." The next day, DreamTeam featured the article in a post on its blog on Seeking Alpha's website entitled, "Seeking Alpha Publishes Article Featuring Galena Biopharma, Inc. (GALE)." The blog post, which described and provided a hyperlink to the article,

Case 4:21-cv-03574   Document 74-1   Filed 01/06/23 in TXSD   Page 7 of 52

disclosed Galena's compensation of DreamTeam, but did not disclose that DreamTeam had generated the article by agreeing to pay the writer as part of its work for Galena.

10. Ahn signed the agreements with Lidingo and DreamTeam. He provided the firms with ideas for certain articles and message board posts, reviewed certain articles before publication, and on occasion suggested the website on which an article should appear.

11. Over the course of the engagements, Ahn exchanged a number of emails with Lidingo and DreamTeam regarding the price of Galena shares and their desire to move the price higher. For example, on July 29, 2013, at about the time that Galena began preparing for the September 2013 Offering, Ahn proposed contract terms with Lidingo that included the following: "$20K/mo for three months. If the price is >$3.00 in 90 days [Galena's stock closed at $1.78/share on the day Ahn sent the email], then another 9 months." And on July 31, 2013, DreamTeam's McCarthy sent Ahn a message with the subject "Great day!" that listed the increasing closing prices of Galena's shares since DreamTeam started work five days earlier, and stated, "$2.00 here we come!" Ahn replied, "Great start!"

12. Ahn understood during the relevant period that a writer who receives direct or indirect compensation from an issuer to write about the issuer's securities must disclose that compensation. He also knew or was reckless in not knowing that the articles and postings generated by Lidingo, and the articles generated by DreamTeam, did not disclose the direct or indirect compensation from Galena or misrepresented that such compensation was not being received.

13. Numerous communications between Ahn and Lidingo discussed payments to Lidingo writers. For example, in an April 4, 2012 email to Ahn, Bjorlin wrote, "I would like to revisit bonus for the writers, as they have done a lot of hard work and have taken the brunt of the criticism." Ahn responded, "Don't worry, I never forget …. submit another invoice for $20K." Galena paid Lidingo the $20,000 bonus on April 9, 2012.

14. The failures of the writers/publishers of the articles and message board posts to disclose the compensation they received directly or indirectly from Galena, and their affirmative misrepresentations denying the receipt of that compensation, were material.

15. The articles that appeared on Seeking Alpha's website described Galena securities, and certain of them operated as offers to buy the company's securities. Seeking Alpha operates a widely-read website that holds itself out as a "platform for investment research, with broad coverage of stocks, asset classes, ETFs and investment strategy," where "articles frequently move stocks, due to a large and influential readership which includes money managers, business leaders, journalists and bloggers."

16. On January 27, 2014, while the price of Galena shares was inflated by the promotion scheme, Ahn sold 796,765 shares of Galena stock.

**Galena Indirectly Transmitted Unlawful Prospectuses**

17. By early August, 2013, Galena had reached an understanding with a broker/dealer that the broker/dealer would serve as the managing underwriter for an upcoming public offering by Galena. The restrictions on offering communications imposed by the "gun jumping" prohibitions of the federal securities laws commenced no later than when Galena and the broker/dealer reached this understanding. [6]

18. Between that time and the closing of the September 2013 Offering, Galena directly or indirectly compensated Lidingo, DreamTeam, and/or their writers to transmit articles and blog posts about the company using means of communication in interstate commerce. [7] These communications constituted prospectuses because they were written offers to sell Galena securities in a public offering, but they did not comply with the requirements of Securities Act Section 10. [8]

**Galena and Ahn Offered and Sold Unregistered Securities to Lidingo and Galena Did Not Disclose and Properly Account for the Sales**

Case 4:21-cv-03574    Document 74-1    Filed 01/06/23 in TXSD    Page 8 of 52

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

19. The 2013 contract between Galena and Lidingo included as part of Lidingo's compensation options to purchase 250,000 shares of Galena stock. Ahn signed the contract on behalf of Galena. From November 2013 through March 2014, Galena issued stock to Lidingo on five occasions after Lidingo paid Galena to exercise vested stock options. Prior to exercising its vested options, Lidingo conveyed to Ahn that its costs had exceeded the cash amount Galena had paid "and that the equity stake is where we [Lidingo] generate our income." Notwithstanding the receipt of this information, neither Galena nor Ahn exercised reasonable care to prevent Lidingo from reselling the shares it received in the public market soon after receiving them – such as by placing a restrictive legend on the shares or putting in place a stop-transfer order – and Lidingo did in fact resell its shares on each occasion within a week of receiving them. These issuances constituted sales of securities that resulted in public distributions that were neither registered with the Commission nor exempt from registration. [9]

20. After selling unregistered securities to Lidingo, Galena did not disclose the sales as required. [10] Galena's Form 10-Q for the quarter ended September 30, 2013, which Ahn signed, incorrectly stated, "[t]here were no stock options granted during the three months ended September 30, 2013," and its Form 10-K for the year ended December 31, 2013, which Ahn also signed, stated that there had been no sales of unregistered securities during the period covered by the annual report that were not previously reported (which the sales to Lidingo were not). Galena's Form 10-Q for the first quarter of 2014, and its 2014 Form 10-K, did not disclose Galena's sale of stock in connection with Lidingo's exercise of stock options in 2014, which constituted unregistered, non-exempt sales of securities, and the Form 10-K for 2014 stated that there had been no sales of unregistered securities during the period covered by the annual report that were not previously reported (which the sales to Lidingo were not).

21. One-hundred-thousand stock options Galena sold to Lidingo in the third quarter of 2013 vested immediately. Galena did not record an expense in that quarter related to the vesting of those stock options.

### GALENA'S REMEDIAL EFFORTS

22. In determining to accept Galena's Offer, the Commission considered remedial acts promptly undertaken by Galena and cooperation afforded the Commission staff.

### VIOLATIONS

23. As a result of the conduct described above, Galena and Ahn violated Securities Act Section 17(a)(1) and (3) and Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder, which prohibit fraudulent conduct in the offer or sale of securities and in connection with the purchase or sale of securities, and Ahn caused Galena's violations of those provisions. Galena and Ahn also caused violations of those provisions, and of Securities Act Section 17(a)(2) and Exchange Act Rule 10b-5(b), by Lidingo and certain writers paid by Lidingo and DreamTeam, and of Securities Act Section 17(a)(2) and (3) by DreamTeam. [11]

24. As a result of the conduct described above, Galena and Ahn caused Lidingo's, DreamTeam's, and certain writers' violations of Securities Act Section 17(b), which prohibits any person from publishing, giving publicity to, or circulating any communication that describes a security in exchange for direct or indirect consideration from an issuer, underwriter, or dealer without fully disclosing the past or prospective consideration and the amount.

25. As a result of the conduct described above, Galena and Ahn violated Securities Act Section 5(b)(1), which prohibits any person from directly or indirectly using interstate means to carry or transmit a prospectus relating to any security with respect to which a registration statement has been filed unless such prospectus complies with Securities Act Section 10. The articles and blog post that Galena and Ahn indirectly transmitted via Lidingo and DreamTeam while preparing for and during the September 2013 Offering were prospectuses that did not meet the requirements of Securities Act Section 10.

26. As a result of the conduct described above, Galena and Ahn violated Sections 5(a) and 5(c) of the Securities Act, which prohibit the offer and sale of unregistered securities absent an applicable exemption from registration.

27. As a result of the conduct described above, Galena violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13 and 12b-20 thereunder, which require every issuer of a security registered pursuant to Section 12 of the Exchange Act to file annual and quarterly reports that disclose certain information, including information regarding "all securities of the registrant sold by the registrant within the past three years which were not registered under the Securities Act," [12] and to include such further information as may be necessary to make the required statements, in the light of the circumstances under which they are

Case 4:21-cv-03574    Document 74-1    Filed 01/06/23 in TXSD    Page 9 of 52

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

made, not misleading. Alin caused Galena's violation of Section 13(a) and Rules 13a-13 and 12b-20 thereunder in connection with the disclosure failures in Galena's 10-Q for the third quarter of FY2013.

28. As a result of the conduct described above, Galena violated Exchange Act Section 13(b)(2)(A), which requires every issuer of a security registered pursuant to Exchange Act Section 12 to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Ahn caused Galena's violation of Exchange Act Section 13(b)(2)(A).

**UNDERTAKINGS BY GALENA3**

Respondent Galena has undertaken to:

In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, (i) agree to appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) accept service by mail, email, or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoint Respondent Galena's counsel in these proceedings as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Galena's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consent to personal jurisdiction over Galena in any United States District Court for purposes of enforcing any such subpoena.

In determining whether to accept the Offer, the Commission has considered the undertaking set forth above.

**UNDERTAKINGS BY AHN**

Respondent Ahn has undertaken to:

A. For a period of five years from the date of this Order, refrain from (1) hiring or causing to be hired for pay any third party to engage in a promotional campaign, on behalf of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act, that involves publishing, giving publicity to, or circulating any form of written communication, whether electronic or hard copy, which, though not purporting to offer a security for sale, describes such security or (2) directly or indirectly participating in any such paid promotional campaign; provided, however, that nothing herein prohibits Ahn from drafting or editing press releases or public filings of issuers with which he is associated, or otherwise commenting upon such press releases or public filings before they are finalized.

B. Certify, in writing, compliance with the undertaking set forth above. The certification shall identify the undertaking, provide written evidence of compliance in the form of a narrative, and be supported, as appropriate, by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent Ahn agrees to provide such evidence. The certification and supporting material shall be submitted to Rami Sibay, Assistant Director, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

C. In connection with this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, agree to (i) appear and be interviewed by Commission staff at such times and places as the staff requests upon reasonable notice; (ii) accept service by mail, email or facsimile transmission of notices or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by Commission staff; (iii) appoint Respondent Ahn's counsel in these proceedings as agent to receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas, waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses Respondent Ahn's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per diem rates; and (v) consent to personal jurisdiction over him in any United States District Court for purposes of enforcing any such subpoena.

In determining whether to accept Ahn's Offer, the Commission has considered the undertakings enumerated in Paragraph C.

Case 4:21-cv-03574 Document 74-1 Filed 01/06/23 in TXSD Page 10 of 52

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 8A of the Securities Act and 21C of the Exchange Act, Respondents Galena and Ahn cease and desist from committing or causing any violations and any future violations of Sections 5(a), 5(b), 5(c), 17(a) and 17(b) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20 and 13a-13 thereunder, and Respondent Galena cease and desist from committing or causing any violations and any future violations of Exchange Act Rule 13a-1.

B. Respondent Ahn be, and hereby is, prohibited for five years from the date of this Order from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

C. Within 14 days of the entry of this Order, Respondent Ahn shall pay disgorgement of $677,250, prejudgment interest of $67,181, and a civil monetary penalty in the amount of $600,000, and Respondent Galena shall pay a civil money penalty in the amount of $200,000, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment of disgorgement and prejudgment interest is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600, and if timely payment of civil money penalty is not made, interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at *http://www.sec.gov/about/offices/ofm.htm*; or

(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center

Accounts Receivable Branch

HQ Bldg., Room 181, AMZ-341

6500 South MacArthur Boulevard

Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying the payor as a respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

D. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph,

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

Case 4:21-cv-03574   Document 74-1   Filed 01/06/23 in TXSD   Page 11 of 52

a "Related Investor Action" means a private damages action brought against Respondent(s) by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

E. Ahn shall comply with the undertakings enumerated in Paragraphs A and B of his undertakings set forth above.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in ⚑Section 523 of the Bankruptcy Code, ⚑11 U.S.C. § 523, the findings in this Order are true and admitted by Respondent Ahn, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent Ahn under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent Ahn of the federal securities laws or any regulation or order issued under such laws, as set forth in ⚑Section 523(a)(19) of the Bankruptcy Code, ⚑11 U.S.C. § 523(a)(19).

By the Commission.

Brent J. Fields

Secretary

## Footnotes

1   The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in this or any other proceeding.

2   The information about Galena in the articles and postings is not, itself, alleged to have been false or misleading.

3   Ahn also caused violations by Galena of the periodic reporting and books-and-records provisions.

4   Seeking Alpha maintains a website ( *www.seekingalpha.com*) that describes itself as 'a platform for investment research ….' The article, entitled 'Will Galena's Post-Holiday Charm Continue ,' appeared on Seeking Alpha's website on December 19, 2013.

5   The article, entitled 'Galena Biopharma Presents an Attractive Investment Opportunity,' appeared on Seeking Alpha's website on August 6, 2013.

6   The September 2013 Offering was made pursuant to a delayed shelf registration on Form S-3 that Galena filed on May 24, 2013, and a prospectus supplement thereunder. Galena was not 'in registration' with respect to the offering, and the offering-communications restrictions of Securities Act Section 5(b)(1) did not apply, until Galena began the process of offering the securities off the shelf. *See, e.g.*, Use of Electronic Media, Securities Act Release No. 7856, 65 Fed. Reg. 25843, 25845 n.10 (May 4, 2000) ( "In registration' is a term that refers to the entire registration process under the Securities Act, 'at least from the time an issuer reaches an understanding with the broker-dealer which is to act as managing underwriter [before] the filing of a registration statement' until the end of the period during which dealers must deliver a prospectus. *See* Securities Act Release No. 5180, at n. 1 (Aug. 16, 1971) [36 FR 16506]. An issuer will not be considered to be 'in registration' at any particular point in time solely because it … has on file a registration statement for a delayed shelf offering on Form S-3 … and has not commenced or is not in the process of offering or selling securities 'off of the shelf.")

Case 4:21-cv-03574 Document 74-1 Filed 01/06/23 in TXSD Page 12 of 52

¶ 81,749 IN THE MATTER OF GALENA BIOPHARMA,..., Fed. Sec. L. Rep. P...

7 *See*, *e.g.*, 'Galena Biopharma Presents an Attractive Investment Opportunity' (Seeking Alpha, 8/6/13) (generated by DreamTeam); 'Galena Biopharma: Best and Worst Case Scenario' (Seeking Alpha, 8/14/13) (generated by Lidingo); 'Seeking the Best Opportunities in Biotech by Value' (Seeking Alpha, 8/20/13) (generated by Lidingo); 'Galena Biopharma: Ready for a Jump ' (Seeking Alpha, 8/22/13) (generated by Lidingo); 'Galena Biopharma, Inc. (GALE) Backed With High Expectations For Upcoming Abstral Launch' (MissionIR's Instablog on Seeking Alpha's website, 9/10/13) (generated by DreamTeam); and '2 Small Cap Biotechnology Stocks with Big Promise' (Wall Street Cheat Sheet, 9/11/13) (generated by Lidingo).

8 *See* 15 U.S.C §§ 77b(3), 77b(10), 77j.

9 Galena purportedly issued the stock options under its 2007 Incentive Plan. Galena registered with the Commission, via Form S-8 filings, the sale of common stock issuable upon exercise of the stock options under that plan, but sales of stock to a consultant may be registered via a Form S-8 only if the stock is issued to a natural person. *See* Form S-8, Instruction A.1.(a)(1)(i). Also, grants of options to a consultant may be registered via a Form S-8 only if 'the services [provided by the consultant] … do not directly or indirectly promote … the registrant's securities.' Form S-8, Instruction A.1.(a)(1)(iii). Because Lidingo was not a natural person, and because its services promoted Galena securities, the sale of stock to Lidingo was not registered with the Commission on a Form S-8.

10 Item 2 of Part II of Form 10-Q, and Item 5 of Part II of Form 10-K, require disclosure pursuant to Item 701 of Regulation S-K of information regarding 'all securities of the registrant sold by the registrant within the past three years which were not registered under the Securities Act of 1933.' Regulation S-K, Item 701.

11 Securities Act Section 17(a)(2) and (3) make it unlawful for any person, in the offer or sale of securities, by the use of communication in interstate commerce, 'to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading,' and 'to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.'

12 Regulation S-K, Item 701.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br><br>EDWARD CONSTANTIN, a/k/a "MrZackMorris,"<br>a/k/a "Edward Constantinescu,"<br>PERRY MATLOCK, a/k/a "PJ Matlock,"<br>THOMAS COOPERMAN, a/k/a "Tommy Coops,"<br>GARY DEEL, a/k/a "Mystic Mac,"<br>MITCHELL HENNESSEY, a/k/a "Hugh Henne,"<br>STEFAN HRVATIN, a/k/a "LadeBackk,"<br>DANIEL KNIGHT, a/k/a "Deity of Dips," and<br>JOHN RYBARCYZK, a/k/a "Ultra Calls," a/k/a<br>"The Stock Sniper,"<br><br>Defendants. | Civil Action No. 22-CV-____ (___)<br><br>JURY TRIAL DEMANDED |

COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against the defendants:

SUMMARY

1.      To their legions of followers on social media, the eight defendants have, for years,

promoted themselves as trustworthy stock-picking gurus.  In reality, they are seasoned stock

manipulators.  They identify stocks ripe for manipulation, acquire substantial positions in these

securities, and then recommend those stocks as good investments to their followers on Twitter, in

online stock-trading forums they run, and on podcasts.  They encourage their followers to

purchase the selected stocks, often claiming that they likewise have bought or intend to buy these

stocks for themselves and hold them. Instead, the defendants sell their shares into the demand that their deceptive promotions generate.

2.      Seven of the defendants—Perry Matlock, Edward Constantin, Thomas Cooperman, Gary Deel, Mitchell Hennessey, Stefan Hrvatin, and John Rybarcyzk—carried out the scheme, coordinating the acquisition of shares, promoting the shares to their followers, and dumping the shares for substantial profits. They were aided and abetted by Daniel Knight, who with Hennessey, co-hosted a popular stock-trading podcast that promoted the other defendants as expert traders and provided a platform for other defendants to deceptively promote the stocks they intended to dump.

3.      From at least January 2020 through present (the "Relevant Period"), the eight Defendants earned approximately $100 million from this stock-manipulation scheme.

## VIOLATIONS

4.      As a result of the conduct alleged herein, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5(a), (b) & (c)]. Knight aided and abetted, and unless restrained and enjoined, will continue to aid and abet these violations of the Securities Act and the Exchange Act.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.      The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this

Complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and such other relief as the Court may deem appropriate. The Commission further seeks an order barring Hrvatin from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)].

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

7. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of Texas, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Four Defendants reside in the Southern District of Texas, where they communicated with co-defendants in furtherance of the fraud scheme and made numerous false and deceptive statements as described herein.

## DEFENDANTS

8. **Edward Constantin**, a/k/a "MrZackMorris," a/k/a "Edward Constantinescu," 38, is a resident of Houston, Texas. His Twitter account, @MrZackMorris, had more than 551,000 followers as of December 2022. Constantin is a co-founder of Atlas Trading, a stock-trading forum on the social media platform Discord, which offers users the ability to communicate via

voice calls, video calls, and text messaging, among other things.

9. **Perry Matlock**, a/k/a "PJ Matlock," age 38, is a resident of The Woodlands, Texas. His Twitter account, @PJ_Matlock, had more than 340,000 followers as of December 2022. Matlock refers to himself as the "CEO" and co-founder of Atlas Trading.

10. **Thomas Cooperman**, a/k/a "Tommy Coops," 34, is a resident of Beverly Hills, California. His Twitter account, @ohheytommy, had more than 129,000 followers as of December 2022. Cooperman is a member of the electronic music group Breathe Carolina and, with Gary Deel, runs a YouTube channel called the "Goblin Gang," described as "[t]wo multi-millionaire day traders filming their lives for the internet to see."

11. **Gary Deel**, a/k/a "Mystic Mac," 28, is a resident of Beverly Hills, California. His Twitter account, @notoriousalerts, had approximately 144,000 followers as of December 2022. With Cooperman, Deel runs the Goblin Gang YouTube channel.

12. **Mitchell Hennessey**, a/k/a "Hugh Henne," 24, is a resident of West New York, New Jersey. Along with Daniel Knight, Hennessey hosts the "Pennies: Going in Raw" podcast, which promotes Atlas Trading. His Twitter account, @Hugh_Henne, had more than 237,000 followers as of December 2022.

13. **Stefan Hrvatin**, a/k/a "LadeBackk," 35, is a resident of Miami, Florida. His Twitter account, @LadeBackk, had more than 150,000 followers as of December 2022.

14. **Daniel Knight**, a/k/a "Deity of Dips," 28, is a resident of Houston, Texas. With Hennessey, Knight is a co-host of the Pennies: Going in Raw podcast. His Twitter account, @DipDeity, had more than 171,000 followers as of December 2022.

15. **John Rybarcyzk**, a/k/a "Ultra Calls," a/k/a "The Stock Sniper," 32, is a resident of Spring, Texas. His Twitter account, @Ultra_Calls, had more than 267,000 followers as of

December 2022. Rybarcyzk is the founder of Sapphire Trading, another stock trading forum on Discord.

16. Defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk are referred to herein as the "Primary Defendants." With the addition of Knight, the collective group of all defendants is referred to herein as the "Defendants."

## FACTS

### I. SUMMARY OF SCHEME

17. The Defendants engaged in a long-running fraudulent scheme to manipulate securities by publishing false and misleading information in online stock-trading forums, on podcasts, and through their Twitter accounts. The Primary Defendants, aided and abetted by Knight, engaged in a pattern of conduct, sometimes referred to as "scalping," in which they recommended the purchase of a particular stock without disclosing their intent to sell that stock. They generally executed their scheme in three phases. First, one or more of the Primary Defendants identified a security to manipulate (the "Selected Stock") and purchased shares of that particular security. By sharing the name of the Selected Stock among some or all of the group, the Defendants provided each other with the opportunity to purchase shares at lower prices prior to the manipulation. Next, they promoted the stock to their followers on podcasts and/or social media platforms in order to generate demand and inflate the share price. Typically, the Primary Defendants announced price targets, teased upcoming news about the company, and/or stated their intention to buy shares or hold their current positions for longer periods. Finally, after promoting the stock to their followers in these ways, the Primary Defendants sold their shares into the demand generated by their recommendations. When the scheme succeeded, the Primary Defendants were able to sell their shares at higher prices and make profits. In order

5

to cover up their scheme and continue perpetrating it, the Primary Defendants at various points deleted old tweets and Discord chats, and lied to their followers about the reasons why particular stock picks were followed by declines in the prices of those stocks, obscuring their own roles in causing losses among their followers and other retail investors.

18. None of the Primary Defendants disclosed that they were either planning to sell, or were actively selling, a Selected Stock while recommending that their followers buy it. Nor did any of the Primary Defendants disclose that they were coordinating with each other to manipulate the price and volume of trading in the stocks they were promoting. Moreover, the Primary Defendants' deception extended beyond their omissions and outright lies about their intentions regarding, and views about, the securities they were promoting. For instance, sometimes they peddled false or misleading news about particular stocks through social media or podcast interviews. On some occasions, the Primary Defendants lied about losing money on a particular stock when in reality they had profited handsomely, in order to generate trust among their followers—trust that was necessary to perpetuate the scheme and ensure that their followers would continue to purchase shares based on their future recommendations. Indeed, in private chats and surreptitiously recorded conversations, they bragged and laughed about making profits at the expense of their followers.

19. Defendants' specific roles in the fraudulent scheme varied depending on the timeframe and the specific security at issue. Typically, only a subset of the Primary Defendants participated in the manipulation of a particular stock. Those Primary Defendants would agree on a Selected Stock in which they would each establish a position (i.e., "load" or "load up" on the stock). After loading up on the Selected Stock, most, if not all, of the Primary Defendants who had established positions in that stock would recommend it to their followers. The Primary

6

Defendants often referred to "swinging" or taking a "swing" position in the stock, by which they conveyed to their followers that they intended to hold onto the stock for at least a day, and likely longer. As the Primary Defendants involved in the deceptive promotion of a particular stock often informed other Defendants of their plans, those not directly promoting the stock could—and often did—take advantage of the advance knowledge by purchasing the Selected Security, in advance of the promotion, and selling the Selected Security at inflated prices that resulted from the promotion. Over the course of the ongoing scheme, all of the Primary Defendants, aided and abetted by Knight, engaged in this conduct, participating directly in scalping and other deceptive conduct, and all of the Defendants profited from the knowledge that others were doing so.

20. The Primary Defendants deceptively promoted stocks through three channels: stock-trading forums on Discord; podcasts; and Twitter.

21. **Online stock-trading forums.** In 2018, Defendants Matlock and Constantin founded Atlas Trading ("Atlas")—a free online forum that cultivated a following of novice stock traders by purporting to provide educational content about trading and securities markets. Atlas describes itself as "a team of consistent profitable traders who are willing to educate beginning traders with free resources of education, free trading alerts and ideas." Atlas is hosted on Discord, a social media platform that offers users the ability to communicate via voice, video, and text messaging, among other things. Matlock and Constantin are among a small group of individuals who control the portion of the forum in which various Defendants recommended specific stocks (the "SMALL CAPS trading floor"). Sub-forums such as the SMALL CAPS trading floor are referred to as "channels" on Discord. Although anyone could view the content on the SMALL CAPS trading floor channel, only individuals who are granted permission by the small group of members that include Matlock and Constantin are permitted to post content there.

7

As Matlock explained, "the … [SMALL CAPS] trading floor is locked . . . to most.  We kind of reserve this channel for people who know more about stocks and have better information that we've, you know, deemed worthy, I guess you could say, and they'll discuss tickers in here . . . during market hours, it's more about calls and what's going on with the market."  At various times from 2018 to the present, Matlock and Constantin, along with Rybarcyzk, Deel, Hennessey, Cooperman, and Knight, were allowed to post stock recommendations on the Atlas SMALL CAPS trading floor.   By early 2021, Atlas had more than 150,000 members.

22.     In 2018, Rybarcyzk founded Sapphire Trading ("Sapphire"), another stock-trading forum on Discord.  Sapphire featured a channel called the "pro-trader floor" that was analogous to Atlas's SMALL CAPS trading floor.  In addition to Rybarcyzk, Defendants Deel and Cooperman were permitted to post on Sapphire's pro-trader floor.  By mid-2021, Sapphire had nearly 60,000 members.

23.     **Podcasts.**  In July 2020, Knight and Hennessey launched a podcast called "Pennies: Going in Raw" ("PGIR").  PGIR bills itself as an informational podcast "[d]iscussing volume, price targets, penny stocks, accumulation, reverse splits and much more" and claims to be the "#1 Stock Market Podcast in America" with over 2.3 million downloads.   PGIR served as a platform to promote Atlas and the Defendants, most of whom sat for multiple interviews with Knight and Hennessey.

24.     **Twitter.**  Each of the Defendants amassed substantial numbers of followers on Twitter, where they regularly post about stocks they are manipulating.  The term "FinTwit" refers to the community of Twitter users that regularly tweet about finance and the stock market.  Defendants considered themselves influential within the FinTwit community.  As Hennessey remarked in a private Discord chat, "20 of us run fintwit an [sic] we have more money then [sic]

some countries." The Defendants each included disclaimers on their Twitter accounts that they were not providing stock recommendations or financial advice. But they intended for their followers to act on their promotional tweets, and understood that their followers would do so. Constantin, for example, acknowledged in an interview with Knight and Hennessey on PGIR: "I understand that if I call something, you know, everybody and their mom is going to buy." That expectation is reflected in hundreds of tweets by the Defendants, including in the examples below during the Relevant Period:

   a.  Rybarcyzk ("The Stock Sniper" / @Ultra_Calls): *If you didn't bank with the gang today; then idk what's wrong. Gave this alert on Twitter and Sapphire Trading Discord (1000% FREE)*

   b.  Cooperman ("Tommy Coops" / @ohheytommy): *Hope everyone banked on this one. Did exactly what I said . Support entries and then NHOD [New High of the Day]. Didn't wanna just keep talking about it <3*

   c.  Deel ("Mystic Mac" / @notoriousalerts): *Alright Goblins I'm out for the day. EVERYONE should have banked with me on the initial $EXPR call at 5.15 or on the dip entry a second ago. Love you guys I'll see you all tomorrow to make stupid money with you again!*

   d.  Matlock (@PJ_Matlock): *I'll never get sick of pumping.... money into my followers bank accounts.  LETS ALL GET RICH!*

   e.  Hennessey (@Hugh_Henne): *Every single member of atlas admin Have the same goal...  to get as many people away from the 9-5 slavery and into the area of financial freedom and f u money.  ❤our gains but seeing stories of others paying off debt& banking is much more rewarding @MrZackMorris @PJ_Matlock*

   f.  Knight ("Dan, Deity of Dips" / @DipDeity): *Congrats to all the longs that banked with me on this one. I know I called it right as the market opened, but if you caught this one - you should be thanking me now*

   g.  Hrvatin (@LadeBackk,): *Next week I'm gonna have a nice one for us. Promise. I might even say something along the lines of... "Get in p\*ssy, we're going to the moon."*

9

25. Defendants regularly promoted their own stock-trading success, and the substantial wealth it brought them, along with the success of individuals who followed their advice, in order to further their scheme and encourage their followers on social media to act on their recommendations. For example:[1]

**Hennessey:**

a. On June 15, 2020, Hennessey tweeted: *"6/15/2020: Decent day for the swings. Had to deal with something personal early this morning.. but working on a few new winners Had a blast w my boy @notoriousalerts An hour of bro's, analogies and lessons! $1 MILLION in UNDER a YEAR Trading Stocks!!!"*

b. On December 19, 2020, Hennessey tweeted: *"ATLAS has the most self made millionaires We do not even know the names of the people that consider us their "competition" We are the '85 Bears. No one survives."*

c. On December 25, 2020, Hennessey tweeted: *"Merry Christmas. Steps to financial freedom 1). Compound gains*

*@MrZackMorris [Constantin] $800 to what 15...20 mil in 3 years*

*@PJ_Matlock [Matlock] few k to MILLIONS*

*@notoriousalerts [Deel] $1,000 to 500ish k in 15 months*

*@DipDeity [Knight] $4,000 to 6 figures in a year*

*WE DID IT SO CAN YOU..."*

**Cooperman:**

d. On April 4, 2021, Cooperman tweeted: *"Get some sleep tonight gang. Tomorrow we continue the journey to you becoming a f*cking millionaire. BRING YOUR F*CKING SHOES!"*

**Hrvatin:**

---

[1] Throughout the Complaint, expletives have been redacted in part with asterisks from the original text. Tweets and Atlas posts are generally italicized but otherwise unchanged, with spelling/grammatical errors preserved.

e. On October 20, 2021, Hrvatin tweeted: *"$4000 a day makes you a millionaire."*

**Matlock:**

f. On July 15, 2022, Matlock tweeted:



**Constantin:**

g. On December 30, 2021, Constantin tweeted:



11

Constantin is depicted in front of the Ferrari in the picture at left; Constantin,

Knight and a third individual (redacted in part) are depicted in front of the Ferrari

in the picture at right.

**Rybarcyzk:**

h. On November 22, 2021, Rybarcyzk tweeted: *"I don't want clout. I want my every single one of my followers to be millionaires."*

i. On December 29, 2021, Rybarcyzk tweeted: *"I'm trying to hit 777 millionaire traders 2022. I'm gonna make it happen. It's not my goal to only make me prosper. I want all of you to prosper. I'm gonna make each and every one of you make it. The market is so universal. You just adapt to current conditions. Let's go crazy."*

j. On July 26, 2021, Rybarcyzk tweeted:



**Deel:**

k. On July 16, 2021, Deel tweeted: *"Actually 500 into 7Million, but who's counting."*

l. October 29, 2021, Deel tweeted: "Bout 5K short of a million dollar month. Truly UN F*CKING REAL!!!! We will nail in on November I promise you that!!!! LETS GO!"

26. Tweets like those identified above served to further the scheme by convincing followers that acting on the Primary Defendants' recommendations would likely lead to significant wealth, and by falsely portraying their trading methods as accessible to anyone willing to learn.

27. As described above, defendants repeatedly sold shares in direct contradiction to their public statements to followers on social media that they were continuing to buy, and or holding their positions, in anticipation of higher share prices. This practice is called "dumping," and despite repeatedly dumping their stock as they recommended it to their followers, the Primary Defendants reassured their followers and the general public that they did not engage in such behavior, as illustrated by the false and misleading statements and posts below from the Relevant Period:

a. Constantin (Twitter): *I don't dump on people.*

b. Constantin (PGIR Interview): I'm not going to like continue calling something just so, you know, we can get out. We take our losses, whatever, you move on.

c. Matlock (Twitter): *And I'm not pumping and dumping on anyone. Why would I sell when I truly believe $RIBT gets over $1.50-$2. Haters mad to see anyone winning and come out if the stock is down 3% . All I post is information about it.*

d. Deel (Twitter): *$BCTX recap: I buy stocks that I think have a good chart and good news. That's how I always play it and sometimes it goes the wrong way. That's trading. I never dump shares on alerts. BCTX got smacked hard on a vwap reject and I took the L with you guys earlier. On to next*

13

    e.   Cooperman (Twitter): *so we are CRYSTAL F\*CKING CLEAR ... i dont dump on my followers. nor do i even have the following big enough to dump all my shares on. if i say i think something is going to do something THATS WHAT I THINK ITS GONNA DO.*

    f.   Rybarcyzk (Twitter): *You guys are my family. Whoever has my back is a real MVP. I've posted many negative P&L images. I don't dump on anyone. If I have to I'll just take my losses. I have diamond hands though.*

28.    These false and misleading statements furthered the Primary Defendants' scheme by building trust among their followers, so that the Primary Defendants could continue to deceptively promote stocks, and continue to profit by selling their shares into the demand that their promotion generated, all without disclosing either their plans to sell, or their actual sales.

29.    The Defendants understood that they were participating in an unlawful market-manipulation scheme, and that they were profiting from misleading their followers. The Defendants sometimes discussed their scheme over Discord voice chats that they believed were private, but were being recorded. For example, on March 1, 2021, Knight and Cooperman (along with others) discussed the group's manipulation of the securities of GTT Communications, Inc., which at the time traded on the New York Stock Exchange ("NYSE") under the ticker GTT.[2] The following is a portion of the conversation:

*Knight*: Get caught? . . . We're robbing f\*cking idiots of their money. . .

*Cooperman*: It's so funny because I can see the . . . . I can like see the timeline of these. Like I get it [the ticker], I send it to Dan [Knight]. I know Dan's on voice. Dan tells you guys. I see it go up more. Then I send it to Gary [Deel] and I see it go up like way more [laughter] . . . . My other thing is too, is like alright, if we lose on one of these, we've won on like a hundred so . . . We gotta remember with these Ultra [Rybarcyzk] ones, they all do the same thing. It like spikes, comes down for a second—

*Knight*: Then the scalpers get out, like Gary [Deel] gets out, then—

---

[2] The NYSE delisted GTT on August 2, 2021.

*Cooperman*: And then it goes f*cking bukoo, but no, that's not only it. Like what he [Rybarcyzk] does is he alerts it, and then like five minutes later, all his little minions start like retweeting it and saying added with him, so it like builds the hype back up. It happens every single time. They have their shit down to a f*cking science, it's crazy.

Cooperman, Knight, and others were watching GTT's stock price and volume in real time during that conversation. An unidentified individual exclaimed, "Wow, big dump!" Cooperman then commented that he understood that at least one of the Primary Defendants, Rybarcyzk, was dumping at that moment. He stated: "I can like see them in my head coming out of the candle. Like weee! [laughter] Weee!" Knight responded, "Another banger call guys," referring to the promotion. Knight went on to make fun of Rybarcyzk's followers who were losing money as Rybarcyzk's share dump crashed the stock price: "And all his [Rybarcyzk's] followers are like, 'Uh, yo we can't sell today, I don't have any day trades left.'"[3] Knight's mocking of Rybarcyzk's followers elicited laughter. The group continued to mock Rybarcyzk's followers. Playing the role of one of Rybarcyzk's followers, Cooperman asked: "Is this a swing?" eliciting laughter. Knight continued, imitating Rybarcyzk's followers: "Please be a swing."

30. In another surreptitiously recorded Discord call, on February 24, 2021, involving Knight, Cooperman, and others, Knight acknowledged that he understood the Primary Defendants were engaging in market manipulation, and explained why he posted fewer recommendations on Twitter and Atlas than the Primary Defendants:

> "[The less] I mention a stock, the less likely I get involved whenever all of Atlas gets a class action f*cking lawsuit . . . I'm playing this extremely smart, for the very long term. If you don't think all these f*ckers go to jail or at least get sued, you are crazy. . . playing stupid does not work in court. . . it's market manipulation. . . . I mean you look up the definition of market manipulation . . ."

---

[3] The Financial Industry Regulatory Authority imposes certain restrictions on the number of "day trades" allowed in certain types of accounts below certain asset thresholds.

15

31. Despite understanding that the Primary Defendants were engaging in market manipulation and profiting from misleading recommendations to their followers on Twitter, Atlas, and Sapphire, Knight continued to promote the Primary Defendants as expert traders on PGIR and provided them with a platform to peddle misleading statements about the stocks they were promoting. Knight himself profited from the fraud scheme by taking positions in the stocks that he knew the Primary Defendants were manipulating, and selling into the demand the Primary Defendants generated through the fraud scheme. Although Knight posted less frequently about the stocks, his role on the podcast was often to ask questions intended to elicit Hennessey or others to promote a stock.

32. As noted, the Primary Defendants regularly trumpeted their trading successes to their followers. They held themselves out as stock picking experts worthy of the substantial followings they had amassed. But they also from time to time claimed they lost money on particular stock "plays." Many of these claims of losses were false and designed to conceal the fact that the Primary Defendants had profited by dumping their shares into the demand their deceptive promotions had generated.

33. For example, on August 11, 2021, Rybarcyzk claimed in a tweet that he lost money trading on ABVC Biopharma Inc. (NASDAQ: ABVC), which he had previously recommended to his followers:

> $ABVC Strange action today . Bag holder here ☚ honestly doesn't make sense. Ran from $3.30 to $4.40's yesterday and to $4.20's today. But faded due to shorts and scalpers. I'm sure some made money. But I hold my word and don't dump on anyone.

Here, Rybarcyzk claimed that he lost money trading ABVC Biopharma (he was a "[b]ag holder"), and that others (including short sellers and "scalpers") caused the share price to drop, but that he did not make money because he does not "dump" shares on anyone. But Rybarcyzk

16

actually made approximately $68,690 on August 10 and August 11, 2021 (the day he posted that tweet) by dumping his shares while recommending ABVC to his followers.

34. Similarly, on March 18, 2021, Deel, having promoted American Resources Corp. (Ticker: AREC) to his followers, claimed he lost $20,000:

> Deel (@notoriousalerts): *"$AREC stopped me guys. Sorry about this one I lost 20k here it looks like 1.5M shares were sold over 5. Sorry to anyone who took with me. Had great news this morning but didn't wanna go. I'll look for us a better one"*

In fact, Deel made more than $7,000 dumping his AREC shares on that day alone (and over $6,000 selling his shares into demand generated by his posts the day before).

35. Others Primary Defendants also deceived their followers about profits and losses to further the scheme. Matlock, for example, having promoted FDS Pharma, Inc. (NASDAQ: HUGE) to followers, reported on Atlas on February 3, 2021: "HUGE I took the loss on it too. We will find a better one." Matlock in fact made approximately $27,734 dumping his HUGE shares the day he made that post.

## II. Examples of Manipulation

### A. Camber Energy, Inc.

36. Several Primary Defendants manipulated the stock of Camber Energy, Inc. at various times from August to October 2021. Camber Energy trades on the New York Stock Exchange under the ticker "CEI." Deel, Matlock, and Cooperman established positions in CEI stock and sold into their deceptive promotion in early August 2021; Constantin and Hvartin established positions in the stock and sold into their deceptive promotion in September and October 2021. CEI was one of the Selected Stocks.

August 3-5, 2021: Deel, Matlock, and Cooperman

37. Matlock and Deel began purchasing shares of CEI on August 3, 2021.

17

Cooperman bought shares the next day. By the afternoon of August 4, 2021, all three had acquired significant positions in CEI, with Deel owning 936,422 shares acquired at an average price of $.46 per share, Matlock owning 835,429 shares acquired at an average price of $.46 per share, and Cooperman owning 405,000 shares acquired at an average price of $.47 per share. Then, at 3:37 p.m. Deel posted the following message about CEI on Twitter and on Atlas:

> *$CEI I added for a swing. Volume is starting to come into pennies this week and this is very cheap. On the daily chart we have formed a double bottom. Last time it was at these prices we went to $3. So that leaves a lot of range.*

Matlock echoed the sentiment, posting on Atlas at 3:38 p.m.: *"Adding CEI with you that's cheap AF,"* using an abbreviation for the slang term cheap "as f*ck."

38. Within the next four minutes after those posts, Matlock sold 165,100 shares, Deel sold 60,000 shares, and Cooperman sold 240,000 shares of CEI, as the price rose by a penny per share. At 3:43 p.m., Deel, Matlock, and Cooperman posted about CEI again:

- Deel (Twitter): *"$CEI with the CEO saying no reverse split they have to think it will get to a dollar. I feel good with swinging this one this week for a run up."*

- Matlock (Atlas): *"oh no r/s [reverse split] on CEI"*

- Cooperman (Twitter): *"adding CEI here for a swing last time it touched these levels on the daily we saw a move to 3+ lots of DD on @notoriousalerts"*

39. Immediately after these posts, Deel, Matlock, and Cooperman began selling more shares. Within two minutes, Deel had sold 95,000 shares, Matlock had sold 198,303 shares, and Cooperman had sold all 165,000 of his remaining shares. Each defendant sold for an average price of $.48 per share. All three continued to promote CEI on Twitter following their sales, and Deel and Matlock continued selling, as described below.

- 3:46 p.m.: Deel (Twitter): *$CEI payyyyyyy us. Let's clear .50 next and trend up all after hours and tomorrow.*

- 3:47 p.m.: Deel (Twitter):

18



40.     While Deel was promoting CEI on Twitter, he was simultaneously selling his shares, liquidating 60,000 shares at an average price of $.48 per share.  During that same two-minute window, Matlock sold 228,781 shares at an average price of $.48 per share.  Matlock then immediately promoted CEI on Atlas, claiming "Also CEI is great for Biden infrastructure plan."

41.     As soon as Matlock promoted CEI on Atlas, he began selling again, and by 3:51 p.m. had liquidated another 70,600 shares at an average price of $.48 per share.  Deel also sold 41,000 shares at the same average per-share price during that two-minute window.

42.     Cooperman, despite not owning shares at that moment, continued to promote CEI while Matlock and Deel were selling.  At 3:51 p.m. Cooperman tweeted:  *"big bigger $CEI �textbf𝟔𝟔𝟔𝟔."*  Over the next three minutes, Deel and Matlock sold, respectively, approximately 80,000 and 158,327 shares at an average price of $.49 per share.

19

43.     Deel then tweeted at 3:54 p.m., "*$CEI let's squeeze* 🌀," suggesting that investors bid up the price of CEI in order to force short sellers to exit their positions ("squeeze" the short sellers) to avoid further losses.  As he had several times already that day, Deel continued to sell CEI shares immediately after his tweet recommending that others buy CEI shares.  By 3:55 p.m., Deel sold 115,000 shares and Matlock sold all of his remaining 14,318 shares, at an average price of $.49 per share.  A minute later, at 3:56 p.m., Matlock posted on Atlas: "*nhod CEI*" referring to a "new high of the day."  Starting around the same time, Deel sold 165,000 shares at an average price of $.494 per share over the next three minutes.  Between 3:58 p.m. and 3:59 p.m., Matlock bought 48,555 shares at an average price of $.487 per share and sold 48,555 at an average price of $.493 per share, leaving him with none.  .

44.     At 4:00 p.m., Deel tweeted:  "*$CEI .50 now!!! How high we going*"?  He immediately sold 9,610 shares at $.50 per share.  A few minutes later, at 4:06 p.m., Deel tweeted: *$CEI holding and adding more in AH. Tomorrow we should run most of day.*"  Despite telling his followers he was holding his CEI shares and intended to add to his position in after hours ("AH" trading), Deel immediately began selling.  Over the next five minutes, Deel sold another 5,390 shares at $.50 per share.

45.     Conforming to his typical pattern, Deel continued to suggest that his followers hold their shares and await increases in price, while he was dumping his shares into the market:

- 4:13 p.m.: Deel (Twitter): *yes it can AC that's what I am waiting on $CEI we nailed those low entries down there and now everyone is safely in the profit zone and we ride https://t.co/0AqkvUYl3N*

- 4:15 p.m.: Deel (Atlas): *CEI we look really good here. We got dead bottom on original alert in here and now we should all be in the profit and see how far we run up. I am holding full into tomorrow*

From 4:17 to 4:20 p.m., Deel sold another 6,000 CEI shares at $.50 per share.

20

46. At 4:23 p.m., with the CEI share price around $.49 per share, Deel tweeted, *"Nice!! Thanks for sharing it would be great if they give us a PR on Friday 👀 $CEI. Either way, I think this stock will eventually get back to $1 the chart has room to $3 but I'll will gracefully make my exit around $1."*

47. At 5:00 p.m., after telling his followers he was holding his shares until the CEI share price reached $1, Deel sold 3,000 shares for approximately $.50 per share.

48. The next day, August 5, 2021, Matlock and Cooperman reestablished positions in CEI, and Deel increased his position in CEI, before once again posting buy-and-hold recommendations while they sold their shares. That morning, Deel bought 212,400 CEI shares and Cooperman bought 190,000 shares, each at an average price of $.48 per share.

49. Immediately after buying his CEI shares, Deel began promoting the company on Twitter. At 9:55 a.m., Deel tweeted: *"$CEI still in full and added more this morning. This is a swing and I'm here until I get the move I want. We already tested that .50 level yesterday I think another break of that sends us."* A minute later, Matlock bought 130,000 CEI shares at an average price of $.48 per share.

50. At 9:56 a.m., Deel posted to Atlas: *"I added more to my CEI swing this morning."* Over the next two minutes, Matlock and Cooperman sold 32,500 and 30,000 CEI shares, respectively, for an average price of $.48 per share.

51. At 9:58 a.m., Cooperman sold 30,000 CEI shares; tweeted that he *"added some more CEI to the swing"*; and immediately sold all of his remaining 130,000 shares at an average price of $.48 per share. Matlock also liquidated his CEI position, selling 97,499 shares (leaving him with 1 share) over the next few minutes at an average price of $.48 per share. Deel also sold 64 shares at $.50 per share.

21

52.     Deel continued to post positive assessments of CEI on Twitter and Atlas throughout the morning, while selling his shares.  Between 10:35 and 11:09 a.m., Deel bought an additional 45,000 CEI shares at $.49 per share and then tweeted:

> *Don't panic on $CEI and tag me every 20 minutes. It's a*
> *swing. I'm adding all day. I alerted this yesterday at .46 and*
> *we are holding nicely right under .50 currently. I think we get*
> *a close over .50 by end of day and start the climb higher.*
> *There was hint of a PR [press release] tomorrow too*

Despite telling his followers he would be "adding all day" to a "swing," Deel soon began selling his entire position.  By noon, he had sold all 508,822 of his shares for about $.51 per share.  He continued to promote CEI as he sold, posting on Atlas *"CEI looks so good it will pay us"* as he was dumping his shares.

53.     Between August 3, 2021 and August 5, 2021, the three defendants made approximately $54,989 through their misleading tweets and posts about CEI; specifically, Deel made $37,566; Matlock made $12,729, and Cooperman made $4,694.  This was a small taste of the profits to come from the longer-term manipulation that followed soon after.

September 1 – October 5, 2021: Constantin and Hrvatin

54.     On September 1, 2021, between 1:42 and 1:47 p.m., Constantin bought 2,000,000 shares of CEI at prices between $.49 and $.51.  Constantin then began posting price targets and memes about CEI in an effort to boost the stock's price and trading volume.  During the same period, Hrvatin purchased CEI shares, posted price targets, and then sold his entire position on multiple occasions.  What follows are representative examples of Constantin's and Hrvatin's purchases, posts, and sales.

55.     On September 1, 2021, at 1:58 p.m., Constantin tweeted:  *"$CEI average .51 swinging with @LadeBackk [Hrvatin] for $2+. Don't give us crap if it hits $1 and you don't sell.*

22

*Your body, your choice. I like this stock."* The next morning, at 9:30 a.m., Hrvatin bought 100,000 CEI shares for $.69 per share, while announcing a $1 price target for CEI on Twitter: *"$CEI let the $1 run begin."* Two minutes after that tweet, Hrvatin dumped all of his shares for $.72 per share.

56. On September 3, 2021, Constantin tweeted: *"My homie @LadeBackk [Hrvatin] holding with me. $3-5".* On September 13, 2021, Constantin tweeted a price target of $3 to $5 for CEI and encouraged his followers to hold onto the stock: *"$CEI $3-5+. Too many of you act like little bitches when there's dips. It's all part of the game."*

57. On September 15, 2021, Hrvatin bought 100,000 CEI shares at $1.65 per share. At 3:31 p.m., two minutes after he bought the shares, he tweeted: *"$CEI I'm holding overnight. A huge day is coming. I can feel it."* Within minutes, Constantin responded to Hrvatin's tweet: *"I ain't selling under 3 beleed that."* Meanwhile, Hrvatin—despite telling his followers he was "holding overnight" because "a huge day is coming"—had already begun to dump all 100,000 of his shares for $1.66 per share between 3:34 and 3:36 p.m.

58. On September 23, 2021, Constantin tweeted price targets of $3 and $5 dollars to maintain interest in CEI among his followers. Similarly on September 28, 2021, he tweeted: "$CEI We consolidate at $3 and then we push to $5 then $10."

59. The next day morning, September 29, 2021, Hrvatin bought 100,000 shares for an average of $3.27 per share. One minute after buying, at 10:30 a.m., Hrvatin tweeted: *"$CEI get ready for the next leg up. We're aiming for $4 today."* Five minutes later, Hrvatin sold all his shares for $3.33 per share. Later that day, Constantin continued to promote CEI, tweeting a price target of $10 per share: *"$CEI shorts are screwed. See you at $10."*

60. On October 1, 2022, for example, Constantin told his followers he believed the

23

price of CEI shares would exceed $10 per share (*"$CEI will be another monster $10++"*) and that he would sell CEI shares at $10 to $20 per share (*"$CEI everything is going to be very ok. Z-DADDY selling $10-20"*).

61.     On October 5, 2021, Constantin reiterated on Twitter his $10 price target for CEI shares (*$CEI $10+*).  About a half hour later, he sold all 2,070,000 shares he owned, including the 2,000,000 shares that he purchased on September 1, 2021, for an average price of $2.61 per share.

62.     Between September 1, 2021 and October 5, 2021 Constantin made approximately $4,301,440, while Hrvatin made $249,761 buying and selling CEI stock.

**B.      Alzamend Neuro, Inc.**

63.     On or about June 15, 2021, Deel, Rybarcyzk, Hennessey, and Matlock identified Alzamend Neuro, Inc. (NASDAQ: ALZN) as one of the Selected Stocks in the scheme.  After an unsuccessful attempt to manipulate ALZN's securities on June 15, 2021, these defendants, joined by Cooperman and Knight (collectively, the "ALZN Participants"), regrouped and tried again between June 29, 2021 and June 30, 2021.  On June 29, 2021, Hennessey, Cooperman, and Knight all acquired shares of ALZN, while Deel also purchased ALZN shares before selling his entire position for a gain of $16,884 after posting:  *"ALZN I added for the swing. I think this one has a lot of upside in it and it goes with the theme. I think tomorrow this one is a lot higher."*  On the morning of June 30, 2021, Rybarcyzk and Matlock rejoined the group, purchasing 15,000 ALZN shares and 29,876 ALZN shares, respectively, while Deel reestablished a position in ALZN (84,000 shares) and Hennessey and Cooperman added to their positions.  Throughout the morning, several of these defendants posted about ALZN and sold at least a portion of their shares following their posts.

24

64.     For instance, at 10:11 a.m., Deel posted on Atlas:  *"ALZN great daily volume here. I think this one is setting up to breakout over 12 today. I mentioned my swing adds yesterday and I added more this morning."*  Following this post, between 10:12 and 10:14 a.m., Deel sold 39,800 shares of ALZN for an average price of $11.40 per share.  Then, at 10:17 a.m., Deel tweeted:  *"I think $ALZN is the next sick mover.  I have some added. I think it breaks 12 today."*  Right after this post, between 10:18 and 10:19 a.m., Deel sold 39,000 ALZN shares for an average price of $11.73 per share.

65.     Then, at 10:19 a.m., Hennessey posted a "teaser" on Atlas from his and Knight's PGIR interview of ALZN's CEO that was set to air later that day.  Specifically, Hennessey quoted ALZN's CEO as saying there were "No plans to in the year raise any capital" and "We have enough Capital to put our drugs in human trials without needing to raise capital."

66.     Following the morning manipulation of ALZN, Deel and Rybarcyzk exchanged private messages about the stock on Discord, in which Deel shared that they were "loading" up on ALZN, and shared a direction from Hennessey to establish a large position before the promotion.  Specifically, they stated:

> Deel:  *we are loading these shares back down here on ALZN to send to nhod [new high of the day] after lunch if you want anymore*
>
> Rybarcyzk:  *Yes sir!*
>
> Deel:  *hugh* [Hennessey] *says get size*
>
> Deel:  *posting*

67.     Prior to this exchange, Hennessey had purchased 35,000 shares of ALZN. Following the exchange between Rybarcyzk and Deel, virtually simultaneously between 12:24 p.m. and 1:01 p.m., Rybarcyzk, Deel, Cooperman, and Matlock all "loaded up" on ALZN.

25

68.     Specifically, Deel purchased 48,000 shares, Rybarcyzk purchased 35,000 shares (for a total of 50,000 shares including 15,000 shares purchased earlier in the day), Cooperman purchased 10,209 shares, and Matlock purchased 24,000 shares. The price of the shares purchased during that period was between $10.77 and $11.40 per share. The ALZN Participants then engaged in a campaign to raise the price of the stock, falsely claiming that they were holding their shares, while selling them to realize profits.

69.     Specifically, immediately after the purchases were made, at approximately 1:02 p.m., Deel posted about ALZN on both Twitter and Atlas: *"$ALZN is now my largest swing position open. We broke 12 earlier, but that was a tease on what this will do. I added these dips through lunch and now I will ride this for new highs and more. I like the potential here and the market is hot for it."* Deel's claim that he had a "swing" position was a representation that he would be holding the stock for at least a day or more rather than immediately selling.

70.     Minutes later and over the course of the next two hours, Rybarcyzk, Hennessey, and Cooperman joined Deel and began posting about ALZN. Deel repeated his claim that he was "swinging" or that he had a "swing position." Rybarcyzk specifically claimed that he was holding the stock "O/N" (overnight). The messages also contained specific price targets of $12 per share, and talk of a "new high" approaching. Deel also promoted the potential for growth from the company, claiming that *"the market [for ALZN's pharmaceutical products] is expected to exceed 10 Billion by 2025."*

71.     However, in contrast to their claims that they were holding their ALZN stocks and even adding to their positions, anticipating the stock price reaching $12 per share, Rybarcyzk, Hennessey, Cooperman, and Deel were, during the same two-hour period of time, selling all or most of their stock (i.e. "dumping" it) for less than $12 per share. For instance, while at 1:02

26

p.m. Deel had claimed that $12 was a "tease" and that he would now "ride this for new highs and more," immediately thereafter he sold 5,000 shares for $11.57 per share.

72. By the end of the approximately two-hour period, when Deel, Rybarcyzk, Hennessey, and Cooperman were actively promoting the stock and making the above claims, Rybarcyzk, Deel, and Cooperman had sold all of their shares. Matlock and Hennessey also sold during this period, with Matlock making $6,473 to add to his morning manipulation profits of $25,519 and Hennessey making $7,682 from his ALZN sales that day.

**C. Vislink Technologies Inc.**

73. Vislink Technologies Inc. (NASDAQ: VISL) is another example of a stock that was manipulated multiple times by various Defendants. VISL was a manipulation involving misleading posts from Hennessey about on topics including "due diligence" he conducted on the company, and an interview of the CEO on PGIR. Much of this activity occurred in February (when most of the illicit profits were made) and March 2021. Below is an example from March 2, 2021 involving Rybarcyzk, Deel, Cooperman, Matlock, and Knight (the "VISL Participants").

74. On the morning of March 2, 2021, Deel bought 40,193 VISL shares (net) at an average price of $3.76 per share. Hennessey bought 1,600 shares for $3.73 per share. Almost immediately, Deel and Hennessey started promoting VISL on Atlas.

75. At 11:02 a.m., Deel posted: "VISL climbing up to vwap [volume weighted average price] here." At the same time Deel posted this, Hennessey bought 48,400 VISL shares for $3.79 per share. Hennessey then posted at 11:03 a.m.: "VISL CEO will also be on espn radito today." With the price climbing over the next two minutes, Deel quickly sold his entire position for $3.84 per share.

27

76.     Later that afternoon, at 2:15 p.m., Deel bought 20,000 VISL shares at $3.635 per share.  One minute later, Hennessey tweeted:  "*Never gave my updated $VISL thesis and breakdown video I did with CEO Mr.Miller  My bad*."  One minute after that tweet, Deel sold his entire VISL position again, this time for $3.64 per share.

77.     Within minutes, Knight, Deel, Rybarcyzk, Matlock, and Cooperman began buying VISL securities.  By 2:41 p.m., the VISL Participants had amassed positions in VISL in the following amounts and average prices:

- Knight:  21,270 shares (net) for $3.72 per share (along with 20 call options with a strike price of $5.00 that expired on March 19, 2021);

- Deel:  91,160 shares for $3.67 per share;

- Matlock:  68,432 shares (net) for $3.82 per share;

- Cooperman:  25,000 shares for $3.72 per share; and

- Rybarcyzk:  200,000 shares for $3.80 per share.

78.     Matlock began promoting VISL stock almost immediately on Atlas.  At 2:41 p.m., he noted the increased volume of VISL trading in the "last 30 minutes," without noting that he and four other defendants were buying shares during that time.  One minute later, Matlock posted:  "VISL ww [i.e., "worth watching"] here."  Around the same time as that post, Matlock sold 23,414 (net) shares for an average price of $3.90 per shares, and Knight sold 6,000 shares at $3.89 per share. Knight also purchased 5 VISL call options with a strike price of $5.00 and an expiration of March 19, 2021.

79.     At 2:43 p.m., Deel posted on Atlas that VISL's price might increase in after hours trading, and that he purchased shares ("*VISL might be the runner in AH* [Afterhours] *I grabbed some*").  Meanwhile on a private Discord voice call that was surreptitiously recorded, Knight joked about Deel's Atlas post:  "He always grabs them a little bit too late," eliciting laughter

28

from others on the call.  Knight immediately sold 1,450 shares for $3.90 per share, and Matlock sold 45,018 shares for $3.89 per share.

80.     Knight then asked in his private Discord voice chat:  "Should I retweet Michael Hunt 'VISL yawn.  Wake me up at $10?'"  Knight joked that Hunt "may be sleeping for a while bro," indicating Knight did not believe the stock price would rise to $10 per share.  Knight nonetheless retweeted the Michael Hunt tweet.  A few minutes later, again in his private Discord voice chat, Knight said, "I think my tweet worked."  And later he said, "I think my tweet definitely helped it out right there."  Knight immediately began selling shares, and, by 2:48 p.m., had sold 8,050 shares for an average price of $3.91 per share.

81.     At 2:49 p.m., Deel posted to Atlas that VISL's share price would exceed $4 ("*VISL breaking 4*").  Deel, Cooperman, and Knight then immediately began selling VISL shares.  The continued to sell over the next three minutes, in the amounts and at the prices below:

- Deel:  20,000 shares for an average price of $3.99 per share;

- Cooperman: 12,500 shares for $4.00 per share;

- Knight:  2,500 shares for $4.01 per share (and 10 VISL call options).

82.     At 2:52 p.m., Knight tweeted *"All hail $VISL the Piss Missile"* and quickly began selling again.  By 3:05 p.m., Knight had sold 1,500 shares for $3.99 per share (and 15 call options), and Deel had sold 25,000 shares for $4.04 per share.  At 2:55 p.m., on his private Discord voice chat, Knight joked that he "sold those VISL piss missiles at the right time."

83.     Right after he sold 5,000 shares, at 3:05 p.m., Deel posted to Atlas that he believed VISL's price would still climb that day:  "*yeah VISL to nhod* [new high of the day] *soon."*  Beginning at 3:06 p.m., in a seven-minute span, Deel, Knight and Rybarcyzk sold shares in the amounts and at the prices below:

- Deel:  4,876 shares for $4.11 per share;

29

- Knight: 1,270 shares for $4.07 per share;

- Rybarcyzk: 50,000 shares for $4.04 per share.

84. At 3:17 p.m., Knight bought 450 shares for $4.03 per share. Two minutes later, Hennessey tweeted "$VISL star link?" with an embedded video clip of Hennessey's interview of VISL's CEO. Knight immediately sold 350 shares for $4.06 per share. Within minutes, Hennessey and Rybarcyzk were promoting VISL on Twitter again, with Hennessey embedding additional video of his interview with the VISL CEO and Rybarcyzk stating he expected the share price to jump in after-hours trading (*"I smell an AH GAPPER on $VISL")*. Rybarcyzk also posted Hennessey's tweet regarding Hennessey's interview with the VISL CEO.

85. Immediately following these tweets, Rybarcyzk, Hennessey, and Knight collectively dumped 156,050 shares in two minutes. Specifically:

- Rybarcyzk sold 100,000 shares for $3.93 per share;

- Hennessey sold all 50,000 of his shares for $3.94 per share;

- Cooperman sold 6,000 shares for $3.94 per share;

- Knight sold 50 shares for $3.97 per share (after buying 100 shares for $3.95 per share).

86. At 3:31 p.m., Deel posted on Atlas that he believed, based on trading activity over the last hour (and without mentioning the VISL Participants' role in the activity), that VISL shares would increase in value in after hours trading: "*VISL has been active the last hour. I think this makes a move AH a close over 4 would be* ideal *for a move."* A minute later, Deel sold 15,000 shares for $3.96 per share. Cooperman sold another 500 shares for the same per-share price. By 3:40 p.m., Deel had liquidated his entire VISL position, selling 26,284 shares for $3.90 per share. He then reloaded, buying another 75,000 shares over the next few minutes for $3.92 per share.

30

87.     While Deel was buying shares, Hennessey tweeted "*$VISL - anyone hear it ? CEO confirmed a PR [press release] within 4 weeks (Now 3 weeks)*" again embedding a clip of his interview with the VISL CEO.   At 4:01, Hennessey tweeted additional information about his "thesis" for VISL:  "*$VISL - from investor deck  - adding to the thesis  The 4 mil contract adds 13% to annual Rev (this accounts for doing nothing else)*."  Two minutes later, he tweeted: "*$VISL we know rev are increasing as they've added customers and contracts and now have NO DEBT*."  At 4:10 p.m., Deel posted on Atlas that based on the "VISL tape" he was "bullish."  Within minutes, he had dumped 74,090 shares for $3.81 per share.

88.     This particular manipulation of VISL stock occurred from March 2 to March 3, 2021.  Over this two-day period, Rybarcyzk made $26,315 trading VISL securities; Deel made $25,829; Hennessey made $7,407; Cooperman made $6,690; Knight made $5,386; and Matlock made $5,140.

**D.     Torchlight Energy Resources**

89.      On or about February 9, 2021, Hennessey identified Torchlight Energy Resources (NASDAQ: TRCH) as a Selected Stock.[4]  On February 10, 2021, Hennessey, Matlock, Deel, and Knight ("the TRCH Participants") purchased shares in the following amounts:  Hennessey (196,019), Matlock (383,421), Deel (210,000, net), and Knight (8,562, net).  The price of the shares ranged from $1.68 to $1.95 per share.

90.     After purchasing the shares, the TRCH Participants engaged in a campaign to raise the price of the stock, falsely claiming that they were holding their shares, while selling them to realize profits.  Knight aided and abetted the TRCH Participants in furthering the scheme, by, among other things, providing them with a platform, the PGIR podcast.

---

[4] The company became Meta Materials Inc. (Ticker: MMAT) following a merger.

91.     In the course of the scheme, various Defendants often highlighted an anticipated event that would purportedly raise the stock price (a "catalyst") and encouraged buying and holding the stock until the event, falsely claiming that they too were holding the stock waiting for the catalyst.  In the case of TRCH, the catalyst was a purported upcoming merger with another company, Metamaterial Inc.  Hennessey claimed that he had discovered that this merger was coming in the course of his due diligence ("dd") research on the company.  Hennessey repeatedly promoted false information about Meta itself (e.g., that it was worth "north of $4.8 billion") and promoted the purported benefits of the merger.  Hennessey also posted about other purported long-term benefits to TRCH stock holders, including a "dividend" that TRCH shareholders would purportedly receive after the merger.  Hennessey also claimed that Meta was potentially partnering with Tesla, and that Meta had products that had applications for fighting COVID-19 and thus a "10 billion dollar MARKET CAP POTENTIAL."

92.      Several times in the course of the month, after realizing profits from a sale of TRCH stock, various TRCH Participants then "reloaded" by purchasing and selling more shares, as the stock price continued to rise in part as a result of their promotional efforts.

93.     Specifically, in the first round of manipulation, on February 10, 2021, from 10:11 a.m. to 10:12 a.m., after the TRCH Participants had all finished purchasing their shares that morning, Hennessey, Matlock, and Deel posted about TRCH on Atlas.  Despite the fact that all of the TRCH Participants had already purchased their positions, the posts were designed to falsely make it appear that Matlock and Deel were acting on Hennessey's recommendation:

- Hennessey : *im Long TRCH for merger*
- Matlock: *merger?*
- Hennessey: *$TRCH merger should be done soon enough @Trade ALERT*
  *yes*
  *they had to do an offering*
  *now that the offering is done full steam ahead for merger*

32

- Deel: *added TRCH*
- Hennessey: *merger will be done any day now*
- Matlock: *added*

94. At 10:11 a.m., Hennessey also posted about TRCH on Twitter, falsely describing it as a "swing" position and promoting the purported upcoming merger with Meta.

95. Over approximately the next seven minutes Knight sold most of his position (6,056 of 8,562 shares) for $2.12 per share, and Deel sold his entire position for $2.13 per share. By 10:25 a.m., Matlock had sold his whole position for $2.25 per share.

96. Similarly, on February 12, 2021, Hennessey, having previously sold his entire position in TRCH, "reloaded" by purchasing 75,000 shares at 11:30 a.m. at $2.32 per share. At approximately 12:30 p.m., Hennessey and Knight appeared as guests on a podcast, where they promoted TRCH. Hennessey then spent the afternoon promoting TRCH on Atlas and Twitter, advancing the Tesla rumor and the purported upcoming merger. In the late afternoon, between approximately 4:40 and 4:47 p.m., Deel and Matlock bought TRCH shares for between $2.84 and $2.99 per share. Immediately thereafter, Hennessey made a misleading post about a potential COVID-19 "angle" for Meta products. Matlock and Deel began tweeting to amplify the message and suggest they were holding TRCH stock. In reality, immediately after the posting, they began selling their positions.

97. Specifically, between 4:40 and 4:43 p.m., Matlock bought 153,582 shares at prices ranging from $2.84 to $2.99 per share. Between 4:44 and 4:47 p.m., Deel bought 35,000 shares at prices ranging from $2.93 to $2.99 per share. Hennessey, Deel, and Matlock then immediately began promoting TRCH on Atlas and on Twitter:

- 4:47 p.m.: "Hennessey (Atlas): *DD for COVID 19 ANGLE - presentation (feb 2021)*
  *Inside the very last slide Meta mentions a biosensor*

33

> *'This smartphone attached biosensor under development uses nanomaterial for molecular fingerprint detection in a range of applications (such as COVID19 and others)*
> *THIS GIVES A 10 billion dollar MARKET CAP POTENTIAL*
> *@Trade ALERT"*

- 4:48 p.m.:  Deel (Atlas):  *"I am adding for the hold on TRCH"*

- 4:48 p.m.:  Matlock (Atlas, responding to Hennessey's post):  *"adding"*

- 4:48 p.m.:  Matlock (Atlas):  *"more"*

- 4:48 p.m.:  Matlock (Atlas):  *"that's insane news"*

- 4:49 p.m.:  Matlock (Twitter):  *$TRCH I smacked 50k on this news. She's going to all time highs*

Matlock's tweet included a link to a 4:47 p.m. tweet from Hennessey that was similar to Hennessey's Atlas post, described above.

98.    Immediately after that tweet, Matlock sold 30,000 shares for $3.14 per share, and Deel sold all 35,000 of his TRCH shares for $3.19 per share and a total profit on the day of $7,750.

99.     One minute later, at 4:50 p.m., Matlock posted on Atlas a price target of at least $4 for TRCH, referencing Hennessey's "due diligence":

> *TRCH going to 4+ after hours on @Hugh Henne new found covid DD*
>
> *https://discord.com/channels/428232997737594901/458013311846449152/809903629027770378 @PJ Matlock ALERT*

At the same time Matlock was posting this to Atlas, he was selling 49,602 shares for $3.32 per share.

100.    At 4:51 p.m., Matlock posted on Atlas:  *"THis is gonna f\*cking blast off."*

Matlock then immediately began liquidating his position in TRCH, as described below:

- 4:51 p.m.: Matlock sold 38,977 shares for $3.43 per share;
- 4:52 p.m.: Matlock sold 29,298 shares for $3.56 per share;
- 4:53 p.m.: Matlock sold 5,430 shares for $3.63 per share;
- 4:54 p.m.: Matlock sold his remaining 176 shares for $3.48.

Matlock made a profit of $67,766 during these last minutes of the trading day; his total profit was $75,116 for the day.

101.    On Sunday, February 14, 2021, in furtherance of the scheme, Hennessey and Knight discussed TRCH on PGIR.  Hennessey reiterated numerous false statements that he had made in previous communications to encourage buying and holding TRCH stock, including: falsely claiming that Meta was worth $5 billion; describing the "catalyst" of a merger happening on March 12; and describing the purported special dividend for TRCH shareholders after a merger.

102.    In total, the TRCH Participants' profits on TRCH from February 10 through February 23, 2021 were $288,603 for Hennessey; $336,138 for Matlock; $148,131 for Deel; and $2,757 for Knight.

### E.    ABVC Biopharma Inc.

103.     In addition to working together in coordination to manipulate particular stocks, at times certain Defendants carried out the scheme on their own, by moving quickly to buy, manipulate, and sell a stock in a short period of time, quickly realizing a significant profit.

104.    For example, on August 10, 2021, Rybarcyzk began purchasing shares of ABVC Biopharma Inc. (NASDAQ: ABVC), at various prices under $4 per share, ending the day with 282,099 shares.  The next morning, August 11, 2021, he bought more than 24,000 additional shares at prices between $3.72 and $3.75.  Starting at approximately 8:00 a.m. and continuing for the next hour and a half, Rybarcyzk began tweeting positive messages about ABCV, setting a

35

price target of $4 and increasing to $6, all while buying stock and adding to his position:

- At 8:00 a.m., he tweeted: "NO sleep just waking up too lol $ABVC looking strong still!!$4/$4.50 breakouts next."

- At 9:30 a.m., he tweeted: "$ABVC Long $6+++"

105. Beginning at 9:30 a.m., Rybarcyzk began selling his shares, starting at $4.09 per share. For the next three hours, he continued to promote ABVC and a $6 price target, all while selling his shares for between $4.04 and $3.40 (as the share price began dropping). By 12:25 p.m., Rybarcyzk had sold all of his ABCV shares, for a total profit that day of $68,690.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a) of the Securities Act)**

106. Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

107. By reason of the conduct described above, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

108. As a result, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §77q(a)(1), (2), and (3)] and will continue to violate those sections unless enjoined.

36

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

109.    Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

110.    By reason of the conduct described above, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

111.    As a result, defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) [17 C.F.R. §240.10b-5(a), (b), and (c)] thereunder.

**THIRD CLAIM FOR RELIEF**
**AIDING AND ABETTING VIOLATIONS OF**
**SECTION 17(a) OF THE SECURITIES ACT**

112.    Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

113.    By reason of the conduct described above, defendant Knight directly or indirectly, singly or in concert with others, aided and abetted defendants Constantin, Matlock, Cooperman,

37

Deel, Hennessey, Hrvatin, and Rybarcyzk in violating Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §77q(a)(1), (2), and (3)].

## FOURTH CLAIM FOR RELIEF
## AIDING AND ABETTING VIOLATIONS OF
## SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

114.    Paragraphs 1 through 105 above are re-alleged and incorporated by reference as if fully set forth herein.

115.    By  reason of the conduct described above, defendant Knight directly or indirectly, singly or in concert with others, aided and abetted defendants Constantin, Matlock, Cooperman, Deel, Hennessey, Hrvatin, and Rybarcyzk in violating Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a), (b), and (c) [17 C.F.R. §240.10b-5(a), (b), and (c)] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain the Defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5];

B.    Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C.    Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

38

C.      Enter an order barring the defendant Hrvatin from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 13th day of December, 2022.

Respectfully submitted,

*/s/ David J. D'Addio*
David J. D'Addio
Amy Harman Burkart
Andrew Palid
David Scheffler
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-4526 (David D'Addio)

39