United States District Court
Southern District of Texas
**ENTERED**
September 22, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD E. COGGINS, *et al*, | § § | CIVIL ACTION NO 4:21-cv-03574 |
| Plaintiffs, | § § § | |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| CAMBER ENERGY INC, *et al*, Defendants. | § § § § | |

OPINION AND ORDER
GRANTING MOTIONS TO DISMISS

The motions to dismiss by Defendants Discover Fund Management LLP and Camber Energy, Inc are granted. Dkts 69 & 70.

1.  Background

Defendant Camber Energy, Inc is a small oil and gas company based in Houston, Texas, that trades on the New York Stock Exchange. Its share price collapsed by more than 70% on October 5th and 6th of 2021. Dkt 65 at ¶¶ 8, 164–166.

Lead Plaintiffs George C. Smith, Robert Laurent, and Ajmal Hussain represent (subject to a few exclusions) themselves and all other persons similarly situated who purchased the securities of Camber between July 13th and October 4th of 2021 and held such shares through the close of trading on October 4th. Dkt 65 at 2. They bring various securities claims against Camber and a number of others.

Defendant James Doris is the CEO of Viking Energy Inc, and the CEO of Camber. He began as CEO of Camber

in December 2020 and served in that role throughout the entire class period. Id at ¶ 28.

Defendant Discover Growth Fund, LLC provides financing (typically in exchange for convertible securities) to small publicly traded companies, including Camber. Id at ¶ 30. It is referred to here as *Discover*.

Defendant Discover Fund Management LLLP owns and manages Discover. Id at ¶ 31. It is referred to here as *DFM*.

Defendant John C. Kirkland is the sole member of Discover and the general partner of DFM. Id at ¶ 32. Kirkland controls another entity, Antilles Family Office, LLC that has purchased Camber convertible securities and features here in a minor way. Id at ¶¶ 35, 98.

Camber and Doris are referred to together as *the Camber Defendants*. Discover, DFM, and Kirkland are referred to together as *the Discover Defendants*.

### a.   The alleged scheme

As did many energy-related companies in 2014 and 2015, Camber experienced huge losses when the price of oil collapsed. Beginning in April 2016, it began to issue securities to Discover to obtain financing. These were convertible into a fixed dollar amount of common shares. Id at ¶¶ 30, 43–45, 50. The securities sold to Discover were unregistered. Id at ¶¶ 113, 267, 280–81.

From March 2017 to February 2020, Camber sold 2,315 convertible shares to Discover for $22 million. Id at ¶¶ 53–54. Discover would at times convert its shares to common stock and resell them for a profit. Id at ¶ 55.

This state of affairs, Plaintiffs say, allowed Camber to stay afloat but prevented it from being able to secure any other funding. Id at ¶ 52. The involvement of Camber with Viking, referred to above in relation to Doris, then became important.

In February 2020, Camber announced that it had entered into an agreement for a reverse merger with Viking, meaning that Camber would acquire the assets of Viking in exchange for shares of Camber. Camber was

intended as the surviving entity, but Doris (the CEO of Viking) would become CEO of the newly merged company, with Viking management also replacing that of Camber. Id at ¶¶ 63–65.

Doris owned a large number of convertible shares of Viking, and Viking increased the conversion rate throughout 2020. By the end of 2020, Doris was capable of converting and then holding 95% of Viking equity. Id at ¶¶ 70, 73–75. This meant that any stake that Camber acquired in Viking had the potential to be significantly diluted if Doris ever converted, and Doris had a personal financial interest in Viking. Id at ¶¶ 87–90.

Camber filed a draft registration statement regarding the planned reverse merger on Form S-4 with the SEC in September 2020 for the merger to go through that month. Plaintiffs allege that the SEC determined that accounting by Camber for its convertible securities was false and in violation of generally accepted accounting practices, and that Camber needed to restate its financial statements. But Camber never produced those statements, so the Viking merger never closed. Id at ¶¶ 81–83.

Even without the merger, the relationship between Camber and Viking intensified. Plaintiffs allege that it was intended to work in the following manner:

> *First*, Doris would cause Camber to take on dilutive funding from Discover in which Discover provided Camber cash in exchange for Camber Convertible Securities. *Second*, Camber would transfer the money to Viking. *Third*, Discover would convert its Camber Convertible Securities into common stock and sell those securities. *Fourth*, Discover would recycle some of its sales proceeds into further funding Camber, thereby restarting the cycle[.]

Id at ¶ 78 (emphasis added).

For instance, Camber sold Discover 525 shares of Camber convertible securities for $5 million on February 3, 2020. The same amount was then lent to Viking by Camber that same day. Id at ¶ 79. Camber also sold Discover 630 shares of Camber convertible securities for $6 million on June 22, 2020. Three days later, $4.2 million was lent to Viking by Camber, and Viking the following day paid off a $4 million loan that was about to mature. Id at ¶ 80.

On December 23, 2020, Camber borrowed $12 million from Discover and entered into a transaction with Viking where Camber acquired 26.3 million Viking Shares for $20.1 million. This was described as a 51% interest in Viking—which would be controlling. But if Doris chose to convert his shares, Camber would only own 18.4% and Doris would own more than 67%. Id at ¶¶ 85–88.

After this transaction was complete—and having never submitted the restatement required by the SEC so that the reverse merger could go through—Camber announced in December 2020 (via its Form 8-K) that Viking senior management had already replaced Camber senior management, with Doris serving as CEO for both Viking and Camber. Id at ¶ 91 & 70-1 at 278–80. Camber and Viking then entered into a restructured reverse merger agreement in early 2021, under which each Viking shares would be converted into one Camber share. For Doris, this meant that he could own upwards of 80% of Camber stock if the merger went through. Dkt 65 at ¶¶ 95–96.

Camber was limited to this point to 25 million common shares issued and outstanding. It reached that maximum in September 2020 due to prior conversions. As a result, in February 2021, Camber sought and received approval from its shareholders to increase its maximum authorized shares to 250 million. Id at ¶¶ 99–102.

According to Plaintiffs, this increase allowed the sales and conversions to continue. And specifically, they allege that Defendants, from July to October 2021, engaged in a scheme to support Camber's stock price while Discover unloaded its Camber securities. Defendants made a series of announcements regarding new acquisitions by Viking,

4

but they are alleged to have overstated the significance of the acquisitions and to have not timely filed the appropriate documents that would allow investors to know the number of issued and outstanding shares—and thereby judge the significance of these acquisitions. Id at ¶¶ 126–38.

By the beginning of October 2021, Camber was near the new maximum for authorized shares. This amounted to a tenfold increase in Camber shares from the prior February, when its stockholders approved that maximum. Id at ¶ 138. Plaintiffs allege that Camber's stock price over this time tracked as follows:

- o   March 18, 2021          $1.14
- o   July 12, 2021           $0.59
- o   September 9, 2021       $1.30
- o   September 29, 2021      $4.85

Id at ¶¶ 119–125, 138; see also Dkt 70-1 at 260–262.

Kerrisdale Capital is a research firm that's also a Camber investor with a publicly announced short position. Dkts 65 at ¶ 162 & 70 at 14. On October 5, 2021, it published a report claiming that "there were more than 250 million fully diluted Camber shares issued and outstanding." Dkt 65 at ¶ 162. This report, the Camber Defendants say, was made based solely on publicly available information, including the filings described above. Dkt 70 at 14. Plaintiffs don't dispute this contention. See Dkt 73.

Camber filed an 8-K the next day confirming this fact. It there disclosed under Item 8.01 that it had "249,563,409 shares of common stock issued and outstanding." The increase from February 23, 2021 in authorized shares from 25 million to 250 million shares was acknowledged to be "primarily due to conversions into common stock by an institutional investor of shares of Series C Convertible Preferred Stock of the Company that were sold to the institutional investor in 2018 and/or 2019, along with adjustments to such conversions and/or conversion premiums due in respect of such Series C Preferred Stock,

which were payable in shares of common stock." Dkt 70-1 at 264–66.

Camber's stock price fell from $3.09 to $1.53 per share on October 5, 2021. It then closed on October 6th at $0.91 a share. This represented a drop of more than 70%. Dkt 65 at ¶¶ 162–166.

Due to the stock price and Discover's sales, Plaintiffs allege that this scheme earned Discover "at least high eight-figure profits, likely more than $100 million, and potentially as much as a few hundred million dollars." Id at ¶ 139. Plaintiffs contend that Camber also benefited because it continued to only use Discover for financing, and Discover kicked back a portion of the proceeds to Camber. Id at ¶ 140.

Plaintiffs brought this securities class action and assert the following claims in their second amended complaint:

- o *Count I,* against Camber and Doris, for violations of § 10(b) of the Exchange Act and Rule 10b-5(b), see Dkt 65 at ¶¶ 254–62;

- o *Count II,* against all Defendants, for violations of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c), see Dkt 65 at ¶¶ 263–72;

- o *Count III,* against Doris, for violations of § 20(a) of the Exchange Act, see Dkt 65 at ¶¶ 273–78;

- o *Count IV,* against Kirkland and DFM, for violations of § 20(a) of the Exchange Act, see Dkt 65 at ¶¶ 279–83;

- o *Count V,* against Discover, for violations of Section 10(b) and 20A of the Exchange Act, see Dkt 65 at ¶¶ 284–92.

Pending are motions to dismiss by both the Discover Defendants and the Camber Defendants. Dkts 69 & 70.

b.   Public filings by Camber

As a main point of contention in their motion, the Camber Defendants argue that they complied with all

6

required public disclosures. Dkt 70 at 18–20. And, they say, the fullness of those disclosures was such that the collapse in Camber's stock price in October 2021 was precipitated by a "short-seller's report . . . derived from *public* information." Id at 10 (emphasis original).

In making these arguments, the Camber Defendants submit and rely extensively on the public filings that Camber and Viking made from 2016 through 2021. Dkt 70-1. These disclosures proceeded primarily from Item 3.02 of Form 8-K, as promulgated by the SEC and pertaining to unregistered securities, which specifically references and incorporates aspects of Item 701 of Regulation S-K. See 17 CFR § 229.701(a), (c)–(e). These regulations are fully set out elsewhere below. But detailed understanding of Camber's public disclosures is important to resolution of the motions. Judicial notice is appropriately taken of these public filings, even in the context of a motion to dismiss. See *Funk v Stryker Corp*, 631 F3d 777, 783 (5th Cir 2011); *Norris v Hearst Trust*, 500 F3d 454, 461 n 9 (5th Cir 2007).

### i.   Public disclosures, 2016 through 2020

Camber filed disclosures in 2016, 2018, and 2020 where it specifically disclosed the terms of the Series C Convertible Preferred Stock under Item 3.02, the number of shares sold and on what dates, and that the sales involved a dilution risk for current stockholders.

*April 6, 2016:* Camber (then named Lucas Energy, Inc) disclosed in an 8-K the 2016 stock purchase agreement for the Series C Convertible Preferred stock. The stock purchase agreement stated:

> The conversion of Preferred Shares, exercise of the Warrant, and resale of Conversion Shares *will result in dilution, which may be substantial*; the number of Conversion Shares will increase in certain circumstances; and Company's obligation to issue and deliver Conversion Shares in accordance with this Agreement, the

> Certificate of Designations and the Warrant is absolute and unconditional regardless of the dilutive effect that such issuances may have.

Dkt 70-1 at 9, 35 (emphasis added).

*Fiscal Year Ending in March 2016:* Camber (then named Lucas Energy, Inc) filed a 10-K, in which it referred to the stock purchase agreement entered into in April 2016, and noted, "our stockholders may not be offered the ability to approve transactions we may undertake in the future, including those transactions which would ordinarily require stockholder approval under applicable NYSE MKT rules and regulations, *and/or those transactions which would result in substantial dilution to existing stockholders.*" Id at 92, 94 (emphasis added).

*October 3, 2017:* Camber filed an 8-K and disclosed a summary of the terms applicable to the Series C Convertible Preferred Stock. It stated:

> The Series C Preferred Stock may be converted into shares of common stock at any time at the option of the holder, or at our option if certain equity conditions (as defined in the certificate of designation for the Series C Preferred Stock), are met. Upon conversion, we will pay the holders of the Series C Preferred Stock being converted an amount, in cash or stock at our sole discretion, equal to the dividends that such shares would have otherwise earned if they had been held through the maturity date (i.e., seven years), and issue to the holders such number of shares of Common stock equal to $10,000 per share of Series C Preferred Stock (the "Face Value") multiplied by the number of such shares of Series C Preferred Stock divided by the applicable Conversion Price (as defined in the certificate of designation for the Series C Preferred Stock).

Id at 98, 100. It then disclosed in Item 1.01 (incorporated into Item 3.02) how many Series C Preferred Stock shares were sold and on what dates. In Item 3.02 it disclosed how many common stock shares the Series C Preferred Stock would convert to if fully converted, and stated that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial dilution to existing stockholders.*" Id at 98–103 (emphasis added).

*November 21 & December 27, 2017:* Camber filed two 8-Ks and disclosed in Item 1.01 (incorporated into Item 3.02) how many Series C Preferred Stock shares were sold and on what dates. In Item 3.02 it disclosed how many common stock shares the Series C Preferred Stock would convert to if fully converted, and stated that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial dilution to existing stockholders.* Id at 108–10, 114–16 (emphasis added).

*January 31, February 22, March 9, April 10, May 22, July 9 & October 29, 2018:* Camber filed at least seven different 8-Ks making the same disclosures, specifically stating that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial dilution to existing stockholders.* Id at 120–22, 126–28, 132–34, 140–42, 146–48, 152–54, 158–61 (emphasis added).

*November 23, 2018:* Camber filed an 8-K and disclosed that it entered into a stock purchase agreement with an institutional investor for Series C Redeemable Convertible Preferred Stock and detailed the conditions. Id at 165–68.

*February 3, 2020:* Camber filed another 8-K, again disclosing in Item 1.01 (incorporated into Item 3.02) the terms of the 2020 stock purchase agreement for Series C Redeemable Convertible Preferred Stock, as well as how many shares were sold and on what date. In Item 3.02, it disclosed how many common stock shares the Series C Preferred Stock would convert to if fully converted, and stated that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial*

*dilution to existing stockholders.*" Id at 172–85 (emphasis added).

*Fiscal Year Ending in March 2020:* Camber filed a 10-K which explained, "The issuance of common stock upon conversion of the Series C Preferred Stock *will cause immediate and substantial dilution and the sale of such stock will cause significant downward pressure on our stock price.*" It also noted the following potential under certain conditions:

> Discover would be entitled to receive an increasing number of shares, upon conversion of the remaining securities, which could then be sold, triggering further price declines and conversions for even larger numbers of shares, *which would cause additional dilution to our existing stockholders and would likely cause the value of our common stock to decline.*

Id at 205–10 (emphasis added).

*April 16, 2020:* Camber shareholders (excluding Series C shareholders) affirmatively voted to increase Camber's authorized share count from 5 million to 25 million. The proxy statement notified shareholders that they would be voting on an amendment to increase the authorized shares at that rate. See Dkt 70-1 at 221. It also notified shareholders that there would be a vote to approve the 2020 stock purchase agreement and issue shares pursuant to it. Ibid.

*June 22, 2020:* Camber filed another 8-K making the same disclosures, specifically stating that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial dilution to existing stockholders.*" Id at 187–93.

### ii. Public disclosures in 2021

In addition to the types of information previously reported, some of the reports filed during 2021 stated the number of shares issued and outstanding, and discussed the conversions being made.

10

*February 15, 2021:* Viking disclosed in an 8-K that it had entered into a merger agreement with Camber. Dkt 70-1 at 272–74.

*February 23, 2021:* Camber shareholders (excluding Series C shareholders) again affirmatively voted to increase Camber's authorized share count, this time from 25 million to 250 million. Dkt 70 at 13. The proxy statement had previously stated that the board of directors wished to authorize additional shares "to ensure that enough shares would be available . . . for issuance of shares of common stock upon conversion of currently outstanding Series C Preferred Stock." See Dkt 70-1 at 225–26. It further notified shareholders that, "[t]o the extent that additional authorized shares are issued in the future, they may decrease the existing stockholders' percentage equity ownership and, depending on the price at which they are issued, *could be dilutive to the existing stockholders*. . . . As a result, future conversions of the Series C Preferred Stock *would likely cause substantial dilution to existing stockholders*." Dkt 70-1 at 226 (emphasis added).

*March 18, 2021:* Camber disclosed in an 8-K that it had approximately 35,395,139 shares of common stock outstanding. It also indicated that since "February 23, 2021, approximately 9,705,045 shares were issued to an institutional investor in connection with conversions of Series C Convertible Preferred Stock held by such investor pursuant to the exemption from registration provided by Section 3(a)(9) of the Securities Act of 1933, as amended, and Rule 144 promulgated thereunder." Id at 216–17.

*April 27, 2021:* The complaint alleges that Camber disclosed in an 8-K that 42,050,780 shares were outstanding, and "Camber acknowledged that the entire increase since March 18, 2021 resulted from institutional investor, again Discover, converting its Camber Convertible Shares into common shares." Dkt 65 at ¶ 119. The Camber Defendants don't appear to have attached this 8-K to their motion to dismiss.

*June 8, 2021:* The complaint indicates that Camber disclosed in an 8-K that there were 58,455,304 million

shares outstanding, and "Camber acknowledged that the entire increase since April 27, 2021 resulted from institutional investor, again Discover, converting its Camber Convertible Shares into common shares." Ibid. The Camber Defendants don't appear to have attached this 8-K to their motion to dismiss.

*July 9, 2021:* Camber disclosed in an 8-K under Item 8.01 that it had 104,195,295 shares of common stock issued and outstanding. Regarding the increase, it stated:

> [T]he increase in our outstanding shares of common stock from the date of the Company's February 23, 2021 increase in authorized shares of common stock *(from 25 million shares to 250 million shares)*, is primarily due to conversions of shares of Series C Preferred Stock of the Company into common stock, and conversion premiums due thereon, which are payable in shares of common stock.

Dkt 70-1 at 195–197 (emphasis added). Under Item 1.01 (incorporated into Item 3.02) Camber disclosed that an investor "purchased 1,575 shares of Series C Redeemable Convertible Stock." The purchase agreement for that stock involved Camber agreeing to include proposals relating to "approval of the July 2021 Purchase Agreement and the issuance of the shares of common stock upon conversion of the Series C Preferred Stock sold pursuant to the July 2021 Purchase Agreement, as well as an increase in authorized common stock to fulfill our obligations to issue such shares," and a statement that it would work to obtain those approvals. Id at 196. Under Item 3.02 it noted that the sale of this stock was exempt from registration under the Securities Act of 1933, as amended. Ibid.

*August 6, 2021:* Camber filed an 8-K and an amendment to their 8-K, but didn't disclose the number of outstanding shares. Id at 254–262.

2. Legal standards

Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court holds that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). However, Rule 9(b) also requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." See also *Dorsey v Portfolio Equities Inc*, 540 F3d 333, 339 (5th Cir 2008).

Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted." A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 US at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id at 678, quoting *Twombly*, 550 US at 556.

Because the complaint alleges violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, it must also meet the enhanced pleading requirements imposed by the Private Securities Litigation Reform Act, codified at 15 USC §§ 78u-4 and 78u-5. Generally stated, for a Section 10(b) claim involving alleged misrepresentations or omissions, the plaintiff must specify (i) the time, place, and content of each allegedly false or misleading statement or omission; (ii) the reason or reasons why the statement is misleading; and (iii) with particularity, all facts upon which an allegation regarding a statement or omission is made on information and belief. 15 USC § 78u-4(b)(1). And for any Section 10(b) claim, the plaintiff must state with

particularity the facts giving rise to a "strong inference" that the defendant acted with scienter. 15 USC § 78u-4(b)(2)(A). See generally *ABC Arbitrage Plaintiffs Group v Tchuruk,* 291 F 3d 336, 350 (5th Cir 2002).

### 3.   Analysis

Pending is a motion to dismiss by the Camber Defendants. Dkt 70. In very brief summary, they argue:

- o The Section 10b-5(b) claim fails for a lack of a misrepresentation or actionable omission because Camber complied with its disclosure obligations. Id at 18–23.

- o The scheme liability claim under Section 10b-5(a) and (c) fails because Plaintiffs can't show that the Camber Defendants committed a deceptive or manipulative act, and the pleading fails to meet the Rule 9(b) pleading requirements. Id at 23–29.

- o The Plaintiffs can't establish a strong inference of scienter. Id at 29–36.

- o The Kerrisdale Report wasn't corrective, but simply analyzed publicly available information, and so it can't support loss causation. Id at 37.

- o The Section 20(a) claim against Doris for control-person liability fails because there's no primary violation.

See Dkt 70.

Also pending is a motion to dismiss by the Discover Defendants. Dkt 69. In further brief summary, they argue:

- o The Section 10(b) and 10b-5(a) and (c) claims against it are "non-viable" for numerous reasons, including (i) Discover could legally sell the Camber unregistered securities under Section 4(a)(1) of the Securities Act; (ii) the Section 10(b) claim is a non-viable secondary liability claim; (iii) Discover had no duty to disclose its own stock conversions or sales, (iv)

14

Discover's sales weren't deceptive because the terms of the stock purchase agreements and conversions were publicly disclosed by Camber; (v) nothing establishes either illegal stock promotion scheme or scienter; (vi) the Section 10(b) claim against DFM and Kirkland relies entirely on impermissible group pleading. Id at 18–19.

o   The Section 20A claims fail because Plaintiffs can't establish an underlying § 10(b) claim, and they fail to identify any dates on which Discover sold shares. Additionally, Plaintiffs can't establish insider trading because the stock purchase agreements and conversions were disclosed, and it can't be shown that Discover traded on Camber's nonpublic information. Id at 19.

o   The Section 20(a) claims for control-person liability fail because (i) Plaintiffs can't establish an underlying Section 10(b) claim; (ii) allegations that the Discover Defendants controlled Camber are conclusory and rely on group pleading; and (iii) allegations that Kirkland controlled Discover are conclusory and mistaken. Id at 19–20.

All of the claims asserted by Plaintiffs must be dismissed, but only a few of these many arguments need be addressed. In short, Camber disclosed all that it was required to under applicable SEC rules and guidance. This information was certainly sufficient for Plaintiffs to have discerned all material risks. For plainly, the short-seller report that caused the Camber share price to collapse— that by Kerrisdale Capital—was itself derived from publicly available information that by its very nature was equally available at all times to Plaintiffs.

15

a. *Count I vs Camber and Doris:*
Section 10(b) and Rule 10b-5(b) claims

Section 10(b) of the Exchange Act, codified at 15 USC § 78j(b), makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" in contravention of SEC rules and regulations. Congress vested rule-making authority in the SEC to enforce this provision. *Ernst & Ernst v Hochfelder*, 425 US 185, 213–14 (1976). The SEC promulgated Rule 10b-5, which makes it unlawful in connection with the purchase or sale of securities to "employ any device, scheme, or artifice to defraud," to "make any untrue statement of a material fact," or to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b-5. The Supreme Court has long recognized an implied private cause of action to enforce 10(b) and Rule 10b-5. *Halliburton Co v Erica P. John Fund, Inc*, 573 US 258, 267 (2014); see also *Blue Chip Stamps v Manor Drug Stores*, 421 US 723, 730 (1975).

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that:

- o *First,* a defendant made a material misrepresentation or an omission;

- o *Second,* the material misrepresentation or omission was made with scienter;

- o *Third,* a connection exists between the misrepresentation or omission and the plaintiff's purchase or sale of a security;

- o *Fourth*, the plaintiff relied on the misrepresentation or omission in purchasing or selling the security;

- o *Fifth,* the plaintiff suffered an economic loss; and

- o *Sixth,* the plaintiff's injury was proximately caused by the material misrepresentation or omission.

*Edgar v Anadarko Petroleum Corp*, 2019 WL 1167786, \*6 (SD Tex), citing *R2 Investments LDC v Phillips*, 401 F3d 638, 641 (5th Cir 2005).

The allegations here concern whether there were material omissions and advance from there. Dkt 65. The Camber Defendants contend that they cannot have made a material omission with scienter because they were under no duty to disclose either the conversions Discover was making or their current share count after such conversions. Dkt 70 at 10–12.

Plaintiffs allege in Count I that Camber and Doris "had an affirmative duty to disclose the unregistered sales of securities and the dilution of Camber common stock as a result of Discover's conversion and sale of its Camber Convertible Securities," and that they failed to fulfill their duty in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b). And they say that this omission "(i) deceive[d] the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate[d] and maintain[ed] the market price of Camber common stock; and (iii) cause[d] Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Camber common stock at artificially inflated prices." Dkt 65 at ¶¶ 254–56.

The Fifth Circuit hasn't itself specified the sources from which a duty to disclose can arise. But several others have found such a duty (i) when a corporate insider trades securities; (ii) when a statute or regulation requires disclosure; and (iii) when a corporation has made a statement that is inaccurate, incomplete, or misleading without disclosure of further information. See *Roeder v Alpha Industries, Inc*, 814 F2d 22, 26–27 (1st Cir 1987); *Backman v Polaroid Corp*, 910 F2d 10, 12 (1st Cir 1990) (*en banc*); *Stratte-McClure v Morgan Stanley*, 776 F3d 94, 101 (2d Cir 2015); *Oran v Stafford*, 226 F3d 275, 285–86 (3d Cir 2000). District courts in the Fifth Circuit have also recognized that a duty to disclose can arise in these three situations. For example, see *Kurtzman v Compaq*

*Computer Corp*, 2000 WL 34292632, *22 (SD Tex); *Kunz-weiler v Zero.Net Inc*, 2002 WL 1461732, *10 (ND Tex).

Plaintiffs assert that the Camber Defendants had a duty to disclose because federal law and SEC regulations required such disclosure. Dkt 73 at 20–26. They point to Item 3.02 of Form 8-K, as promulgated by the SEC, which pertains to unregistered securities. See Dkt 65 at 39–40.

Item 3.02 provides in full:

> (a) If the registrant sells equity securities in a transaction that is not registered under the Securities Act, furnish the information set forth in paragraphs (a) and (c) through (e) of Item 701 of Regulation S-K (17 CFR 229.701(a) and (c) through (e). For purposes of determining the required filing date for the Form 8-K under this Item 3.02(a), the registrant has no obligation to disclose information under this Item 3.02 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the equity securities are to be sold. *If there is no such agreement, the registrant must provide the disclosure within four business days after the occurrence of the closing or settlement of the transaction or arrangement under which the equity securities are to be sold.*

> (b) No report need be filed under this Item 3.02 if the equity securities sold, in the aggregate since its last report filed under this Item 3.02 or its last periodic report, whichever is more recent, constitute less than 1% of the number of shares outstanding of the class of equity securities sold. In the case of a smaller reporting company, no report need be filed if the equity securities sold, in the aggregate since its last report filed under this Item

18

3.02 or its last periodic report, whichever is more recent, constitute less than 5% of the number of shares outstanding of the class of equity securities sold.

Item 3.02(a) specifically references and incorporates Item 701(a) & (c)–(e) of Regulation S-K. See 17 CFR § 229.701(a), (c)–(e). These provide for disclosure of the following:

(a) *Securities Sold.* Give the date of sale and the title and amount of securities sold.

. . .

(c) *Consideration.* As to securities sold for cash, state the aggregate offering price and the aggregate underwriting discounts or commissions. As to any securities sold otherwise than for cash, state the nature of the transaction and the nature and aggregate amount of consideration received by the registrant.

(d) *Exemption from registration claimed.* Indicate the Section of the Securities Act or the rule of the Commission under which exemption from registration was claimed and state briefly the facts relief upon to make the exemption available.

(e) *Terms of conversion or exercise.* If the information called for by this paragraph (e) is being presented on Form 8-K, Form 10-Q, Form 10-K, or Form 10-D under the Exchange Act (§ 249.308, §249.308(a), § 240.310 or § 249.312) of this chapter, and where the securities sold by the registrant are convertible or exchangeable into equity securities, or are warrants or options representing equity securities, disclose the terms of conversion or exercise of the securities.

Plaintiffs contend that Items 3.02 and 701 imposed upon Camber a duty to disclose "the current number of outstanding shares" within four days of "material share issuances"—including issuances "through conversion of other securities." Dkt 73 at 20–21. Plaintiffs assert that the obligation imposed under Item 3.02 and 701 gives rise to a § 10(b) claim because it is the "longstanding and consistent position" of the SEC that violation of "an SEC disclosure obligation can be the predicate for a Rule 10b-5 claim." They further contend that the SEC's position is entitled to deference. Id at 24, citing Brief for the United States as Amicus Curiae Supporting Respondents, *Leidos, Inc v Indiana Public Retirement System*, 2017 WL 4004533, **22, 27–28 (US).

The question of deference to an interpretation given by an administrative agency can at times present a thorny issue under *Chevron USA, Inc v Natural Resources Defense Council, Inc*, 467 US 837 (1984) and related progeny. For example, see *Mexican Gulf Fishing Company v United States Department of Commerce*, 60 F4th 956, 963 (5th Cir 2023). But those problems needn't be addressed here. For the Camber Defendants in no way assert that Items 3.02 and 701 don't apply, or that the SEC has somehow construed them too broadly. Instead, they simply and flatly argue that these provisions in no way textually required the disclosure demanded by Plaintiffs. Dkt 70 at 18–19.

On this, the Camber Defendants are correct. As noted above, Item 3.02(a) directs a registrant such as Camber to furnish the information set out at Item 701(a) & (c)–(e). These provisions are each set out in full above. Nothing on their face requires (or even implies) disclosure when the holder of convertible securities *actually converts* those securities. Most pertinent to the circumstances here appears to be Item 701(e), which states with emphasis:

> (e) *Terms of conversion or exercise*. If the information called for by this paragraph (e) is being presented on Form 8-K, Form 10-Q, Form 10-K, or Form 10-D under the Exchange Act (§ 249.308, §249.308(a),

§ 240.310 or § 249.312) of this chapter, and *where the securities sold by the registrant are convertible* or exchangeable into equity securities, or are warrants or options representing equity securities, *disclose the terms of conversion or exercise of the securities.*

As detailed at length above, Camber made numerous disclosures under Items 3.02 and 701 related to its stock purchase agreements and its sales of convertible securities to Discover. For example, Camber disclosed the terms of its stock purchase agreements in April 2016 and February 2020, while also explaining the risk of dilution due to the sale and conversion of Series C Preferred Stock into common stock. Dkt 70-1 at 9–35, 172–85. It then at many points along the way—in October, November, and December of 2017; January, February, March, April, May, July, October, and November of 2018; and February and June of 2020—disclosed its sales of convertible securities to Discover, while stating the date of the sale, the title, the amount of securities sold, consideration, the registration exemption claimed, and the terms of conversion. Id at 98–103, 108–10, 114–16, 120–22, 132–34, 140–42, 146–48, 152–54, 158–61, 172–85, 187–91. In each of these filings it warned that "the conversion of the Series C Preferred Stock into common stock of the Company *will create substantial dilution to existing stockholders.*" Ibid (emphasis added). In 2021, Camber then filed 8-Ks in March, April, June, and July, including the number of shares outstanding—even though Items 3.02 and 701 didn't require it. And in July, it also disclosed that another investor—Antilles, noted above for its connection to Kirkland—had purchased Camber convertible securities, about which Camber disclosed all items required by the terms of Items 3.02 and 701, while also attaching the purchase agreement that contained the terms. Id at 195–199.

This was fulsome disclosure. So fulsome, indeed, that a research firm with a short position on Camber shares was able to compile a report from this information and posit

that "there were more than 250 million fully diluted Camber shares issued and outstanding." Dkt 65 at ¶ 162; see also Dkt 70 at 14. It's a given, then, that Plaintiffs had the information at hand to protect their self-interest, if that was their desire, as opposed to maintaining the speculative risk they steadfastly maintained in the face of these very clear disclosures.

The ultimate question is thus a simple one—in addition to all that it disclosed, was Camber required to promptly disclose when Discover converted its Camber shares and state the then-outstanding share count? Quite simply, no. Nothing in the text of Items 3.02 and 701 imposed any such duty on Camber.

While it's thus unnecessary to go beyond the text, it is informative that the SEC has issued interpretive guidance regarding Item 3.02, construing it as follows:

> Pursuant to Item 701(e) of Regulation S-K, the registrant must disclose the terms of, as applicable, the exercise of the warrants or the options or the conversion of the convertible notes in the Item 3.02 Form 8-K. If the Item 3.02 Form 8-K that discloses the initial sale of the warrants, the options, or the convertible notes *also discloses the maximum amount of the underlying securities that may be issued* through, as applicable, the exercise of the warrants or the options or the conversion of the convertible notes, then a subsequent Item 3.02 Form 8-K filing requirement *is not triggered upon the exercise of the warrants or the options or the conversion of the notes.*

SEC, *Interpretive Responses Regarding Particular Situations* § 212.03, https://www.sec.gov/divisions/corpfin/guidance/8-kinterp (2008) (emphasis added). Little more need be said than that this neatly fits the present fact pattern. Camber appropriately disclosed both "the terms of . . . the conversion of convertible notes in the Item 3.02 Form 8-K"

and "the maximum amount of the underlying securities that may be issued" under its stock purchase agreements, and so no additional "filing requirement" was "triggered upon the exercise of the warrants or the options or the conversion of the notes."

In short, no material omission is evident for the very reason that there was no additional duty to disclose on Camber. The claims against the Camber Defendants for violations of § 10(b) and 10b-5 will thus be dismissed. Follow on issues presented in their motion to dismiss as to scienter, whether there was a connection between the omission and the purchase or sale of a security, reliance, economic loss, and proximate cause needn't be addressed.

      b.  *Count II vs all Defendants:*
Rule 10b-5(a) & (c) claims

Rule 10b-5(a) & (c) make it unlawful to "employ any device, scheme, or artifice to defraud," and "to engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person." 17 CFR § 240.10b-5. Claims under subsections (a) and (c) "are not so restricted" as claims under subsection (b), as they are not limited to claims based on statements. *In re Enron Corp Securities, Derivative & ERISA Litigation*, 235 F Supp 2d 549, 577 (2002) (citation omitted). The type of conduct that falls under these subsections instead includes "market manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company." Id at 579.

To state a claim for a violation of Rule 10b-5(a) & (c), the plaintiff must assert that the defendant committed a deceptive or manipulative act with scienter; the act affected the market for securities or was otherwise in connection with their purchase of sale; and the defendant's actions caused the plaintiff's injuries. *In re Enron Corp Securities*, 529 F Supp 2d 644, n 45 (SD Tex 2006), citing *In re Parmalat Securities Litigation*, 376 F Supp 2d 472,

491–92, n 90 (SD NY 2005) (collecting cases). Rule 10-b5(a) & (c) claims do "sound in fraud," and thus also fall under the Rule 9(b) heightened pleading requirements. *In re Parmalat*, 376 F Supp 2d at 492.

Plaintiffs allege in Count II that Defendants Camber, Doris, Discover, DFM LLP, and Kirkland violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) because they "carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period," do the following:

> (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Camber securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Camber securities and options at artificially inflated prices, all while Discover were selling their shares of Camber securities at a profit.

Dkt 65 at ¶¶ 264–65. They allege that the acts taken in furtherance of the putative scheme include (i) concealing the truth and/or adverse material information about the business and operation of Camber, including Discover's conversion of its Camber securities; and (ii) employing devices and schemes while in possession of material adverse public information "to permit Discover to convert and sell Camber shares in violation of the prohibition on the sale of unregistered securities, even in the absence of updated financials that would allow Discover to meet the Rule 144 exemption, while at the same time, concealing those actions from the investing public." Id at ¶¶ 266–67.

Central to Plaintiffs' theory is that (i) it was deceptive for Camber to not continually update its Form 8-K to report that its common stock share count was increasing as Discover converted its shares; (ii) it was deceptive to allow Discover to sell its unregistered securities without an applicable exemption at a time when Camber didn't have updated financials; and (iii) Discover participated in

24

concealment by failing to abide by their own duty to disclose their conversions and sales of the Camber unregistered securities.

i.   Duty to disclose by Camber

The Supreme Court has limited the scope of the term *deception* as pertinent to this cause of action. A device or scheme "is not 'deceptive' unless it involves breach of some duty of candid disclosure." *Regents of University of California v Credit Suisse First Boston (USA), Inc,* 482 F3d 372, 389 (5th Cir 2007), citing *Chiarella v United States,* 445 US 222, 234–35 (1980).

As determined above at length, Camber was under no duty to disclose either the conversions that Discover was making or its own increasing common-stock share count. And it had fully and plainly disclosed the terms of its stock purchase agreements with repeated warning that dilution was possible. Dkt 70 at 12–13.

ii.   Sale of Camber securities by Discover

Sections 5(a) and 5(c) of the Securities Act require securities to be registered with the SEC prior to any sale or offer of a sale. 15 USC § 77(a) and (c). But sales of unregistered securities are permitted under certain exemptions. For example, see 17 CFR §§ 230.236–41 (special exemptions), 230.251–63 (conditional small issues exemptions), 230.601–701 (exemptions for securities of small business investment companies), 230.800–02 (exemptions for cross-border rights offerings, exchange offers and business combinations) and 230.1001 (coordinated exemptions for certain issues of securities exempt under state law).

Plaintiffs allege that no exemption was available for Discover's conversions and sales of the unregistered Camber securities. They assert in particular that the Rule 144 exemption—which pertains to persons not engaged in a distribution and therefore not underwriters subject to the Securities Act—wasn't available to Discover because Camber was delinquent on its SEC filings. Dkt 65 at ¶¶ 13–14, 267.

Discover doesn't pursue the safe harbor under Rule 144. It instead argues entitlement to a different exemption—the general provisions of Section 4(a)(1), which exempts from registration transactions by any person other than "an issuer, underwriter, or dealer." Dkt 69 at 22.

Plaintiffs don't contend that Discover was the *issuer* or *dealer* for purposes of this exemption. But the parties do join issue as to whether Discover acted as *underwriter*. Compare Dkt 69 at 25–26, with Dkt 73 at 36–40.

An *underwriter* is defined "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect underwriting of any such undertaking." 15 USC § 77b(11). This definition has generally been interpreted broadly, with courts finding it to "include any person who is 'engaged in steps necessary to the distribution of security issues.'" *SEC v Kern*, 425 F3d 143, 152 (2d Cir 2005).

Plaintiffs don't contend under this definition that Discover "participate[d] or ha[d] a direct or indirect underwriting of any such undertaking." But they do argue that Discover "purchased from [Camber] with a view to . . . the distribution of [its] security."

*Distribution* in this usage requires "intent" to resell the securities to the public at the time of purchase. *Ackerberg v Johnson*, 892 F2d 1328, 1335–36 (8th Cir 1989); see also *US SEC v Big Apple Consulting USA, Inc*, 783 F3d 786, 807 (11th Cir 2015). In order to qualify for the Section 4(a)(1) exemption, the party claiming it must "at least point to some evidence that their receipt of the unregistered securities was *not* made 'with a view to' distribution." *Big Apple Consulting*, 783 F3d at 807. But distribution requires a particular state of mind, not just a sale to have occurred. "Because it is difficult to discern a party's intent at the time of purchase with respect to downstream sales of unregistered shares, courts and commentators have typically focused on the amount of time a security holder holds on to shares prior to reselling them." *Berckeley*

26

*Investment Group, Ltd v Colkitt*, 455 F3d 195, 213 (3d Cir 2006). "That is, the courts look to whether the security holder has held the securities long enough to negate any inference that his intention at the time of acquisition was to distribute them to the public." *Ackerberg,* 892 F2d at 1336.

To be clear, *distribution* differs from mere *sale*. Section 4(a)(1) is itself drafted in a manner that exempts routine trading transactions—literally encompassing "any person *other than* an issuer, underwriter, or dealer." 15 USC § 77d(a)(1) (emphasis added). Many courts thus look to whether a defendant has held the securities for more than two years. If held more than two years, the inference that the security holder didn't take the securities with a view to distribute is negated. *Berckeley Investment Group*, 455 F3d at 213; see also *Big Apple Consulting* 738 F3d at 807; *Ackerberg*, 892 F2d at 1336; *US v Sherwood*, 175 F Supp 480, 483 (SD NY 1959). This two-year rule was ultimately incorporated into Rule 144 and subsequently reduced to one year. Rule 144 now mandates that anyone "who sells restricted securities of the issuer for his or her own account *shall be deemed not to be an underwriter* of those securities" without further conditions "*provided a period of one year has elapsed since the later of the date the securities were acquired* from the issuer or from an affiliate of the issuer." 17 CFR § 230.144(b)(1)(i) (emphasis added).

Discover asserts that it didn't acquire the Camber securities "with a view to" distribution. Dkt 69 at 24. As proof, it establishes that the shares it exchanged for common stock in 2021 "were issued and fully paid for on or prior to December 4, 2018," which was "*over* 2.5 years prior to any class period sales." Id at 25 (emphasis original). In direct support, it points to the S-1 filed by Camber in June of 2022, which states in relevant part:

> The preferred convertible shares Discover exchanged for common stock in 2021 were issued and fully paid for on or prior to December 4, 2018. With respect to its conversions prior to May 13, 2021, Discover

> submitted legal opinions from its outside counsel to our transfer agent opining that the shares could be resold pursuant to Rule 144, and with respect to its conversions after May 13, 2021, Discover submitted legal opinions opining that the shares could be resold pursuant to Section 4(a)(1) of the Securities Act of 1933.

Id at 25 n 14 (linking to Camber's public filing, its S-1 filed June 17, 2022).

Plaintiffs raise two arguments in response, contending that the Section 4(a)(1) exemption wasn't available.

*First*, the stock purchase agreements state, "As long as Investor owns any Shares, Company will prepare and make publicly available such information as is required for Investor to sell its Conversion Shares under Rule 144." Dkt 65 at ¶ 114. Plaintiffs argue that the agreements thus "expressly contemplate" that the converted shares would be sold under Rule 144. Dkt 73 at 36–37. To the contrary, such statements simply account for the *possibility* of sale under Rule 144. They do nothing to address or negate the possibility of a Section 4(a)(1) sale.

*Second*, Plaintiffs assert that the terms of the stock purchase agreements indicate that Discover had intent to distribute because it "specified that Discover must own less than 10% of Camber's shares. Yet the Convertible Securities could by their terms be converted into 99% or more of Camber shares. Thus, to profit from its Convertible Securities, Discover had to convert, sell, rinse, and repeat." Id at 37–38. The argument is insufficient to the extent that it merely presumes mere sale to indicate that Discover had intent to distribute. To the contrary, while Discover *could convert* its securities into 99% or more of Camber's total shares, that only speaks to the potential dilutive effect *if and when* Discover converted. No provision required Discover to convert and sell on any particular timeline. And the record establishes that Discover held the unregistered securities for over two years.

That Discover held the unregistered securities for this length of time negates the inference that it purchased the securities with intent to distribute. This objective evidence—rather than speculation about Discover's intentions years in the past at the time of purchase—control analysis with respect to the exemption. And with the inference negated, Discover's sales permissibly fall under the Section 4(a)(1) exemption for sales of unregistered securities. Further, according to Rule 144 itself, because Discover held the unregistered securities for well over one year, Discover "shall be deemed not to be an underwriter of those securities." 17 CFR § 230.144(b)(1)(i).

### iii. Duty to disclose by Discover Defendants

Plaintiffs allege that Discover was a corporate insider because it was a temporary fiduciary of Camber, asserting that it had "entered into a special confidential relationship in the conduct of the business enterprise and [was] given access to information solely for corporate purposes." Dkt 73 at 59, citing *Dirks v SEC*, 463 US 646, 655 (1983). Plaintiffs thus contend that the Discover Defendants had a duty to disclose when they converted and sold their Camber securities because they were insiders with "the precise information concealed from the public investors upon whom they dumped shares: the number of Camber shares issued to Discover and the number outstanding." Dkt 73 at 33.

A corporate insider—including temporary fiduciaries—has a "relationship of trust and confidence" with the shareholders of that corporation. That relationship "gives rise to a duty to disclose or abstain from trading." *US v O'Hagan*, 521 US 642, 652 (1997) (cleaned up).

The Discover Defendants didn't have the requisite *relationship of trust* with Camber's shareholders. Instead, they simply *were* some of Camber's shareholders. As argued by the Discover Defendants, Discover was "a contractual *counterparty* to Camber in the complained-of transactions." Dkt 75 at 17 (emphasis original). As such, by submitting notices of conversion to Camber's transfer agent and receiving common shares, Discover didn't gain

material non-public information. It simply received the benefit of its disclosed contractual rights.

As already determined and reiterated, Camber was under no duty itself to disclose the Discover conversions or its own increasing number of outstanding shares. Nothing suggests any separate duty upon the Discover Defendants to make such disclosures, when Camber itself had fully and properly disclosed its stock purchase agreements with Discover and its sales of convertible securities to Discover.

### iv.  Conclusion

Plaintiffs haven't pleaded sufficient facts to support allegations that Defendants committed a deceptive or manipulative act. The scheme liability claim under Rule 10b-5(a) & (c) must also be dismissed.

Additional arguments attacking this claim needn't be addressed.

### c.  *Counts III and IV vs Doris, Kirkland and DFM:* Section 20(a) claims

Plaintiffs allege in Counts III and IV several claims for control-person liability under Section 20(a) of the Exchange Act as follows: (i) against Doris, in his alleged capacity as a "controlling person" of Camber; (ii) against Kirkland and DFM, in their alleged capacity as "controlling persons" of Discover; and (iii) against Discover, for its sales of Camber common stock "while in possession of material, non-public information" of "Camber's true business and financial condition." Dkt 65 at ¶¶ 276, 281 & 285.

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the

> controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 USC § 78t(a).

Liability under this provision is derivative, being "predicated on the existence of an independent violation of the securities laws." *Rubinstein v Collins*, 20 F3d 160, 166 n 15 (5th Cir 1994). Liability of "control persons" is thus "secondary only" and not actionable "in the absence of a primary violation." *Indiana Electric Workers Pension Trust Fund IBEW v Shaw Group, Inc*, 537 F3d 527, 545 (5th Cir 2008), citing *Southland Sec Corp v INSpire Insurance Solutions, Inc*, 365 F 3d 353, 383 (5th Cir 2004).

The claims under Section 10(b) and Rule 10b-5 are inadequately pleaded, as determined above. The Section 20(a) claims must also be dismissed.

Additional arguments attacking this claim needn't be addressed.

> d.   *Count V vs Discover:* Section 20A claim

Plaintiffs allege in Count V violations of Sections 10(b) and 20A of the Exchange Act against Discover for selling shares of Camber common stock while in possession of material, non-public information "concerning the dilution of Camber securities." Dkt 65 at ¶¶ 285–87.

"To plead a § 20A cause of action, the plaintiff must (1) allege a requisite independent, predicate violation of the Exchange Act (or its rules and regulations), e.g., § 10(b), and (2) show that he has standing to sue under § 20A because he 'contemporaneously with the purchase or sale of securities that is the subject of such violation has purchased . . . or sold . . . securities of the same class' as the insider defendant." *In re Enron Corp Securities, Derivative & ERISA Litigation*, 258 F Supp 2d 576, 599 (SD Tex 2003), citing 15 USC § 78t-1(a).

The claims under Section 10(b) and Rule 10b-5 are inadequately pleaded, as determined above. The Section 20A claim must also be dismissed.

31

### 4. Potential for repleading

Rule 15(a)(2) states that a district court "should freely give leave [to amend] when justice so requires." The Fifth Circuit holds that this "evinces a bias in favor of granting leave to amend." *Carroll v Fort James Corp*, 470 F3d 1171, 1175 (5th Cir 2006) (quotation marks and citation omitted). But the decision whether to grant leave to amend is within the sound discretion of the district court. *Pervasive Software Inc v Lexware GmbH & Co KG*, 688 F3d 214, 232 (5th Cir 2012). It may be denied "when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v Chapman*, 969 F3d 238, 248 (5th Cir 2020).

The Fifth Circuit affirms denial of leave to amend where it's determined as a matter of law that the plaintiff failed to state a claim upon which relief can be granted under the PSLRA. See *Heinze v Tesco Corp*, 971 F3d 475, 485 (5th Cir 2020) (finding no abuse of discretion when district court dismissed PSLRA claim with prejudice). Any amendment in such circumstance would be futile. Ibid.

Repleading would appear to be futile here, as the complaint in the main fails for seeking to impose a disclosure obligation beyond regulatory requirement. No conceivable set of facts or pleadings would appear to overcome the above conclusions of law. If Plaintiffs disagree, they may within twenty-one days seek leave to replead by submitting a letter of no more than five pages specifying what additional facts and allegations they in good faith could further assert, to which the Camber Defendants and the Discover Defendants may each reply by equally brief letter.

Absent such request, the claims will be dismissed with prejudice, and Plaintiffs may pursue any further relief on appeal.

### 5. Conclusion

The motions to dismiss by the Discover Defendants and the Camber Defendants are GRANTED. Dkts 69 & 70.

Plaintiffs may within twenty-one days seek leave to replead by submitting a letter as specified above.

So ordered.

Signed on September 22, 2023, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge